14-0826(L)
Chevron Corp. v. Donziger

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2014

(Argued:  April 20, 2015                                    Decided:  August 8, 2016)
 Final briefs submitted June 1, 2015

Docket Nos. 14-0826(L), 14-0832(C)

_____

CHEVRON CORPORATION,

Plaintiff-Appellee,

- v. -

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC, HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,

Defendants-Appellants,

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

Defendants-Counter-Claimants,

Pablo Fajardo Mendoza, Luis Yanza, Frente De Defensa De La Amazonia aka Amazon Defense Front, Selva Viva Selviva CIA, LTDA, Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo José Alvarado Yumbo, Narcisa Aida Tanguila Narváez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguila Grefa, Rosa Teresa Chimbo Tanguila, José Gabriel Revelo Llore, María Clelia Reascos Revelo, María Magdalena Rodríguez Barcenes, José Miguel

Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narváez, Lourdes Beatriz Chimbo Tanguila, María Hortencia Viveros Cusangua, Segundo Angel Amanta Milán, Octavio Ismael Córdova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfín Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustín Payaguaje Piaguaje, Emilio Martín Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, Angel Justino Piaguage Lucitante,

Defendants,

ANDREW WOODS, LAURA J. GARR, H5,

Respondents.[*]

_____

Before: KEARSE, PARKER, and WESLEY, Circuit Judges.

Appeals from a judgment of the United States District Court for the Southern District of New York, Lewis A. Kaplan, Judge, principally (1) enjoining defendants-appellants from seeking to enforce in the United States an $8.646 billion Ecuadorian judgment against plaintiff-appellee Chevron Corporation, and (2) imposing a constructive trust for Chevron's benefit on any property defendants-appellants have received or may receive anywhere in the world that is traceable to the Ecuadorian judgment or its enforcement. The district court found, following a bench trial, that the Ecuadorian judgment had been procured through, inter alia, defendants' bribery, coercion, and fraud, warranting relief against defendants Steven Donziger and his law firm under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, and against all defendants-appellants under New York common law. See 974 F.Supp.2d 362 (2014). Appellants challenge the district court's judgment principally on grounds of Article III standing, international comity, judicial estoppel, lack

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.

2

of legal authority for the granting of equitable relief, and/or lack of personal jurisdiction over defendants other than Donziger and his firm. Noting, <u>inter alia</u>, that appellants do not challenge the sufficiency of the evidence to support the district court's factual findings, that the Ecuadorian appellate courts declined to hear and resolve the above charges of corruption and expressly preserved the parties' rights to litigate those charges in United States courts, and that the district court's judgment has imposed <u>in personam</u> restrictions on the appellants without disturbing the Ecuadorian judgment, we find no basis for overturning the judgment of the district court.

Affirmed.

THEODORE B. OLSON, Washington, D.C. (Randy M. Mastro, Andrea E. Neuman, Caitlin J. Halligan, Gibson, Dunn & Crutcher, New York, New York, William E. Thomson, Gibson, Dunn & Crutcher, Los Angeles, California, on the brief), <u>for Plaintiff-Appellee</u>.

DEEPAK GUPTA, Washington, D.C. (Gregory A. Beck, Jonathan E. Taylor, Gupta Beck, Washington, D.C.; Justin Marceau, John Campbell, Denver, Colorado, on the brief), <u>for Defendants-Appellants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC</u>.

BURT NEUBORNE, New York, New York, <u>for Defendants-Appellants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje</u>.

Winston & Strawn, Washington, D.C. (Eric W. Bloom, Lauren B. Schuttloffel, Eric M. Goldstein, Nassim H. Hooshmandnia, of counsel), <u>filed a brief for Amicus Curiae The Republic of Ecuador, in support of neither party</u>.

Gross Belsky Alonso, San Francisco, California (Jonathan Moore, Terry Gross, Adam C. Belsky, Monique Alonso, San Francisco, California; Thomas Bennigson, Public Good Law Center, Berkeley, California, of counsel), <u>filed a brief for Amici Curiae Amnesty International, Amazon Watch, 350 Bay Area, Center for Environmental Health, CT Citizen Action Group, Food and Water Watch, Friends of the Earth, Global</u>

3

Exchange, The Global Initiative for Economic, Social and Cultural Rights, Greenaction for Health and Environmental Justice, The International Accountability Project, Justice in Nigeria Now!, Marin Interfaith Task Force on the Americas, Media Alliance, Pachamama Alliance, Rainforest Action Network, Rights Action and Sunflower Alliance, in support of Defendants-Appellants.

Donald K. Anton, Canberra, Australia, filed a brief for Amici Curiae International Law Professors, in support of Defendants-Appellants.

G. Robert Blakey, Paradise Valley, Arizona, filed a brief as Amicus Curiae, in support of Plaintiff-Appellee.

Christopher J. Walker, Columbus, Ohio (Kate Comerford Todd, Tyler R. Green, U.S. Chamber Litigation Center, Inc., Washington, D.C., of counsel), filed a brief for Amicus Curiae Chamber of Commerce of the United States of America, in support of Plaintiff-Appellee.

Faegre Bakers Daniels, Minneapolis, Minnesota (Aaron D. Van Oort, Jeffrey P. Justman, of counsel), filed a brief for Amici Curiae Keith S. Rosenn, Francisco Reyes, and Raul Nunez Ojeda, in support of Plaintiff-Appellee.

Holwell, Shuster & Goldberg, New York, New York (Richard J. Holwell, of counsel), filed a brief for Amici Curiae Human Rights and Anti-Corruption Jurists, in partial support of Plaintiff-Appellee.

Richard A. Samp, Washington, D.C. (Cory L. Andrews, Washington Legal Foundation, of counsel), filed a brief for Amicus Curiae Washington Legal Foundation, in support of Plaintiff-Appellee.

Roger P. Alford, Notre Dame, Indiana, filed a brief for Amici Curiae Business Roundtable and International Law Scholars, in support of Plaintiff-Appellee.

Jesse P. Levine, New York, New York (William B. Shipley, Genthod, Switzerland, of counsel), filed a brief for Amici Curiae Richard Janda, Juan C. Pinto, and Carolina Cruz Vinaccia, in support of Defendants-Appellants.

4

Richard L. Herz, Washington, D.C. (Marco B. Simons, Jonathan G. Kaufman, Michelle Harrison, Benjamin Hoffman, of counsel), filed a brief for Amicus Curiae EarthRights International, in support of Defendants-Appellants.

G. Elaine Wood, New York, New York, filed a brief for Amicus Curiae Legal Momentum, in support of Plaintiff-Appellee.

Schwarcz, Rimberg, Boyd & Rader, Los Angeles, California (K. Lee Crawford-Boyd, Los Angeles, California; Judith Kimerling, New York, New York, of counsel), filed a brief for Amici Curiae Proposed Huaorani Intervenors, in partial support of Defendants-Appellants.

KEARSE, Circuit Judge:

Defendants-appellants Steven Donziger, Donziger & Associates, PLLC, and the Law Offices of Steven R. Donziger (collectively the "Donziger Firm" or "Firm"), and defendants-appellants Hugo Gerardo Camacho Naranjo ("Camacho") and Javier Piaguaje Payaguaje ("Piaguaje"), appeal from a judgment of the United States District Court for the Southern District of New York, Lewis A. Kaplan, Judge, granting certain relief against them in favor of plaintiff-appellee Chevron Corporation ("Chevron"), in connection with an $8.646 billion judgment obtained against Chevron in Ecuador ("Ecuadorian Judgment"), by several dozen named plaintiffs from Ecuador's Lago Agrio area (the "Lago Agrio Plaintiffs" or "LAPs") represented by the Donziger Firm, for environmental damage in connection with 1960s-1990s oil exploration activities in Ecuador by Texaco, Inc. ("Texaco"), whose stock was later acquired by Chevron. The district court's judgment, entered after a bench trial, principally (1) enjoins defendants-appellants from seeking to enforce the Ecuadorian Judgment in any court in the United States, and (2) imposes a constructive trust for Chevron's benefit on any property defendants-appellants have received or may receive anywhere in the world that is traceable to the Ecuadorian Judgment or its enforcement, based on the court's findings that the Ecuadorian Judgment was procured through, inter alia, defendants' bribery, coercion, and fraud, warranting relief against Steven Donziger ("Donziger") and his Firm under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and against all defendants-appellants under New York common law. See Chevron v. Donziger, 974 F.Supp.2d 362 (S.D.N.Y. 2014) ("Donziger"). Without challenging the sufficiency of the evidence to support any of those factual findings, defendants-appellants challenge the district court's judgment, arguing principally that the action should have been dismissed on the ground that Chevron lacks Article III standing, and/or

6

that the judgment should be reversed on the grounds, <u>inter alia</u>, that it violates principles of international comity and judicial estoppel, exceeds any legal authorization for equitable relief, and was entered without personal jurisdiction over defendants other than Donziger and his Firm. For the reasons that follow, including the absence of challenges to the district court's factual findings, the express disclaimers by the Ecuadorian appellate courts of their own jurisdiction to "hear and resolve" the above charges of corruption, "preserving the parties' rights" to pursue those charges in actions in the United States (Ecuadorian intermediate appellate court clarification order dated January 13, 2012, at 4; <u>see also</u> Opinion of Ecuadorian National Court of Justice at 120 ("preserving the rights and actions of the parties" in "acknowledge[ment of] the lack o[f] jurisdiction to decide whether or not there has been procedural fraud")), and the district court's confinement of its injunction to a grant of <u>in personam</u> relief against the three defendants-appellants without disturbing the Ecuadorian judgment, we find no basis for dismissal or reversal, and we affirm the judgment of the district court.

**TABLE OF CONTENTS**

I. BACKGROUND **10**

    A. The Scope of the Trial in the Present Case **14**

    B. Specific Findings by the District Court as to Donziger's Acts **17**

        1. Donziger Attempts To Intimidate Chevron Into Settling by Trumpeting a Huge Remediation Cost Estimate Based Only on "SWAG" **17**

        2. Donziger Causes a Change to Less Probative Tests When the LAPs' Experts Find Pollution that Likely Was Not Caused by Texaco **20**

        3. Donziger Knowingly Submits to the Court Reports that Falsify a LAPs' Expert's Conclusions **21**

4.    Donziger Secretly Hires Industry Experts To Offer Their Supposedly Neutral Monitoring Services to the Court, But To Disagree With Any Pro-Chevron Findings **23**

5.    Donziger, Anticipating Additional Pro-Chevron Testing Results, Coerces then-Presiding Judge Yánez To Cancel Most of the Remaining Site Inspections **24**

6.    Donziger Coerces Judge Yánez To Appoint a "Global" Expert--Cabrera--Who "[W]ould [T]otally [P]lay [B]all [W]ith" the LAPs **27**

7.    Donziger and the LAPs Plan the Cabrera Report and Begin To Pay Him Secretly **30**

8.    Donziger and the LAPs' Team Control Cabrera's "Work," While Denying Any Contact or Involvement **32**

9.    The LAPs' Consultant, Stratus, Writes Cabrera's Report **35**

10.   Donziger Has Stratus Fabricate Objections To Be Submitted By the LAPs to the Cabrera Report that Stratus Wrote For the LAPs **37**

11.   When "Crude" Is Released and Chevron Gets Discovery Revealing the LAPs-Cabrera Collaboration, Donziger Hires New Consultants To "Cleanse" the Cabrera Report **38**

12.   The District Court's Summary **42**

C.   The February 14, 2011 Lago Agrio Judgment **43**

D.   Findings by the District Court as to the Sources and Authorship of the Lago Agrio Judgment **45**

1.    The Lago Agrio Judgment Drew Heavily on the Cabrera Report **45**

2.    Then-Presiding Judge Zambrano Did Not Write the Lago Agrio Judgment **48**

3.    The Lago Agrio Judgment Was Written by the LAPs **51**

a.    The Judgment Copied Documents That Were Not in the Court Record but Were LAPs' Internal Documents **51**

b.    The LAPs' Team Prepared the Judgment, Beginning Work on It as Early as mid-2009 **57**

4.    The LAPs Bribed Zambrano To Sign the Judgment They Wrote **60**

a.    The Relationships Among Guerra, Zambrano, and the LAPs **61**

b.    Zambrano's Agreement With the LAPs **62**

c.    The LAPs-Written Judgment, Lightly Edited by Guerra **64**

E.    The Ecuadorian Appellate Proceedings **65**

1.    Appeals to an Appellate Panel **65**

2.    Appeal to the Ecuadorian National Court of Justice **67**

F.    The LAPs' Strategies To Enforce the Judgment **69**

G.    The Final Judgment in the Present Action **70**

II.    DISCUSSION **74**

A.    Challenges to Federal Jurisdiction **75**

1.    Article III Standing **75**

2.    Mootness:  The Break-in-Causation Theory **81**

B.    The Judicial Estoppel Contention **86**

C.    Naranjo **90**

D.    The RICO-Based Rulings Against Donziger **94**

1.    RICO Injury and Causation **99**

2.    The Availability of Equitable Relief Under RICO **102**

E.    The Availability of Equitable Relief Under New York Common Law **108**

F.    Considerations of International Comity **113**

G.    Contentions of the LAP Representatives **116**

9

1. Personal Jurisdiction **117**

2. Responsibility of the LAPs for the Misconduct of Their Attorneys **124**

H. Appropriateness of the Equitable Relief Granted **126**

CONCLUSION **127**

## I. BACKGROUND

This appeal is the latest chapter in the litigation against Chevron by residents of the Oriente region of Ecuador, which includes the canton of Lago Agrio, with respect to oil-exploration-related activities in that region from the 1960s into the 1990s by Texaco, whose stock was acquired by Chevron in 2001. In 1964, the Republic of Ecuador ("ROE") had granted to a joint venture--which was then 50%-owned by a subsidiary of Texaco dubbed "TexPet"--a concession to explore for and produce oil in the Oriente (the "Concession"). In the 1970s, Ecuador's state-owned oil company, now known as PetroEcuador, acquired at first a minority, and then a majority, interest in the joint venture. TexPet was the operator of the Concession until the early 1990s. In late 1989, PetroEcuador took over operation of the Trans-Ecuadoran Pipeline, see Jota v. Texaco, Inc., 157 F.3d 153, 156 n.4 (2d Cir. 1998) ("Jota"); in mid-1990, PetroEcuador took over operation of the Concession drilling operations as well, see id.; Aguinda v. Texaco, Inc., 303 F.3d 470, 473 (2d Cir. 2002) ("Aguinda"). In mid-1992, when the Concession expired, TexPet's interest in the joint venture reverted to PetroEcuador, leaving PetroEcuador as the sole owner and operator of the venture. See Donziger, 974 F.Supp.2d at 386.

10

In connection with the termination of TexPet's Ecuadorian operations, TexPet and Texaco in 1993 entered into a Memorandum of Understanding [MOU] with the ROE that provided that TexPet would be released from any potential claim for environmental harm once TexPet performed an agreed-upon remediation in the area in which it had operated. In the Spring of 1995, the parties executed a Settlement Agreement and Scope of Work agreement (the "Settlement Agreement") that laid out specific tasks TexPet was required to complete before its remediation and wind down were complete, whereupon it would be entitled to a release. From 1995 through 1998, ROE inspectors issued 52 actas in which they confirmed TexPet's completion of each task. The final acta--the 52nd Certificate--was issued in September 1998 and stated that TexPet had complied with its obligations under the Settlement Agreement. The final release was signed on September 30, 1998. It stated that TexPet had fully performed its obligations under the MOU and Settlement Agreement and that TexPet was released from all potential claims by the ROE and PetroEcuador.

Id. at 386-87 (footnotes omitted) (emphases added).

In the meantime, a group of Oriente residents, represented by New York City lawyer Donziger, among others, commenced a class action against Texaco in the Southern District of New York in 1993, seeking billions of dollars in damages, as well as certain equitable relief within Ecuador, for alleged environmental damage in Ecuador and injury to the health of the plaintiffs, see Aguinda, 303 F.3d at 473-74. Thus began this conflict, which "must be among the most extensively [chronicled] in the history of the American federal judiciary." Chevron Corp. v. Naranjo, 667 F.3d 232, 234 (2d Cir.) ("Naranjo"), cert. denied, 133 S.Ct. 423 (2012); see id. at 234 n.1 (noting that an "underinclusive Westlaw search for Chevron or Texaco & Ecuador & 'Lago Agrio' yield[ed] fifty-six results, all of which deal directly with this litigation"); see, e.g., Jota, 157 F.3d 153 (vacating an unconditional forum non conveniens dismissal of class actions brought against Texaco in New York by, respectively, the Aguinda Oriente residents in 1993 and residents of Peru in 1994); Aguinda, 303 F.3d 470 (approving a forum non conveniens dismissal of the Oriente residents' 1993 New York

11

action against Texaco, conditioned on Texaco's agreement to submit to personal jurisdiction and waive certain statute of limitations defenses in Ecuador); Chevron Corp. v. Berlinger, 629 F.3d 297 (2d Cir. 2011) (requiring filmmaker, whom Donziger had commissioned to make a documentary film about his Ecuadorian case, to turn over to Chevron hundreds of hours of outtakes, some of which had initially been aired--showing, inter alia, Donziger discussing his litigation strategy and disparaging the Ecuadorian judiciary--but were later deleted at Donziger's insistence); Republic of Ecuador v. Chevron Corp., 638 F.3d 384 (2d Cir. 2011) ("Republic of Ecuador") (affirming refusal to stay treaty-based arbitration proceeding commenced by Chevron in 2009 alleging, inter alia, ROE's breach of the 1993 Settlement Agreement with TexPet and Texaco and the 1998 release); Chevron Corp. v. Republic of Ecuador, 795 F.3d 200 (D.C. Cir. 2015) (affirming confirmation of an arbitration award of approximately $96 million in favor of Chevron against ROE in a proceeding commenced by Chevron in 2006 for failure to resolve in a timely fashion lawsuits by TexPet against ROE), cert. denied, 136 S. Ct. 2410 (2016).

In 2003, following the affirmance of a forum non conveniens dismissal of the Aguinda case, the Lago Agrio Plaintiffs--Camacho, Piaguaje, and 46 other named plaintiffs residing in or near Lago Agrio--represented by the Donziger Firm, sued Chevron in Ecuador, seeking to hold it responsible for extensive environmental damage allegedly caused by Texaco in the area covered by the Concession (the "Lago Agrio Litigation" or "Lago Agrio Chevron case"). The action was brought for the benefit of some 30,000 indigenous residents of the area, and the complaint requested that any money awarded for performance of the requested remediation--plus an additional 10%--be paid to the Frente de la Defensa de la Amazonia ("ADF") for its use in performing ordered remediation. See

12

Donziger, 974 F.Supp.2d at 391-92. Thus, the LAPs sought to have "any and all sums recovered" in the action controlled by the ADF. Id. at 392. The ADF was formed in 1993 by Donziger and Luis Yanza, his closest friend in Ecuador, to support the Aguinda litigation; the ADF was controlled by Donziger and Yanza. See, e.g., id. at 398-99.

In February 2011, the trial court in Ecuador entered a judgment in favor of the LAPs awarding $8.646 billion in compensatory damages, plus $8.646 billion in punitive damages unless Chevron issued an apology, for a total of $17.292 billion ("Lago Agrio Judgment" or "Initial Judgment" or "Judgment"). The punitive damages aspect of the award was eventually eliminated on appeal (see Part I.E.2. below), leaving the judgment against Chevron, as modified, at $8.646 billion (the Ecuadorian Judgment).

The present action was commenced by Chevron in 2011 against Donziger, his Firm, and the named Lago Agrio Plaintiffs, including Camacho and Piaguaje (referred to in the district court and this opinion as the "LAP Representatives"), alleging that the LAPs procured the Lago Agrio Judgment by a variety of unethical, corrupt, and illegal means, including: making secret payments to industry experts who would submit pro-LAPs opinions to the court while pretending to be neutral; announcing multi-billion-dollar remediation cost estimates while knowing them to be without scientific basis; persuading an expert to sign blank pages that were then submitted to the court with opinions he did not authorize; employing extortion to coerce an Ecuadorian judge to curtail inspections of alleged contamination sites after the experts began to find pro-Chevron conditions at other such sites; using the same extortionate means to coerce that judge to appoint, as a supposedly neutral expert court adviser, an expert who was bribed to submit--as his own opinion--a report written

by the LAPs; and providing ex parte to another judge--or to whoever wrote the $17.292 billion Lago Agrio Judgment--material that is not part of the record for inclusion in that judgment.

Chevron originally sought damages and a global injunction forbidding enforcement of the Lago Agrio Judgment. Initially, the district court bifurcated the case and granted Chevron's request for a global preliminary injunction, citing New York's Uniform Foreign Country Money-Judgments Recognition Act (the "Recognition Act"), N.Y. C.P.L.R. §§ 5301-5309 (McKinney 2008). That injunction was reversed by this Court in Naranjo, on the ground that the Recognition Act allows a judgment debtor to challenge a foreign judgment's validity only defensively, in response to an attempted enforcement. See 667 F.3d at 240. We declined to address other issues in this action, such as claims of lack of personal jurisdiction and "the parties' various charges and counter-charges regarding the Ecuadorian legal system and their adversaries' conduct of this litigation." Id. at 247 n.17.

After our decision in Naranjo, Chevron waived its claims for damages, and the case was tried to the court without a jury.

A.     The Scope of the Trial in the Present Case

The judgment now on appeal was entered after a seven-week trial at which the evidence included live testimony from more than 30 witnesses, 25 of whom were called by Chevron; deposition testimony of 22 witnesses, all presented by Chevron; and more than 4,000 documents. As is common practice in nonjury cases in federal court in the Southern District of New York, "the direct testimony of most witnesses was taken in the form of written statements, the truth of which was

14

affirmed on the witness stand. The witnesses so testifying then were tendered for cross-examination, redirect, and any subsequent questioning as usual." Donziger, 974 F.Supp.2d at 546. The exhibits included emails among Donziger and members of the LAPs' litigation team; scenes or outtakes from "Crude," the documentary film that had been commissioned by Donziger, in which, inter alia, Donziger made disparaging remarks about the Ecuadorian judiciary; and portions of a personal notebook maintained by Donziger during the Lago Agrio Litigation, in which he recorded, inter alia, his thoughts, concerns, aspirations, and strategies (the "Donziger Notebook").

The issues in the present case concerned the conduct of--not the environmental issues in--the Lago Agrio Litigation. Before making its findings of specific facts as to the issues in this case, the court stated:

> The Court assumes that there is pollution in the Orienté. On that assumption, Texaco and perhaps even Chevron--though it never drilled for oil in Ecuador--might bear some responsibility. In any case, improvement of conditions for the residents of the Orienté appears to be both desirable and overdue. . . .

> The issue here is not what happened in the Orienté more than twenty years ago and who, if anyone, now is responsible for any wrongs then done. It instead is whether a court decision was procured by corrupt means, regardless of whether the cause was just. An innocent defendant is no more entitled to submit false evidence, to coopt and pay off a court-appointed expert, or to coerce or bribe a judge or jury than a guilty one. So even if Donziger and his clients had a just cause--and the Court expresses no opinion on that--they were not entitled to corrupt the process to achieve their goal.

> Justice is not served by inflicting injustice. The ends do not justify the means. There is no "Robin Hood" defense to illegal and wrongful conduct. And the defendants' "this-is-the-way-it-is-done-in-Ecuador" excuses--actually a remarkable insult to the people of Ecuador--do not help them. The wrongful actions of Donziger and his Ecuadorian legal team would be offensive to the laws of any nation that aspires to the rule of law, including Ecuador--and they knew it. Indeed, one Ecuadorian legal team member, in a moment of panicky

15

candor, admitted that if documents exposing just part of what they had done were to come to light, "apart from destroying the proceeding, all of us, your attorneys, might go to jail."

Donziger, 974 F.Supp.2d at 385-86 (quoting March 30, 2010 email from LAPs' attorney Julio Prieto to Donziger, Yanza, and LAPs' attorneys Pablo Fajardo Mendoza ("Fajardo"), and Juan Pablo Sáenz (emphases added)).

The district court found that throughout the Lago Agrio Chevron case, Donziger controlled all important aspects of the case, see Donziger, 974 F.Supp.2d at 396, 398, as he, inter alia, "supervised the Ecuadorian legal team, . . . reviewed their court filings, directed the legal strategy, and coordinated the work between the lawyers in Ecuador and the scientists, experts, lawyers, litigation funders, politicians, and media consultants throughout the world," id. at 397. Although much of the Lago Agrio Litigation was funded by Philadelphia attorney Joseph Kohn, Donziger "made tactical and strategic decisions," and "largely . . . controlled the money." Id. at 388-89, 398; see also id. at 396 (the Ecuadorian lawyers "often referred to [Donziger] as the 'cabeza,' or head, of the team" (quoting Donziger Notebook)). Donziger described himself as "the 'lead lawyer,'" the "'person primarily responsible for putting [the LAP] team together and supervising it,'" the person who had the "'primary obligation'" to "'run the case on a day to day basis,'" and the person who "was 'at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S.'" Donziger, 974 F.Supp.2d at 531 (quoting a Donziger November 9, 2009 email to Kohn, and a Donziger proposal to author a book).

16

B.      Specific Findings by the District Court as to Donziger's Acts

The court made extensive factual findings as to the acts undertaken by Donziger to procure the Lago Agrio Judgment, including the following. None of them is disputed.

1.      Donziger Attempts To Intimidate Chevron Into Settling by Trumpeting a Huge Remediation Cost Estimate Based Only on "SWAG"

The initial phase of the Lago Agrio proceedings was to involve "judicial inspections" to establish the level of contamination at various oil exploration sites throughout the Concession area under the supervision of the judge. The court appointed experts nominated and paid by each side, who were to take samples under judicial supervision, send the samples to a laboratory for testing and analysis, and then submit to the court written reports of their respective findings and conclusions. The court also appointed experts, known as "settling experts," who, although ultimately paid by the parties, were neutral and not nominated by the parties; the settling experts attended the judicial inspections and were to resolve any disputes between the reports of the two sides' experts. See Donziger, 974 F.Supp.2d at 411-12.

Soon after the Lago Agrio Litigation was commenced, Donziger hired David Russell, an environmental engineer, to generate an initial estimate of the total cost of remediation for all polluted sites. Donziger hoped for an astronomic estimate that would have an in terrorem effect, impelling Chevron to agree to a settlement. See, e.g., id. at 406 & n.166. At Donziger's direction, Russell went to the Oriente in the fall of 2003 to work on his damages estimate. However, Russell's site inspections were anything but complete or thorough.

17

First, although there were more than 100 oil pits that were to be subjected to judicial inspection, Russell visited only about 45. He made his estimate of the total cost of remediation based on extrapolations from what he observed at the sites he visited. But even at the sites he did visit, he did not analyze any soil or water samples. Indeed, "his visits to some of those sites, he acknowledged at trial, were no more searching than driving past them at 40 or 50 miles per hour." Id. at 406.

Second, notwithstanding the facts that the ROE-owned PetroEcuador had long been a member of the oil-exploration and production joint venture with TexPet--and indeed was the majority owner of the venture from the mid-1970s until mid-1992, when it became the sole owner, see id. at 386--Donziger instructed Russell to make his cost calculations on "the assumption that Texaco was fully liable for all of the contamination in the region, even that caused by PetroEcuador after it took over operation of the [venture's] properties when TexPet left in 1992," id. at 406 (footnote omitted). In part, Donziger's desire to have Chevron alone held liable for all environmental damage to the region stemmed from a reluctance to attribute any such blame to an instrumentality of the ROE; but he also had an incentive that was purely monetary: The LAPs had "entered into an agreement with the ROE and PetroEcuador pursuant to which [the LAPs] were obliged to reduce the amount of any judgment they might obtain against Texaco by the amount of any contribution judgment that Texaco might obtain against the ROE and PetroEcuador." Id. at 414-15. "The LAPs therefore had an interest in obtaining a judgment that Chevron was entirely responsible for any and all pollution liability and remediation responsibility." Id. at 415 (emphases added).

In his report to the LAPs' team, Russell estimated the cost of remediation at $6 billion; but he made clear to Donziger and the other members of the LAPs' team that that cost projection was

18

very rough, and he cautioned "the team not to 'rush to judgment' based on a 'guesstimate.'" Id. at 406 (quoting December 12, 2004 email chain with Russell, Donziger, and other LAPs' team members). Russell informed them that "due to 'the amount of unknowns and the lack of information [he] had with regard to not only levels of contamination but the extent of those levels of contamination[]'. . . . his estimates were 'best guesses based upon a week of looking at the sites, without any scientific data.'" Donziger, 974 F.Supp.2d at 406 (quoting testimony of Russell and December 12, 2004 email chain with Russell, Donziger, and other LAPs' team members (emphasis ours)). Russell testified that as a consequence, his $6 billion remediation cost estimate was "'SWAG,' an acronym for a 'scientific wild ass guess.'" Donziger, 974 F.Supp.2d at 406 (quoting testimony of Russell).

Nonetheless, "Donziger and his public relations operation avidly used Russell's $6 billion [SWAG] figure in the media to generate leverage despite the fact that they knew that it could not withstand serious analysis." Donziger, 974 F.Supp.2d at 407. Russell's "explicit" warning "to Donziger that [Russell's] cost estimate had been 'wildly inaccurate and that it should not be used' . . . . did not stop Donziger and his public relations team from using the number, over Russell's protests, to pressure Chevron through the media." Id. (quoting testimony of Russell (emphasis ours)).

Donziger drafted a letter that ultimately was sent by Amazon Watch, a nongovernmental entity that supported Donziger and the LAPs, to the Securities and Exchange Commission ("SEC"). The letter "promoted Russell's SWAG remediation estimate"--despite Russell's disclaimer--and "asserted also that Chevron had creat[ed] toxic contamination over 30 times larger than the Exxon Valdez," Donziger, 974 F.Supp.2d at 408 (internal quotation marks omitted), despite advice from scientists on the LAPs' team that that figure was "vastly exaggerated," id. at 408 n.185.

19

The letter urged the SEC to investigate Chevron's alleged failure to disclose its alleged potential liability. Donziger's references to the Exxon Valdez and statements about the cost of remediation "relied upon estimates and comparisons that he knew were false or the truth of which he seriously doubted." Id. at 582 (emphasis added); see also id. at 409 (Donziger admitted in an email to his team that he felt that the SEC investigation he sought was "'bogus.'" (quoting July 12, 2006 email from Donziger to LAPs' team members)).

2.      Donziger Causes a Change to Less Probative Tests When the LAPs' Experts Find Pollution that Likely Was Not Caused by Texaco

Consistent with Donziger's insistence that Russell operate on the assumption that all environmental damage had been caused by Texaco, Donziger also sought to cease certain tests that were producing evidence to the contrary. In late 2004, Russell met in New York with Donziger and other leaders of the LAPs' legal team and reported that scientists at the site inspections were in fact "'finding BTEX, which is benzene, toluene, ethylbenzene, and xylene; and GRO, which is gasoline range organics,'" and that those findings were "'much more indicative of contamination from PetroEcuador rather than Texaco because these compounds are volatile and degrade quickly in [a] hot, wet, warm environment such as in the jungle.'" Donziger, 974 F.Supp.2d at 415 (quoting Russell testimony (emphases ours)). Texaco had not operated in the Concession area since more than a decade earlier.

Following this report, Russell and his team of scientists, at the request of Donziger and other LAPs' team members, "'stopped analyzing for [BTEX and GRO]'" because their presence suggested "'more recent contamination,'" implicating "'PetroEcuador rather than Texaco.'" Donziger,

20

974 F.Supp.2d at 415 (quoting Russell testimony and Russell November 4, 2004 email to Donziger and others). They "'instead substitut[ed] a less reliable measure[,] which was total petroleum hydrocarbons,' or TPH," and used methods that could give "'a false positive'" and that "were unable to distinguish between TPH attributable to recent activity and activity that occurred a considerable period earlier." Donziger, 974 F.Supp.2d at 415 (quoting testimony of Russell).

### 3. Donziger Knowingly Submits to the Court Reports that Falsify a LAPs' Expert's Conclusions

In 2004, Donziger and Russell nominated industrial hygienist Charles Calmbacher to serve as the LAPs' judicial inspection expert. See Donziger, 974 F.Supp.2d at 412. Calmbacher served in that capacity at the first four judicial inspection sites; he was eventually fired by Donziger after falling ill and failing to meet deadlines set by Donziger and the LAPs' team. However, Calmbacher insisted that he would write his "perito"--i.e., expert--report to the court for the inspections in which he had participated because he had an obligation to do so. Calmbacher noted that

> "it is highly unusual for a perito [expert] to allow others to contribute to the writing of a report. Comments or review is acceptable, but the perito's opinion and findings are final. I therefore have and feel no obligation to allow your team of textile engineers and associated cron[i]es to review or edit my reports. I am assured, as perito of the court, that I am completely within my rights to write and submit my report independent of [t]hose who have nominated me for appointment as perito. My sole obligation is to tell the truth, as I see it, to the court, no matter the consequences for either party."

Id. at 413 (quoting Calmbacher October 24, 2004 email to Donziger and Russell (emphases ours)).

21

Thereafter, Calmbacher prepared two reports. The LAPs' lawyers in Ecuador edited them, and Calmbacher signed those edited versions because he "agreed with the conclusions reached" and had "'no problem signing [them] because that's what [he] felt.'" Donziger, 974 F.Supp.2d at 413 (quoting Calmbacher deposition). However, "those reports were not the reports that the LAP team eventually filed." Donziger, 974 F.Supp.2d at 413.

Calmbacher testified that:

> "[w]hat happened after that . . . was they asked me to initial some [blank] papers on the corner so [the report] could be printed on that because it had to be initialed. I said, no, I don't think so. David [Russell] implored . . . me to do that, that it was honest, it was fair, it was okay. So I did it. I think it was about 30 pages. And I FedEx'd it down . . . I overnighted it. That was the last I've heard on the project."

Id. (quoting Calmbacher deposition testimony (emphases ours)); see also Donziger, 974 F.Supp.2d at 413 n.229 (noting evidence that Donziger was threatening not to pay Calmbacher for the work he had performed if he did not sign, and that "Russell sent an email to Donziger on March 1, 2005" stating "that he had 'communicated [Donziger's] threat to Calmbacher,' and that Russell had 'also advised him that it was in his interest to comply by signing the documents and sending them to [Donziger].'" (quoting Russell March 1, 2005 email to Donziger)).

> On February 14 and March 8, 2005, respectively, the LAP team submitted to the Lago Agrio court what purported to be the reports of their nominated expert for the judicial inspections of the Shushufindi 48 and Sacha 94 sites. They bore the signatures and initials of, and purported to have been written by, Dr. Calmbacher. The reports found that "highly toxic chemicals" contaminated the area and that TexPet's remediation was "inadequate or insufficient." When shown these reports at a deposition several years later, however, Dr. Calmbacher testified: "I did not reach these conclusions and I did not write this report."

Donziger, 974 F.Supp.2d at 414 (footnotes omitted) (quoting Judicial Inspection Report for Sacha Well 94 and Calmbacher deposition (emphasis ours)).

Calmbacher had "never concluded that TexPet had failed to remediate any site or that any site posed a health or environmental risk." Donziger, 974 F.Supp.2d at 414 (footnote omitted) (emphasis added). The submitted "reports were not the reports he wrote and did not reflect his views." Id. "Thus, someone on the LAP team used the blank pages Calmbacher had initialed and his signature pages to submit over his name two reports that contained conclusions he did not reach. . . . [S]omeone on the LAP Ecuadorian legal team revised his draft reports, printed them on the blank pages that Dr. Calmbacher initialed, and filed them with knowledge of the falsity." Id. (emphasis added).

4.     Donziger Secretly Hires Industry Experts To Offer Their Supposedly Neutral Monitoring Services to the Court, But To Disagree With Any Pro-Chevron Findings

An inspection site called Sacha-53 was of particular interest to the LAPs because Texaco had performed remediation on it pursuant to its Settlement Agreement with the ROE, and Donziger had expected the test results would provide "'the first definitive scientific proof in the case to put the lie to their claim they remediated.'" Donziger, 974 F.Supp.2d at 416 (quoting Donziger November 11, 2004 email to other members of the LAPs' team). When Donziger learned, however, "that the settling experts' conclusions with respect to Sacha-53 would not be favorable to the LAPs," he attempted to insert "outwardly credible," supposedly neutral experts into the process, in order to undermine the settling experts' anticipated conclusion. Donziger, 974 F.Supp.2d at 416. He recruited two new experts: Gustavo Pinto, the president of the Association of Geological, Mining, Petroleum and Environmental Engineers of Ecuador, and Ramiro Fernando Reyes Cisneros ("Reyes"), an Ecuadorian petroleum and environmental engineer. Donziger secretly paid Pinto and Reyes--an amount he characterized as modest but which he admitted may have been $50,000--to pose as

23

"independent monitors" and to criticize the settling experts' anticipated Sacha-53 conclusions, without disclosing to Chevron or the court that the LAPs were paying them. See id. at 416-19.

In addition to that fee, it was agreed that these experts could receive a bonus if the LAPs won the case, see id. at 417. Donziger elaborated that the LAPs were "'not paying for time, but for value,'" id. at 418 (quoting Donziger Notebook). "Donziger well understood that the arrangement was improper"; he termed it his "'bargain with the devil.'" Donziger, 974 F.Supp.2d at 417 (quoting Donziger Notebook (emphasis in Donziger)).

Donziger's efforts in this regard proved futile. Judge Germán Yánez, who presided over the Lago Agrio case from January 2006 until October 2007, declined to appoint monitors.

5. Donziger, Anticipating Additional Pro-Chevron Testing Results, Coerces then-Presiding Judge Yánez To Cancel Most of the Remaining Site Inspections

The report on Sacha-53 filed by five settling experts in February 2006--of which the LAPs' team apparently had an advance copy (see Plaintiff's Exhibit ("PX") 1530 (Pinto and Reyes January 17, 2006 letter to Lago Agrio court, referring to settling experts' report "dated Feb. 1, 2006"))--stated that "Texaco had fully remediated" that site. Donziger, 974 F.Supp.2d at 418. "Donziger characterized the report as 'disastrous' for the LAPs' team." Id. (quoting Donziger Notebook).

Donziger promptly attempted to have Pinto and Reyes, the would-be monitors he had paid (see Part I.B.4 above), submit to the court a report of their own "'establish[ing]'" that the settling experts were wrong and were biased in favor of Chevron, and that the settling experts' report should be disregarded. Donziger, 974 F.Supp.2d at 418-19 (quoting Reyes declaration, the accuracy of which Reyes attested to at his deposition, see Donziger, 974 F.Supp.2d at 416 n.247). However, the report Pinto and Reyes drafted ultimately concluded that the settling experts' report was sufficient to allow

24

the court to reach its own conclusion, and Donziger instructed them not to file it with the court. See id. at 419.

Sacha-53 was the first site as to which the court requested a report from the settling experts. Seeking to reduce the risk of additional findings unfavorable to the LAPs, Donziger requested that the court cancel 26 of the remaining judicial inspections, characterizing them as unnecessary. Judge Yánez denied the request.

However, the LAPs then moved to forgo virtually all the remaining inspections, claiming that the evidence of contamination was clear and abundant; and after further communications from the LAPs' team, Judge Yánez decided to cancel most of the remaining planned judicial inspections, leaving to be performed only four that the LAPs wanted pursued. His decision came about as follows.

> Donziger and the LAP team knew that Judge Yánez was in a weakened state. He recently had been accused of "trading jobs for sex in the court" and was worried about his reputation and perhaps career. They were determined to use that to their advantage.

Id. at 421 (footnote omitted) (quoting Donziger July 26, 2006 email to Kohn).

Fajardo, a relatively recent law graduate whom Donziger had made the LAPs' lead Ecuadorian trial counsel, informed Donziger that there was a belief at the court that the Lago Agrio Plaintiffs were behind the sexual harassment complaint against Judge Yánez. Both Fajardo and Donziger's close friend Yanza felt that that belief--though it was erroneous--could be used to the LAPs' advantage. Donziger described his response to this information in his Notebook as follows:

> "At [this] pt I launched into my familiar lecture about how the only way the court will respect us is if they fear us--and that the only way they will fear us is if they think we have . . . control over their careers, their jobs, their reputations--that is to say, their ability to earn a livelihood."

Donziger, 974 F.Supp.2d at 421 (quoting Donziger Notebook (emphasis in Donziger)). Donziger

25

decided to exploit the belief that the LAPs were the source of the sexual harassment complaint:

"[T]he LAP team 'wrote up a complaint against Yánez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need.'" Donziger, 974 F.Supp.2d at 421 (quoting Donziger Notebook).

> Donziger explained in an email to Kohn that Fajardo then met with the judge, who "said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. . . . The judge also . . . wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed."

Donziger, 974 F.Supp.2d at 421 (quoting Donziger July 26, 2006 email to Kohn). Thus, "Donziger knowingly was complicit both in the preparation of a misconduct complaint against Judge Yánez and in threatening the judge with the filing of the complaint unless the judge did what the LAPs[] wished him to do." Donziger, 974 F.Supp.2d at 421 n.295.

> Faced with this coercion, Judge Yánez granted the request to cancel the LAPs' remaining judicial inspections. Donziger and Fajardo succeeded also in convincing the judge that he should "fear" the LAP team.

Id. at 422 (footnote omitted) (quoting Donziger Notebook (emphasis added)); see, e.g., Donziger, 974 F.Supp.2d at 558 (noting "clear and convincing evidence[] that Fajardo and Donziger coerced Judge Yánez to allow the LAPs to terminate their remaining judicial inspections").

> After Judge Yánez issued the order [canceling the remaining inspections], Donziger on September 13, 2006, wrote that the judge "told Luis [Yanza] that we needed to back him now as he fights for survival on the court. So instead of a strong judge who sees the validity of the case, we now might have a weak judge who wants to rule correctly [i.e., for the LAPs] for all the wrong, personal reasons."

Id. at 422 (quoting Donziger Notebook (emphases ours)).

6. _Donziger Coerces Judge Yánez To Appoint a "Global" Expert--Cabrera--Who "[W]ould [T]otally [P]lay [B]all With" the LAPs_

Donziger had initially been opposed to there being "a single global expert" to advise the court in the Lago Agrio Chevron case, Donziger, 974 F.Supp.2d at 420, the "'[b]ottom line problem'" being his fear that "'we will have no control over [him],'" id. at 422 (quoting Donziger Notebook).

> But the coercion of Judge Yánez eliminated that "bottom line problem." Donziger had found himself with "a weak judge who wants to rule correctly for all the wrong, personal reasons," among them the fear that the LAPs would file their judicial misconduct complaint against him at a time when he least could withstand it. Donziger therefore expected to be able to select and to control the global expert. That is exactly what then took place.

Donziger, 974 F.Supp.2d at 422 (footnote omitted) (quoting Donziger Notebook).

> With these pieces in place, Donziger and the LAP team moved on to finding a compliant global expert. The idea was that the global expert--just like the "monitoring" experts, Reyes and Pinto, who ultimately had not been appointed--in fact would work for the LAPs but would appear to be independent and neutral. This required Donziger to find someone who, in Donziger's own words, would "totally play ball with" him.

Donziger, 974 F.Supp.2d at 422 (quoting Donziger Notebook (emphasis ours)).

Donziger's leading candidate, initially, was Reyes, with whom Donziger was familiar from the Sacha-53 events, despite the fact that Reyes had written a book on oil exploration's environmental impacts in Ecuador, in which he "had 'advocated for joint responsibility between the Ecuadoran government and Texaco,'" Donziger, 974 F.Supp.2d at 423 n.309 (quoting declaration of Reyes). Donziger, Fajardo, and Yanza, interviewing Reyes in 2006,

> "explained to [Reyes] that having a single expert to carry out a global assessment was important to the plaintiffs because they acknowledged that the judicial inspection process had not yielded data to support their claims of contamination. They also said they believed it would be easier to manage a single expert than many."

*Donziger*, 974 F.Supp.2d at 422 (quoting declaration of Reyes (emphasis ours)). "[D]etermined to ensure that Reyes would 'totally play ball with us and let us take the lead while projecting the image that he is working for the court,'" *Donziger*, 974 F.Supp.2d at 423 (quoting Donziger Notebook (emphasis in *Donziger*)), Donziger "reminded Reyes that, as the global expert, he would 'need . . . to state that Chevron was the only party responsible for environmental damages and the harm to the local community,'" *Donziger*, 974 F.Supp.2d at 423 (quoting declaration of Reyes (emphasis ours)).

"Donziger told Reyes 'that if he did this he likely would never work in the oil industry again in Ecuador, at least for an American company, but that he could be a national hero and have a job the rest of his life being involved in the clean-up,'" since "Donziger . . . expected to be able to deliver[ ]long-term, remunerative employment paid for by the ADF," which was "controlled by Donziger and Yanza," and was what "[t]he Lago Agrio complaint identified . . . as the entity to which the LAPs wanted any recovery money paid." *Donziger*, 974 F.Supp.2d at 423 (quoting Donziger Notebook (emphasis in *Donziger*)).

Reyes agreed, and Fajardo and Yanza tried to persuade Judge Yánez to appoint Reyes as the global expert. Judge Yánez balked, however, because both sides had previously agreed that the court's global expert would be one of the experts already appointed by the court. As a result, the LAPs' team shifted focus to José Echeverria and Richard Cabrera Stalin Vega ("Cabrera"), both of whom previously had been designated as settling experts.

Of the two, Donziger's choice was Cabrera. In interviewing Cabrera and "giv[ing] him the 'hard sell,'" Donziger explained to him the same fundamental conditions and cautions, and gave "the same implicit promise of lifetime work on the remediation to Cabrera that he had made previously to Reyes. . . . Cabrera agreed to the plan." *Donziger*, 974 F.Supp.2d at 424. The LAPs' team continued to meet ex parte with Judge Yánez to have him choose Cabrera as the global expert,

28

and by some time in February they were sure he would appoint Cabrera. See, e.g., id. at 558 (noting "clear and convincing evidence[] that Fajardo and Donziger coerced Judge Yánez . . . to appoint a global expert, and to designate their hand-picked choice, Richard Cabrera, for that position").

On March 3, 2007, Donziger, Fajardo, and Yanza called the entire LAPs' team together for a meeting.

> The purpose of the meeting, as will appear in more detail, was to plan the global expert report. So sure were Donziger and Fajardo of Cabrera's appointment that the supposedly independent and impartial Cabrera . . . w[as] present.

Id. at 425 (emphases added). Donziger allowed this meeting to be filmed for the documentary "Crude," and he

> explained the importance of the meeting to the Crude camera even before the meeting began:

>> Today is . . . a very important day 'cause we're meeting with . . . our team of Ecuadorian technical people and our American consultants . . . to figure out how to . . . pull all that information together for the final report we're gonna submit to the court, that is gonna ask for damages that'll very likely be in the multiple billions of dollars.

Id. (quoting March 3, 2007 "Crude" film clip (emphases in Donziger)). Those present at the meeting included Reyes and Ann Maest, a scientist who was working with the LAPs and who worked also for the Boulder, Colorado-based environmental consulting firm, Stratus Consulting ("Stratus"). Parts of the meeting itself were filmed:

> Yanza began by introducing the participants and setting out the general agenda. He introduced Cabrera to the full team for the first time. Fajardo . . . explain[ed] that, while Cabrera was likely to be appointed the global expert, "the work isn't going to be the expert[']s." . . . Fajardo [stated] "what the expert is going to do is state his criteria, alright? And sign the report and review it. But all of us, all together, have to contribute to the report." Maest commented, "But . . [.] not Chevron," which provoked laughter. The video clips of the meeting ended with Donziger commenting, they could "jack this thing up to $30 billion in one day."

*Donziger*, 974 F.Supp.2d at 425-26 (footnotes omitted) (quoting March 3, 2007 "Crude" film clips (emphases ours)). Thus,

> "[a]t the [March 3] meeting, Mr. Fajardo, Mr. Yanza and Mr. Donziger dropped any pretense that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards. On the contrary, it was obvious that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it. The purpose of the meeting was to establish all the conditions for controlling and managing the expert's work, in secret, in accordance to the plaintiffs' interests."

*Donziger*, 974 F.Supp.2d at 426 (quoting declaration of Reyes (emphases ours)).

Donziger met again on March 4, 2007 with some of his American experts, and parts of this meeting too were filmed. One of the experts commented that having Cabrera at the March 3 meeting had seemed bizarre. "Donziger quickly told him not to talk about that and told the film crew 'that was off the record . . . .' Thus, right from the start, Donziger evidenced his intent that the intimate relationship he had forged with Cabrera would not be allowed to see the light of day." *Donziger*, 974 F.Supp.2d at 426 (footnote omitted) (quoting March 4, 2007 "Crude" film clip (emphasis ours)).

7. Donziger and the LAPs Plan the Cabrera Report and Begin To Pay Him Secretly

Cabrera was not sworn in as the court's global expert until June 2007. But following the March 3 and 4 meetings, the LAPs' team prepared a "work plan that supposedly was to be done by Cabrera," and "Fajardo sent the initial draft to Donziger for his approval" on March 21. *Donziger*, 974 F.Supp.2d at 427. The plan

> laid out all of the required tasks including such things as the selection of sites to be studied, field work, drafting of the report, and its submission to the court. It assigned responsibility for each item, in most cases to members of the LAP team or their hired consultants. Cabrera was allotted responsibility for relatively little.

Id. The plan provided for the initial draft of the Cabrera report to be prepared in conjunction with LAPs' personnel and be reviewed by the LAPs' lawyers. "[T]he work plan was submitted to Donziger, who led the entire effort." Id. at 427 n.342. "Donziger . . . instructed all those associated with the preparation of the Cabrera Report to keep their work highly confidential." Id. at 427.

Knowing in advance that Cabrera was to be sworn in as the global expert, the LAPs' team had, in April, begun secretly giving him money--in addition to the court-ordered payments he would receive, see id. at 428, 431-32--despite the fact that "experts are prohibited under Ecuadorian law from requir[ing] or receiv[ing] anything of value, whether directly or indirectly, from the parties in the case," id. at 434 (internal quotation marks omitted); see id. ("'[a]nyone who bribes a[n] . . . expert . . . or who knowingly uses false . . . experts in a court proceeding . . . will be punished as guilty of false testimony or perjury.'" (quoting Ecuador Crim. Code Art. 359)). In June, Donziger and his team set up a new and secret bank account through which they could pay Cabrera surreptitiously. See Donziger, 974 F.Supp.2d at 428, 432. In July, "believ[ing] that supporting Cabrera in every way was necessary to maintaining the 'control' over him upon which Donziger insisted," the LAPs also "entered into a contract with Cabrera, provided him with a secretary ([the girlfriend of LAPs' attorney Prieto]), . . . and provided other support" including "life insurance." Id. at 435.

Less than two weeks later, after Chevron questioned Cabrera's independence, Cabrera represented to the Lago Agrio court, "'I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs.'" Id. at 447 (quoting Cabrera July 23, 2007 letter to Lago Agrio court); see also Donziger, 974 F.Supp.2d at 447 & n.488 (describing Cabrera's repeated denials of connections with the LAPs). The LAPs' lawyers themselves termed Chevron's challenges to Cabrera's independence "baseless." Id. at 447-48 (internal quotation marks omitted).

31

The money the LAPs paid Cabrera secretly was initially sent to Yanza's personal account so that he could open a new account in someone else's name--although Donziger worried about having any of the money pass through Yanza's account. Eventually a preexisting ADF account was repurposed to serve as the secret account. See id. at 432.

> Between August 2007 and February 2009, Donziger had Kohn make three separate payments totaling $120,000 via wire transfer to the secret account. A large portion of this money was paid to Cabrera via direct account-to-account transfers at Banco Pichincha.

Id. at 432-33 (footnote omitted). "[A]t least part of the[se payments] were made as part of even more extensive efforts to ensure that Cabrera 'would totally play ball with' the LAPs and with other U.S. consultants whom the LAPs had hired to draft the report Cabrera would file under his name." Id. at 434-35.

8.    Donziger and the LAPs' Team Control Cabrera's "Work," While Denying Any Contact or Involvement

The LAPs' team "also supported and controlled [Cabrera's] work in the field." Donziger, 974 F.Supp.2d at 435. Cabrera began his field work in July 2007. After being sworn in in June, he had

> submitted what purported to be his work plan to the court. While this was more abbreviated than the detailed March 21 plan initially prepared by the LAP team, it too in fact had been written by the LAP team. It listed categories of experts who would assist in collecting samples in the field and analyzing data--all of whom secretly would be named by the LAP team.

Id. at 430 (footnotes omitted) (emphases added). At the ensuing inspections,

> when Cabrera took samples at various sites . . . the[ Chevron attorneys] observed what seemed to them to be collaboration and familiarity between Cabrera--the supposedly independent global expert--and the LAP team. In addition, unlike the Lago Agrio Plaintiffs' representatives, Chevron lawyers

and . . . technical team members were often blocked from observing up close Cabrera's inspections.

Id. at 431 (footnote and internal quotation marks omitted). When Chevron repeatedly complained to the court, the court "merely reminded Cabrera 'that [Cabrera] is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth' and asserted that '[t]he transparency of the expert's work will be ensured.'" Id. (quoting October 3, 2007 Lago Agrio court order).

Chevron had reason to be suspicious of Cabrera's field work, which was anything but transparent. Among other things, Donziger later admitted that the LAP team "had [also] been involved in Mr. Cabrera's site selection" and his "sampling protocols." Indeed, he conceded that he could not recall a single site Cabrera sampled that the LAPs had not "recommended" to him.

Donziger, 974 F.Supp.2d at 431 (footnote omitted) (quoting Donziger deposition and trial testimony (emphases ours)). "[T]he LAP team had chosen the sites which Cabrera was to visit and, when the team's funds began to run low, sought to limit the number of sites even further. All the while, the LAPs knew," as Donziger told his team, "that--for the samples [Cabrera] did collect--they could simply 'change the focus of the data at [their] offices.'" Donziger, 974 F.Supp.2d at 436 (quoting Donziger July 17, 2007 email to Yanza and Fajardo (emphasis ours)).

The "team" of Ecuadorian technical people and American consultants to which Donziger referred in the March 3, 2007 meeting shown in the "Crude" film clips included consultants and scientists who were hired to perform technical work supposedly to be done by Cabrera and to write the report that Cabrera would file under his name. For example, one "supposedly independent expert on Cabrera's supposedly independent technical team" was an employee of "an environmental consulting firm Kohn and Donziger had hired and paid to develop a potable water report." Donziger, 974 F.Supp.2d at 436. That employee wrote what ultimately became an appendix to the Cabrera

33

Report. The fact that the LAPs' team had hired and was paying his employer was not disclosed to the Lago Agrio court. See id.

Other members of the LAPs' team, including Douglas Beltman, were employees of Stratus, which had signed a retention agreement with Kohn in August 2007 to write Cabrera's report to the court. "The agreement specified that Stratus would provide regular updates on the progress of [its] work with Mr. Steven Donziger via phone or email," and "[t]hroughout the rest of 2007 and early 2008, Beltman, Maest, and others at Stratus consulted with Donziger and worked on preparing the damages assessment." Id. at 440 (internal quotation marks omitted).

In the meantime, Donziger was asking Mark Quarles, another "of the outside consultants hired by the LAPs to, among other things, work on the global expert report supposedly done by Cabrera," to submit in related litigation a declaration that would assert, "'**if true: Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant. <u>At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan</u>**.'" Id. at 438 (quoting Donziger September 16, 2007 email to Quarles (bolding in email) (italics ours)). Donziger's "inclusion of the words 'if true' were nothing more than a misguided attempt to cover himself," because

> Donziger . . . knew that the statements he proposed that Quarles make in his declaration would have been false. Among other things, Donziger had been at the March 3, 2007 meeting with Cabrera and others at which the LAPs laid out the plan they had prepared. Donziger knew also that the LAPs controlled Cabrera's site selections and that Cabrera in all other respects was "totally playing ball" with the LAPs.

Donziger, 974 F.Supp.2d at 438

9. The LAPs' Consultant, Stratus, Writes Cabrera's Report

The report that Cabrera submitted to the court ("Cabrera Report") was not written by Cabrera. "It was written almost entirely by Stratus and others working at the direction of Stratus and Donziger." Donziger, 974 F.Supp.2d at 442.

> [I]t was "the general idea" "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera." In January 2008, Beltman sent a first draft of an outline of the Cabrera Report to Donziger and Maest for their comments. In February 2008--six weeks before Cabrera's report was to be filed--Maest and Beltman traveled to Ecuador to meet with Cabrera, Donziger, and other members of the LAPs' team. Beltman wrote to the Stratus team in Boulder that
>
> > . . . . We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment. We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report. The people in the Quito office are working on some parts, and we're working on others.
>
> The report to which he referred, of course, was the one that Cabrera would submit to the Lago Agrio court. At Donziger's direction, Stratus wrote its portions in the first person as though they were written by Cabrera. Beltman emailed that draft to Donziger on February 27, 2008, and continued to work on it through March. Other members of the Stratus team worked at Beltman's direction and drafted portions of the annexes that would accompany Cabrera's report, often collaborating with members of the LAPs' Ecuadorian team in doing so. All of the portions of the report that Stratus prepared were in English, were written in Cabrera's voice, and later were translated into Spanish for submission to the court.

Id. at 440-41 (footnotes omitted) (quoting Donziger deposition and Beltman February 22, 2008 email to Stratus employees (emphases ours)).

There was "no evidence that Cabrera himself ever" reviewed the report thoroughly, Donziger, 974 F.Supp.2d at 443; "Cabrera 'adopted pretty much verbatim what had been provided to

35

him' by Stratus," id. at 442 n.463 (quoting Donziger deposition testimony). However, "Donziger reviewed and commented on every aspect of the Cabrera Report and its annexes before they were filed," Donziger, 974 F.Supp.2d at 443; he "had the final word on every annex and every piece of the report," id. at 440.

The Cabrera Report was submitted to the Lago Agrio court on April 1, 2008.

The last draft of the Cabrera Report was saved on the morning of March 30, 2008. . . . On April 1, 2008, Donziger downloaded the final version of the report from a secret email account Fajardo had created for him.

Later that day, Cabrera--accompanied by the LAPs, their supporters, and members of the press--walked into the Lago Agrio court and filed the report he claimed to have written. It consisted of an executive summary and 21 annexes and set the amount of damages at $16.3 billion. It stated that "[t]his report was prepared by the Expert Richard Stalin Cabrera Vega for purposes of providing professional technical assistance to the Nueva Loja Superior Court of Justice . . . [.]"

Id. at 442 (footnotes omitted) (quoting Cabrera Report (emphases ours)).

Thereafter, in statements to the press, the LAPs' team emphasized Cabrera's supposed neutrality:

Two weeks after the report was filed, Fajardo gave a press conference, with Donziger at his side, in which he stated that "what scares Chevron the most, is that this independent, court-appointed expert, who doesn't . . . respond to either side of the case has determined that to repair this damage it will be between seven billion and sixteen billion dollars." Donziger and the plaintiffs' team falsely stressed Cabrera's "independen[ce]" to maximize the leverage on Chevron, although they well knew that the claim of independence was a lie.

Donziger, 974 F.Supp.2d at 443 (footnotes omitted) (quoting April 14, 2008 "Crude" film clip of press conference, and April 16, 2008 press release (emphases ours)).

36

10. Donziger Has Stratus Fabricate Objections To Be Submitted By the LAPs to the Cabrera Report that Stratus Wrote For the LAPs

In order to enhance the false image of Cabrera's independence, Stratus proceeded, as instructed by Donziger, to prepare objections to the Cabrera Report for submission to the court by the LAPs. The goal was to create the impression that the LAPs "w[ere] dissatisfied with the Report and that Cabrera had not gone far enough in assessing damages--notwithstanding the fact that the LAP team, including Stratus, itself had written it." Donziger, 974 F.Supp.2d at 444. Thus, "having written the bulk of the Cabrera Report, Stratus began preparing to . . . respond to it on behalf of the LAPs as if the Cabrera Report actually had been written by Cabrera . . . ." Id. at 443.

"The plan was to maximize the deception. . . . Fajardo wrote to the [LAPs'] team the day after the Report was filed," urging them to respond to inquiries as he had, i.e., to say that the report is a "'good report,'" and "'includes an item for recovery, but'" does "not go[] far enough," and "'we are not happy . . . . I think it is good to maintain a uniform line, PLEASE, WE ARE NOT HAPPY.'" Id. at 444 (quoting Fajardo April 2, 2008 email to LAPs' team (emphasis ours)). "This appearance of dissatisfaction with the Cabrera Report was important because it supported the false pretense that Cabrera had acted independently." Donziger, 974 F.Supp.2d at 444.

Cabrera himself later echoed this pretense. He wrote to the Court stating, inter alia,

"I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality. . . ."

Id. at 445 (quoting Cabrera October 8, 2008 letter to the Lago Agrio court (emphasis ours)).

This of course was blatantly false and misleading. . . . Stratus' criticism of its own work product that had been submitted over Cabrera's name[ ] was intended

37

to feed the false impression that Cabrera had been independent. That was a key part of Donziger's strategy.

Donziger, 974 F.Supp.2d at 445.

Cabrera reiterated his claim of independence in response to objections by Chevron. He disputed Chevron's criticisms, saying, inter alia, that everything was "'objective, and deeply impartial. . . . The entire expert investigation procedure was completed by me personally.'" Id. (quoting Cabrera February 5, 2009 letter to the Lago Agrio court (first emphasis ours; second emphasis in Donziger)).

The submission of supposed objections by the LAPs also provided a basis on which Cabrera could increase his damages assessment, and he did so. His November 2008 supplemental report, in which he purported to respond to the comments and questions submitted by the LAPs, "added another $11 billion to the initial damages assessment in the Cabrera Report. This report, just like the one it was supplementing, had been written by Stratus and the LAP team." Donziger, 974 F.Supp.2d at 445 (footnote omitted); see, e.g., id. at 457 ("under the instruction and supervision of Mr. Donziger," Stratus, having "essentially . . . ghostwritten the Cabrera report, then . . . act[ed] as experts for the plaintiffs [and] wrote comments to their own work, and then wrote the Cabrera report's responses to their own comments" (internal quotation marks omitted)).

11. When "Crude" Is Released and Chevron Gets Discovery Revealing the LAPs-Cabrera Collaboration, Donziger Hires New Consultants To "Cleanse" the Cabrera Report

"Crude," the documentary by filmmaker Joseph Berlinger, commissioned by Donziger and featuring him quite prominently, was first released in January 2009. Donziger had given the film

38

crew expansive access to himself, his team, and some of its activities for nearly three years. See Donziger, 974 F.Supp.2d at 453. "One scene showed Dr. Carlos Beristain--a member of Cabrera's supposedly neutral staff--working directly with the LAPs and their lawyers, including Donziger." Id. at 454. Donziger, having received an advance copy in December 2008, asked Berlinger to

> delete the Beristain images and other material. Fajardo made the same request to [Berlinger's cameraman] Bonfiglio, emphasizing that if the scene with Beristain were left in the film, "the entire case will simply fall apart on us. . . . Those two guys [Beristain and Adolfo Maldonado, another supposed neutral] must not appear in the documentary at all! Please, remove them from it. It really isn't much, but it can complicate the entire case for us."

Id. (footnote omitted) (quoting Fajardo December 25, 2008 email to Bonfiglio (emphases ours)).

Berlinger and Bonfiglio initially did not comply, and at a film festival in January 2009 the film was shown with the Beristain scene. See Donziger, 974 F.Supp.2d at 454. When Fajardo persisted, however,

> explain[ing] that the images were "so serious that we could lose everything[,]" Berlinger ultimately removed the Beristain images from the scene, and they were not included in the version released on DVD. They were left, however, in the version of the film that streamed over Netflix. Someone at Chevron noticed.

Id. (footnotes omitted) (quoting Fajardo January 22, 2009 email to Bonfiglio (first emphasis in Donziger; other emphases ours)).

The deleted images appeared to confirm Chevron's suspicion that Cabrera had been neither neutral nor independent. Chevron began to initiate § 1782 discovery proceedings in the United States, see 28 U.S.C. § 1782 (authorizing orders for testimony or document production for use in a proceeding in a foreign tribunal). First, in federal court in Denver, Colorado, it sought discovery of Stratus's communications with the LAPs' team, pointing out that there were similarities between,

on one hand, the Cabrera Report, and on the other hand, papers published by Stratus employees and documents produced by Stratus in a mediation proceeding. Chevron argued that discovery was material to the questions of whether Cabrera had written his own report and whether the LAPs had been involved.

LAPs' attorney Prieto urged Donziger not to let the Stratus-related emails be disclosed, stressing that it was "'NOT acceptable for the correspondence, the e-mails, between Stratus'" and members of the LAPs' team "'to be divulged'"; Prieto said

"the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail) . . . ."

Donziger, 974 F.Supp.2d at 461 (quoting Prieto March 30, 2010 email to Donziger, Fajardo, Yanza, and Sáenz (emphasis ours)). Donziger's efforts notwithstanding, the federal court in Colorado granted Chevron's request for discovery.

Soon thereafter, Chevron also brought a § 1782 proceeding against Berlinger for discovery of outtakes from "Crude"--in particular, for footage of Cabrera and members of his team working directly with members of the LAPs' team. The LAPs opposed, characterizing the Beristain meeting with Donziger as "'innocuous'" and "'of no relevance to anything,'" Donziger, 974 F.Supp.2d at 464 (quoting LAPs' Memorandum of Law in Opposition to an Application for a § 1782 Order To Conduct Discovery), in contrast to the desperate efforts made by Donziger and Fajardo to have such scenes removed because "the images were 'so serious that we could lose everything,'" Donziger, 974 F.Supp.2d at 454 (quoting Fajardo January 22, 2009 email to Bonfiglio (emphasis in Donziger)). Discovery was granted, and Berlinger produced more than 600 hours of raw footage.

40

To guard against the possibility that the court-ordered disclosures might lead to the Cabrera Report's being discredited or stricken, the LAPs' team devised a plan to "cleanse" the Cabrera Report by having new experts "repackage" that report, proffering alternative grounds for the damages evaluation. Donziger, 974 F.Supp.2d at 461. To gain time for implementation of that process, the LAPs sought to delay production of the Stratus-related emails by moving for a protective order on the ground of attorney-client privilege. In support of the motion, they submitted a declaration by Fajardo ("Fajardo Declaration") that was "highly misleading." Id. at 462. It acknowledged that the LAPs had delivered materials to Cabrera, but

> [i]t failed to mention that Fajardo, with Donziger's approval, had threatened the judge with a misconduct complaint unless the judge agreed to their demands to cancel the LAPs' remaining judicial inspections. . . . [I]t did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's Report and indicated, in Cabrera's presence, that the work would be done by them. Nor did it reveal that Stratus and the LAPs' counsel in fact had written most of the Cabrera Report. . . . The declaration similarly neglected to report that the LAP[s] "chang[ed] the focus of [Cabrera's] data at [their] offices." And it, of course, failed to disclose that the LAPs had made secret payments to Cabrera outside the court process.

Id. at 462-63 (footnote omitted) (quoting Donziger July 17, 2007 email to Yanza and Fajardo (emphases ours)).

A subsequent petition filed by Fajardo in the Lago Agrio court ("Fajardo Petition"), requesting permission to submit supplementary information to assist the court in assessing global damages, disclosed a bit more than the Fajardo Declaration, as it admitted that the LAPs had given Cabrera proposed factual findings and economic valuations as to environmental and other damage caused by Texaco. The Fajardo Petition was later filed multiple times in United States courts, with the LAPs representing that it "'fully disclosed' their relationship with Cabrera." Donziger, 974 F.Supp.2d at 464. But the Fajardo Petition too

41

was deceptive. There was no disclosure of the fact that Cabrera was handpicked by Donziger because he would cooperate with the LAPs, that the report was planned and written by the LAPs and Stratus, and that Cabrera "play[ed] ball" by simply affixing his name to it, acting all the while under the false pretense--fostered by the LAPs--that the report was Cabrera's independent work.

Id. at 463-64 (emphases added).

The Fajardo Petition in the Lago Agrio court was granted, and the LAPs submitted seven "cleansing" reports on September 16, 2010, at least some of which had been reviewed and commented upon by Donziger. See id. at 480. The experts who prepared those reports had not been informed that the Cabrera Report had in fact, without the court's knowledge, been written by Stratus, working for the LAPs, and the new experts treated the Cabrera Report with deference. See id. at 480-81. Indeed, some of the reports relied on it directly.

12. The District Court's Summary

The district court summarized the fraudulent provenance of Cabrera's reports to the Lago Agrio court as follows:

In the last analysis, the facts concerning the Cabrera Report are crystal clear. The remaining LAP judicial inspections were cancelled, the global expert proposal adopted, and Cabrera appointed in consequence of the coercion of and pressure placed upon Judge Yánez. As Donziger admitted in a Crude outtake, Judge Yánez "never would have done [that] had we not really pushed him."

Cabrera was not even remotely independent. He was recruited by Donziger. He was paid under the table out of a secret account above and beyond the legitimate court-approved payments. He was promised work on the remediation for life if the LAPs won. The LAPs gave him an office and life insurance, as well as a secretary who was a girlfriend of one of the LAP team members. Stratus and, to some extent others, wrote the overwhelming bulk of his report and his responses to Chevron's objections, as well as to the deceitful comments Stratus had written on its own report. And, in accordance

42

with Donziger's plan to ratchet up the pressure on Chevron with a supposedly independent recommendation that Chevron be hit with a multibillion dollar judgment, he repeatedly lied to the court concerning his independence and his supposed authorship of the report.

Donziger, 974 F.Supp.2d at 446 (footnote omitted) (quoting June 13, 2007 "Crude" film clip (emphases ours)). Donziger

had chosen Cabrera for the global expert position because Cabrera would cooperate with the LAPs. He and Fajardo procured his appointment by coercing Judge Yánez. They had caused Stratus to write all or most of his report and then falsely passed that report off--both to the court and to the world press--as the independent work of a neutral, court-selected expert.

Donziger, 974 F.Supp.2d at 459 n.563. "Donziger was the architect of all that occurred with respect to the Cabrera Report," id. at 447 n.484; "[h]e knew at all times that his actions were wrongful and illegal," id. at 448; and "he had no illusions about the impropriety of what he and his colleagues had done," id. at 459 n.563. "In sum, Donziger knew at every step that what he and the LAP team did with Cabrera was wrong, deceptive, and illegal." Id. at 460.

C.     The February 14, 2011 Lago Agrio Judgment

Largely because of the Ecuador court's system of assigning cases to judges for limited periods of time, a total of six judges presided over the Lago Agrio Chevron case from the time it was filed in 2003 until the Judgment was entered in 2011. Three of them figure prominently in the present case; two of them testified at trial. When the case was filed in May 2003, it was assigned to then-Judge Alberto Guerra Bastidas ("Guerra"), and he presided over it until January 2004; Guerra, who was removed from the bench in May 2008 because of misconduct, became an important witness at trial in the present case. From January 2006 until October 2007, Judge Yánez, as discussed in Parts I.B.4.-I.B.6. above, was presiding. Nicolás Zambrano was a judge from July 2008 until he was

43

removed from the bench for misconduct in February 2012. Zambrano first presided over the Lago Agrio Chevron case for a four-month term beginning in September 2009; he again presided over the litigation beginning in October 2010 and issued the $17.292 billion Judgment in February 2011.

The Lago Agrio Judgment awarded the LAPs $8.646 billion in damages for at least seven categories of injury, including harm to the environment and human health, and another $8.646 billion unless Chevron issued a public apology within 15 days. See Donziger, 974 F.Supp.2d at 481. In addition,

> the Judgment ordered that the LAPs establish a trust for the benefit of the ADF "or the person or persons that it designates" and that Chevron pay the damages awarded to that trust. It directed that the trust's board of directors be made up of the "representatives of the Defense Front," i.e., the ADF, and provided that the board would choose the contractors who would perform the remediation. Thus, the Judgment did exactly what the complaint had asked--it put the ADF in complete control of any proceeds of the Judgment.

Id. at 481-82 (footnotes omitted) (quoting Lago Agrio Judgment (emphasis added)).

In explaining the Judgment, the court "professed to disclaim reliance on the Cabrera Report." Donziger, 974 F.Supp.2d at 481. It stated that it had "'not considered the conclusions presented by the experts in their reports, because they contradict each other despite the fact that they refer to the same reality.'" Id. (quoting Lago Agrio Judgment). The court also noted some of Chevron's charges of misconduct on the part of Donziger but said they were not attributable to the LAPs because the LAPs had not granted Donziger a formal power of attorney. See Donziger, 974 F.Supp.2d at 481.

> Chevron issued no apology. Instead, it filed a motion for clarification and expansion of the Judgment three days after it was issued. It requested further explanation of several of the Judgment's conclusions . . . . It questioned also the Judgment's award of punitive damages, "which are not defined in the Ecuadorian legal system," and were "completely identical to the items indicated in the Cabrera Report," which the Judgment purported to exclude from its consideration.

44

Id. at 482 (footnote omitted) (quoting Chevron motion (emphasis ours)).

> The Lago Agrio court issued a clarification order on March 4, 2011. It held inter alia . . . . that "the Court decided to refrain entirely from relying on Expert Cabrera's report when rendering judgment. . . . [T]he report had NO bearing on the decision. So even if there was fraud, it could not cause any harm to" Chevron.

Donziger, 974 F.Supp.2d at 482 (footnote omitted) (quoting Judgment Clarification Order (emphases ours)).

D.      Findings by the District Court as to the Sources and Authorship of the Lago Agrio Judgment

Zambrano, who was the judge presiding over the case when the Lago Agrio Judgment was issued, testified in the present action that he had written the single-spaced, 188-page Lago Agrio Judgment without any assistance from anyone other than an 18-year-old typist to whom he dictated the entire decision. The Judgment and the clarification order stated that the court had not relied on the Cabrera Report. And Zambrano testified that he relied only on evidence in the record. The district court found that each of these representations was false.

1.      The Lago Agrio Judgment Drew Heavily on the Cabrera Report

Notwithstanding the disclaimers in the Lago Agrio Judgment and clarification order, the district court found that the principal aspects of that Judgment were drawn from the Cabrera Report. For example, of the $8.646 billion awarded for, inter alia, harm to the environment and human health, $5.4 billion was awarded for remediation of soil at "'880 [waste] pits'" in the Concession area, supposedly "'proven through aerial photographs'" in "'the record,'" Donziger, 974 F.Supp.2d at 682 n.53 (quoting Lago Agrio Judgment). However, an expert witness opined that it would have been exceedingly difficult for the Judgment's author to glean that exact number of pits

45

from those aerial photographs because the black and white images were "of such low resolution that it would have been 'difficult for even an experienced photogrammetrist to identify and map pits,' much less someone with no special training or equipment." Donziger, 974 F.Supp.2d at 684 (footnote omitted) (quoting expert trial testimony). (See also Part I.D.2. below re Zambrano's lack of assistance and lack of civil-case experience.) Indeed, enhanced resolution of some of the photographs in the Lago Agrio record revealed that some of what were identified by the Lago Agrio decision as waste pits were in fact "trees, above-ground tanks, and other objects." Donziger, 974 F.Supp.2d at 684 n.65. Thus, the district court found that, given the quality of the aerial photographs in the record, it was "impossible" that those photographs were the source of the Lago Agrio Judgment's conclusion that remediation was required in 880 pits. Id. at 685.

The Cabrera Report, on the other hand, provided a source for exactly 880 pits: It targeted 916 pits for remediation (the number that appeared "in a spreadsheet produced by Stratus, upon which [the relevant Cabrera Report chart] likely was based"). Id. at 683 n.58, 684. But 36 of those pits "either had been operated by PetroEcuador," rather than Texaco, or had shown "no impact and for [them], therefore, no remediation was necessary. With those pits excluded, the net pit count in the Cabrera Report was 880." Id. at 684 (footnote and internal quotation marks omitted (emphases ours)). The district court noted that the LAPs had been desperate to "cleanse" the Cabrera Report and had submitted seven purportedly supplementary expert reports; yet in support of pit count, their penultimate alegato--or written summation--to the Lago Agrio court used the Cabrera Report's 916 figure and cited nothing other than the Cabrera Report. The district court thus found that it was "impossible that the pit count in the Judgment came from anything but the Cabrera Report." Id. at 685.

46

As another example, the Lago Agrio Judgment awarded $150 million for potable water damage. The Cabrera Report had recommended in that category an award of $428 million; the report of a Chevron expert cited in the Judgment characterized the Cabrera Report as recommending an award of $430 million and criticized the recommendation as grossly exaggerated. The Lago Agrio court agreed that the Cabrera Report's recommendation was too high, as it found that only 35% of the people in the Concession area lacked potable water. The district court inferred that the author of the Lago Agrio decision simply took 35% of $430 million, which came to $150,500,000, and rounded it to an even $150 million. Noting that no other evidentiary basis for the $150 million award was cited in the Judgment, the district court found that "the figure awarded was derived directly from the . . . recommendation contained in the Cabrera Report." Id. at 686.

The district court also found that the Lago Agrio Judgment relied on the Cabrera Report by relying on one of the supplemental "cleansing" reports submitted by the LAPs, authored by Dr. Lawrence Barnthouse, to award $200 million for restoration of flora and fauna in the Concession area. This flowed from "the Judgment['s] recogni[tion] that 'Dr. Barnthouse testified that he reviewed expert Cabrera's report, but did not prepare a damage report himself.'" Id. (quoting Lago Agrio Judgment).

Thus, the Court found that a total of $5.75 billion of the $8.646 billion non-punitive damages awarded was based on the Cabrera Report:

> In sum, the Court finds that the Judgment, although it . . . purported not to rely on the Cabrera Report, did so rely at least (1) for the pit count--which drove its largest damages award [**$5.4 billion**], (2) for the potable water damages award [**$150 million**], and (3) by virtue of its reliance on the Barnthouse report [**$200 million**]. The Court thus finds that the Cabrera Report was material to the Judgment at least in those respects, which collectively were very important indeed.

Donziger, 974 F.Supp.2d at 688.

## 2. Then-Presiding Judge Zambrano Did Not Write the Lago Agrio Judgment

The district court also found that "Zambrano did not write the Judgment, at least in any material part." Donziger, 974 F.Supp.2d at 482. Zambrano, a judge on the Lago Agrio court only since July 30, 2008, had been a prosecutor but had had little experience in civil matters. When Zambrano arrived on the court, Guerra had been removed from the bench for misconduct, see id. at 505, and "[h]e and Guerra entered into an agreement by which Zambrano paid Guerra $1,000 per month to assist Zambrano in drafting his 'writs and rulings' in civil cases," id. (quoting Guerra trial testimony).

Zambrano first presided over the Lago Agrio Chevron case for a four-month period beginning in September 2009. Zambrano "admitted . . . that 'Guerra helped [him] with the drafting of orders in [Zambrano's] cases,'" Donziger, 974 F.Supp.2d at 506 (quoting Zambrano trial testimony). Although Zambrano testified that the arrangement did not include the Chevron case, see Donziger, 974 F.Supp.2d at 506--and the district court did not find that the LAPs had an arrangement with Zambrano during that first period in which Zambrano presided, see id. at 513--the court found that "the LAPs, with Donziger's authorization, paid Guerra during this period to ghostwrite Zambrano's orders on the Chevron case and to do so to their advantage," id. at 513 n.983 (emphases added). (See Part I.D.4. below.)

Zambrano began his second period of presiding over the Lago Agrio Chevron case in October 2010, and he issued the Judgment four months later. In a declaration submitted to the district court in the present action before the start of trial, "Zambrano stated: 'I confirm that I am the only author of the judgment that I issued on February 14, 2011 . . . . I did not receive support or assistance from Dr. Alberto Guerra or from any other person . . . .'" Donziger, 974 F.Supp.2d at 485 (quoting Zambrano March 28, 2013 declaration (emphasis in Donziger)).

48

The district court found it difficult to credit this claim, both logistically and substantively. To begin with, the court had substantial doubts that Zambrano had been able, in four months, to review the more than 200,000 pages of documents in the record and write the 188-page, single-spaced Judgment without any help from any other person. The Judgment was "of considerable complexity [and] purport[ed] to rely on innumerable pieces of evidence, many of them lengthy documents themselves." Donziger, 974 F.Supp.2d at 487. Indeed, Zambrano's categorical statement that he had received no help from anyone was subsequently altered twice. First, after Guerra testified at trial that Zambrano had in fact had the daughter of a friend type court orders, Zambrano stated that he had received typing assistance on the Lago Agrio Judgment from a Ms. Calva, an 18-year-old who was not an employee of the court and whom Zambrano personally paid $15 a day.

The court also found it difficult to credit Zambrano's "adamant" testimony that he had dictated the entire decision to Calva and "'never show[ed] Ms. Calva any document,'" id. at 486 (quoting Zambrano trial testimony), from which she could type complicated strings of alphanumeric sequences with dashes, periods, semicolons, and odd parentheses, such as the following:

"3142 y 466 en Auca 1 en AU01-PIT1-SD2-SU2-R(220-240 cm)--sv y AU01-A1-SD1-SU1-R(60-100cm)--sv; 2450 y 876 en Cononaco 6 en CON6-A2-SE1--sv   y   CON6-PIT1-SD1-DU1-R(160-260cm)--sv; 154.152,73.6325,70.4021 en Shushufindi 18, en SSF18-A1-SU2-R(O.Om)--sv, SSF18-PIT2-SD1-SU1-R(1.5-2.0m)--sv; y SSF18-A1-SU1-R(0.0 m)--sv),"

Donziger, 974 F.Supp.2d at 486 (quoting Lago Agrio Judgment). "Even assuming that Zambrano actually prepared the Judgment, as he claims, he certainly would not have dictated these pre-existing documents to Ms. Calva rather than giving them to her with markings indicating exactly what he wanted her to copy." Donziger, 974 F.Supp.2d at 486-87.

49

Second, after initially "testif[ying at trial] that 'nobody helped [him] do the research [he] needed to do to write and author the judgment,'" id. at 485-86 (quoting Zambrano trial testimony), Zambrano slightly modified that representation as well. "[W]hen he later was asked how he had found [the] French, British, Australian, and American authorities that were cited in the Judgment," Zambrano said that Calva "'would look for a specific subject,'" and "'she would print them out so that I would read them later.'" Donziger, 974 F.Supp.2d at 486 (quoting Zambrano trial testimony). The court refused to credit this testimony, however, noting that

> there was no credible explanation of how Calva, as Zambrano claimed, found French, British, Australian, and American legal authorities on the Internet given that there is no evidence that she had any legal training or spoke French or English,

Donziger, 974 F.Supp.2d at 486; and there was no explanation as to how Zambrano himself would have been able to understand those decisions, given that he had "no legal training in the common law," had "very little experience with civil matters in Ecuador," and "reads neither French nor English," id.

More importantly, the district court found it difficult to reconcile Zambrano's claim that he had written the Judgment himself, and without any substantive assistance, with his responses to basic questions about the substance of the decision. Among other things, Zambrano could not recall "the identity of a substance that the Judgment described as the most powerful carcinogenic agent it considered," i.e., benzene, id. at 484. Nor could he recall the name of the "substance for the presence of which the Judgment awarded $5 billion." Id. That substance was TPH, a term that appeared in the Judgment more than 35 times. "But when Zambrano was asked at his deposition what TPH stands for" (it stands for total petroleum hydrocarbons) "he testified that 'it pertains to

50

hydrocarbons, but I don't recall exactly.'" Id. (quoting Zambrano trial testimony). In addition, the English word "workover" appeared in the Judgment twice; but "Zambrano testified that he does not speak English, did not know what 'workover' means, and could not explain why the word was in the Judgment," Donziger, 974 F.Supp.2d at 484 (footnotes omitted) (quoting Zambrano trial testimony). Zambrano also could not recall "the source of the most important statistical data" used in the Judgment, or "the theory of causation on which the Judgment relied." Donziger, 974 F.Supp.2d at 484.

In light of Zambrano's "astonishing[] unfamiliar[ity] with important aspects of [the Judgment's] contents," along with the "evasive[ness] and internal[] inconsisten[cies]" in his trial testimony and the differences between his trial testimony and "his deposition just days before," the district court found that "Zambrano did not write the Judgment issued under his name." Id. at 491.

3. The Lago Agrio Judgment Was Written by the LAPs

Having found that Zambrano did not write the Lago Agrio Judgment, the district court found--based in part on comparisons of the Judgment against internal LAPs' documents, which were produced in discovery in the present action but were nowhere to be found in the Lago Agrio Chevron case record--that the Lago Agrio Judgment had been written by the team representing the LAPs.

a. The Judgment Copied Documents That Were Not in the Court Record but Were LAPs' Internal Documents

The district court noted that the record in the Lago Agrio Litigation consisted of the documents duly filed with the clerk of court; that "[c]onsideration of any other materials, including any materials provided to a judge or court official informally or ex parte, would have been improper

51

under Ecuadorian law"; and that Zambrano testified that "he considered only documents that were in the court record." Donziger, 974 F.Supp.2d at 492. Nonetheless, there were parts of the Lago Agrio Judgment that had no foundation in the court record.

Those parts were present, however, in internal LAPs' documents:

> [P]ortions of eight documents produced by defendants in discovery--[LAPs'] internal work product--appear in haec verba or in substance in the Judgment that Zambrano claims to have written himself. These documents appear nowhere in the Lago Agrio court record.

Id. (footnote omitted) (emphases added); see id. at 483 ("overwhelming and unrefuted evidence establish[es] that portions of at least eight of the LAP team's internal work product documents" that "never were filed with the Lago Agrio court or made part of the official case record" "appear verbatim or in substance in the Judgment"); id. at 651-81 (showing comparisons).

Parts of six of those eight LAPs' internal documents produced in discovery in the present action--a memorandum, an expert report, index summaries, a Fajardo email, and a LAPs' alegato draft--"appear verbatim or in substance on 30 pages of the Judgment." Id. at 492. Expert witnesses, whose testimony the district court credited, made "side-by-side comparisons" of these unfiled LAPs' internal documents against passages in the Lago Agrio Judgment and found numerous strings of identical or virtually identical text that were not explainable either as set phrases or by chance. Id. at 493 (internal quotation marks omitted). They noted "39 examples of plagiarized text from the[se six pieces of the] Ecuadorian plaintiffs' unfiled work product that appear[] in the [Lago Agrio] Judgment." Id. (internal quotation marks omitted).

The district court noted that some of the copied text was "on important issues, including the question whether Chevron could be held liable for alleged pre-acquisition torts of

52

Texaco." Id. It found that "[t]here is no plausible explanation for their presence in the Judgment except that whoever wrote the Judgment copied parts of them." Id. (emphasis added).

A seventh LAPs' internal document, a 2009 memorandum written for the LAPs' team by one of its interns named Moodie, was also used in the Lago Agrio Judgment, which replicated certain of the memorandum's errors, inapposite doctrines, and inaccurate attributions. For example, the Lago Agrio Judgment's causation analysis relied on a common-law "'substantial factor' test" that is used in California, a reliance that is a puzzlement since Ecuador is a civil-law country and since that test "is outdated and generally applied only in asbestos cases." Donziger, 974 F.Supp.2d at 493-94. The "substantial factor" test, however, was a subject of Moodie's memorandum, see id., and the Moodie memorandum and the Lago Agrio Judgment "contain identical strings" of language, id. at 494. "Nothing in the Moodie Memo," however, "appears anywhere in the Lago Agrio Record." Id. at 495.

In addition, both the Judgment and Moodie's memorandum discuss the concept that causation can be established by a process of inference from provable facts in combination, even if each item of proof individually does not show more than a possibility, a proposition that is well established throughout the common-law world and that is "usually attributed . . . to the American text, Wigmore on Evidence 3rd Edition, paragraph 2497." Donziger, 974 F.Supp.2d at 495 (internal quotation marks omitted). But, peculiarly, the Lago Agrio Judgment attributed that proposition to Australian law--as had Moodie's memorandum. See id. American and Australian expert witnesses also identified other errors that are "common to both the Moodie Memo and the Judgment." Id. The district court noted that

53

> [t]he fundamental point . . . is not that the Judgment came to mistaken or odd conclusions about the law of the United States or Australia. It instead is that both the Moodie Memo and the Judgment made the same mistakes in characterizing them. Nothing in the Moodie Memo appears anywhere in the Lago Agrio Record. Thus, the likelihood that the Judgment independently would contain exactly the same errors in characterizations as appear in the Moodie Memo is almost zero. The Court finds that parts of the Moodie Memo were copied into and paraphrased in the Judgment.

Id. (footnote omitted) (emphases added).

The eighth LAPs' internal document used in the Lago Agrio Judgment was an internal database maintained by defendant Selva Viva Selviva CIA, LTDA ("Selva Viva"), an entity formed by Donziger and Yanza in 2004 as a funding vehicle for the Lago Agrio Litigation, see id. at 399. The record in the Lago Agrio court contained the laboratory test results of samples taken from the judicial inspection sites (the "Filed Lab Results"). The Lago Agrio Judgment purported to discuss these reported results; but there were several notable differences between the Filed Lab Results and the Judgment, differences traceable to the database maintained by Selva Viva, which was "a series of spreadsheets that were produced to Chevron in discovery, but not filed with the Lago Agrio court," id. at 495.

One indication that the Judgment relied on Selva Viva materials is the form of its citations to sample results, each of which consists of a series of letters and numbers, with many such citations in the Judgment "end[ing] with the suffix '--sv' or '--tx.' Not one of the Filed Lab Results contained an '--sv' or '--tx' suffix but the Selva Viva Database did." Id. at 496 (footnote omitted) (emphasis added). In addition, the Judgment's formatting--including the use of dashes and underscoring and the placement of parentheses--in various naming conventions differed from that used in the Filed Lab Results, but matched the formatting used in the Selva Viva database. See id.

Moreover, reliance by the authors of the Judgment on the Selva Viva materials resulted in a variety of substantive errors. For example, although the Filed Lab Results correctly identified one of Chevron's experts, Fernando Morales, as the submitter of a particular sample result, the Judgment misidentified the Chevron expert who submitted that sample result as John Connor. The Selva Viva materials likewise misidentified Fernando Morales as John Connor. See id. at 498.

More importantly, reliance on the Selva Viva materials led to serious errors in the Judgment's findings as to the presence or concentrations of injurious substances in the inspection-site samples. For example, where a test did not reveal the presence of the subject substance, the Filed Lab Results generally reported the result by using a less-than symbol ("<") followed by a number that indicated the minimum concentration of that substance that could be detected by the particular equipment and testing method being used. Thus, "<" before a number meant that the number was the minimum detectable level and that the test revealed less than that level. See generally Donziger, 974 F.Supp.2d at 497. The Judgment found that "'alarming levels of mercury have been found in the Sacha, Shushufindi and Lago Agrio fields, where we found several samples reaching 7 mg/kg.,'" and it attributed those findings to samplings taken by two of "'the experts . . . in the judicial inspection[s] at'" those three sites. Id. at 496-97 (quoting Lago Agrio Judgment (emphases ours)).

> In fact, however, the Filed Lab Results did not report that mercury levels reached 7 mg/kg in these samples. They reported levels of "<7"--i.e., no detectable mercury--for every one of them.

Donziger, 974 F.Supp.2d at 497 (emphases added).

The source of the Judgment's error in finding elevated mercury levels was its use of the Selva Viva database, which

separated the "<" sign from the following value by placing each in its own column. The column containing the "<" sign was labeled "flag." The author or authors of the Judgment thus used the Selva Viva Database rather than the Filed Lab Results, ignored or did not understand the "flag" column, and wrongly reported each of these test results as showing a concentration of mercury of 7 mg/kg.

Id. (emphases added).

Another error in the Judgment traceable to its use of the Selva Viva materials was its finding that the concentration of a certain injurious compound, allegedly found at some specific sites, was "'3142 mg/kg.,'" i.e., "milligrams per kilogram." Id. (quoting Lago Agrio Judgment (emphases in Donziger)); see also Donziger, 974 F.Supp.2d at 497 n.874 ("A milligram is one-thousandth of a gram. A concentration of one milligram is one one-thousandth of a gram per 1,000 grams of sample." (emphases added)). The Selva Viva database reported at least some of its test results in milligrams per kilogram. See id. at 497-98. The Filed Lab Results for these samples, however, reported their findings in "micrograms per kilogram," i.e., in millionths of a gram per kilogram, id. at 497 (emphasis in original). Therefore, while the Judgment found that the substance's "'3142 mg/kg.'" concentration "'exceed[ed] any standard of reasonable tolerance,'" see id. (quoting Lago Agrio Judgment (emphasis in Donziger)), its finding of 3,142 "milligrams" per kilogram was 1,000 times the concentration reported in the Filed Lab Results. "Thus, the Judgment could not have obtained the results it reported from the Filed Lab Results. It had to have copied them from the Selva Viva Database . . . ." Donziger, 974 F.Supp.2d at 497.

The district court noted that in analyzing these aspects of the Lago Agrio Judgment, it was not reviewing the substantive merits of the Judgment.

The point is that these particular characteristics of the Judgment are inconsistent with the evidence in the Lago Agrio record upon which the

56

Judgment purportedly relied, but appear in the Selva Viva Database, which is not in that record. This goes directly to the question of the authorship of the Judgment. At least in these respects, the Judgment was copied from LAP material outside the record, and Zambrano's testimony was untrue.

Id. at 498.

b. The LAPs' Team Prepared the Judgment, Beginning Work on It as Early as mid-2009

As described in Part I.B.11. above, in the wake of the January 2009 public showing of "Crude" containing a scene in which members of the LAPs' team were conferring with one of Cabrera's scientists, a scene that Fajardo implored the filmmaker to delete because it could cause the LAPs to "lose everything," Donziger and the LAPs' team were anxious not only to have the judgment be in their favor but also to have it not rely to any great extent on the Cabrera Report. They needed to control the content of the judgment. However, it is unlawful under Ecuadorian law for parties to submit proposed judgments to a court.

In mid-2009, Fajardo gave a LAPs' team intern named "Parker 'a research assignment for our legal alegato and the judgment, but without him knowing what he is doing.'" Donziger, 974 F.Supp.2d at 500 (quoting Fajardo June 5, 2009 email to Donziger (emphases ours)). Fajardo's ensuing email to Donziger was more circumspect, as it referred to the LAPs' alegato, followed by "and" and an ellipsis. See Donziger, 974 F.Supp.2d at 500 (citing Fajardo June 18, 2009 email to Donziger that attached a recent court decision that Fajardo stated would "'serve us well for our alegato and . . .'" (ellipsis in email) (emphasis ours)). The district court found these emails

suggestive. The distinction drawn between the alegato--i.e., the written closing argument in an Ecuadorian litigation--and the judgment in the email about Parker indicates that Fajardo's reference to "the judgment" meant exactly what it said. Parker was to do research for preparation of a judgment, but was not to be told the purpose of the assignment. Moreover, defendants have advanced no reason why it was important to keep Parker in the dark, save for

57

> the logical inference that he really was working on a judgment that could not properly have been submitted to the Lago Agrio court. Likewise, the strategically placed ellipsis at the end of the quoted sentence from the June 18 email implies that Fajardo knew that Donziger would know from the June 5 email that the ellipsis referred to the judgment.

Donziger, 974 F.Supp.2d at 500 (footnote omitted) (emphases added).

By early to mid-2010, even as their newly hired scientists worked toward "cleansing" the Cabrera Report, id. at 500 n.893, 501, Donziger and the LAPs "were deeply concerned" that the Lago Agrio court might rule against them because it "discredited [the Cabrera Report] as the work of the LAPs' consultants, Stratus," or that that "court, even assuming it ruled in their favor, might rely on the Cabrera Report if left to its own devices," which could "discredit" its decision, id. at 500. And by later in 2010,

> the LAPs' Cabrera Report problem had grown even more acute . . . . [T]he Denver lawyers had withdrawn as counsel upon their discovery of what had transpired among Donziger, Stratus, and the LAPs. The LAPs' last-ditch effort to stop the production of the Stratus documents had failed. The Second Circuit had directed Berlinger to produce substantially all of the Crude out takes, so that material either had been or was about to be produced. This Court had directed Donziger to produce extensive material and to submit to a deposition in a Section 1782 proceeding. Other Section 1782 proceedings had been or were being filed around the country. Hopes of suppressing the facts that Cabrera had been neither impartial nor independent and that Stratus had written all or much of his report had been dashed.

Id. at 502 (footnotes omitted) (emphases added). "There could have been no better way to ensure that the Lago Agrio court would not rely on the Cabrera Report than for the LAPs to draft the decision themselves." Id. at 501.

In addition, Kohn withdrew his financial support for the Lago Agrio Litigation in 2010 and the LAPs were attempting to raise new financing. One problem in attracting new investors--and in preserving the prospects of reward for the LAPs and their team--was a perceived ambiguity in Ecuador's Environmental Management Act ("EMA"), Article 43 of which could require the judge in

an action such as the Lago Agrio Chevron case to order the defendant to pay the damages to the community directly affected and to order the defendant to pay the plaintiffs only ten percent of the value of damages. See id. at 528.

> Writing the decision precisely as they wished and securing Zambrano's signature on it would have solved or, at least gone far toward solving, both the Cabrera Report and Article 43 problems. The disclaimer of reliance on the Cabrera Report offered the best hope for the first. Obtaining a judgment providing that all of the damages would be payable to the ADF, as the Judgment ultimately did, would have eliminated the EMA Article 43 concern.

Id. (emphasis in original). Plainly there was no lack of opportunity for the LAPs to have the judgment written as they wished. "The LAPs previously had availed themselves of Guerra's ghostwriting efforts when Zambrano was on the case for the first time." Id. (See Part I.D.4.a. below.)

The district court also found that "[t]he probability that the LAPs drafted the judgment draws strength" from the way in which Donziger equivocated when asked the question in his deposition:

> "Q. Did the Lago Agrio plaintiff team at any time develop a proposed judgment for the Lago Agrio case?
>
> A. I don't believe so. I don't know. It is possible."

Donziger, 974 F.Supp.2d at 501 (quoting Donziger deposition testimony). Thus,

> Donziger, almost in the same breath, testified that he (1) believed that the LAPs had not prepared a proposed judgment, (2) did not know whether they had prepared a proposed judgment, and (3) thought it possible that they had prepared a proposed judgment. But this deposition took place only five months after the Judgment was issued. Chevron already had suggested that the Judgment, like the Cabrera Report, had been ghostwritten by the LAPs, or at least that the judge received "secret assistance" from the plaintiffs' team in writing it. So Chevron's suggestion that the LAPs had ghostwritten the Judgment, the Court finds, was in Donziger's mind when this deposition was taken. Given his lead role in the litigation and the emails discussed above, it is most unlikely that he did not know whether the LAPs had prepared a proposed judgment. If they had not, the easy and truthful answer would have been that they had not done so. Period. Indeed, the fact that Donziger

59

> obfuscated--that he quickly changed his answer to this very simple question from "I don't believe so" to "I don't know" to "[i]t is possible"--suggests that Donziger knew quite a bit more than he was willing to say and that he did not say what he knew because it would have been damaging.

Donziger, 974 F.Supp.2d at 501 (footnote omitted) (quoting Donziger deposition testimony (emphases ours)).

In all the circumstances, the district court found "that the LAPs wrote the Judgment in its entirety or in major part and that Zambrano made little or no contribution apart from his signature and perhaps some light editing designed to make it read more like other decisions he had signed in this and other cases." Donziger, 974 F.Supp.2d at 502.

4.      The LAPs Bribed Zambrano To Sign the Judgment They Wrote

The district court found that the LAPs bribed Zambrano to allow them to write the Judgment in the Lago Agrio Chevron case (or "Chevron case") and that this bribe was facilitated by Guerra. Guerra so testified at trial. Although the district court did not credit all of Guerra's testimony as to the relationship between Zambrano and the LAPs, see, e.g., Donziger, 974 F.Supp.2d at 503 (noting "substantial credibility issues with respect to the testimony of Guerra, Zambrano, and Donziger"); id. at 505 ("all three of . . . these witnesses testified in ways that, if believed, would advance their own interests, economic and personal"), it found ample circumstantial evidence to support its conclusion that "Guerra told the truth regarding the bribe and the essential fact as to who wrote the Judgment," and "that the LAPs bribed Zambrano and wrote the Judgment in their favor," id. at 526.

a.     The Relationships Among Guerra, Zambrano, and the LAPs

Many of Zambrano's decisions in civil cases were written by someone other than Zambrano. "Zambrano admitted that he and Guerra had a close relationship that continued after Guerra was removed from the court and after Zambrano became a judge" in mid-2008. Donziger, 974 F.Supp.2d at 506 (footnote omitted). In an "arrangement [that] began in late 2008 or early 2009 . . . before there was any immediate prospect of Zambrano being assigned the Chevron case," id. at 507, "Guerra drafted court decisions in civil cases over which Zambrano presided," id. at 503. "Zambrano paid him for his ghostwriting services," id.; see also id. at 506 (noting that with respect to the period "December 22, 2010 through November 28, 2011," the hard drive on Guerra's computer contained "drafts of 105 rulings issued by the Lago Agrio court in cases unrelated to the Chevron case . . . . At least 101 of the 105 draft rulings were issued by then judge Zambrano or in cases assigned to him.").

During Zambrano's first tenure as presider over the Chevron case, which began in October 2009, Guerra also ghostwrote several orders for Zambrano in the Chevron case. A forensic examination of the hard drive on Guerra's computer revealed "nine drafts of orders that Zambrano issued in the Lago Agrio Chevron case between October 21, 2009 and February 17, 2010." Id. at 509. Guerra testified that during that first period of Zambrano's presiding over the Chevron case, he had struck the ghostwriting deal with Fajardo and Donziger, and for those decisions he was being paid by the LAPs. His agreement with the LAPs was evidenced by communications among Donziger, Fajardo, and other members of the LAPs' team beginning in mid-September 2009, which, using codes--as was their custom, see id. at 428, 510 n.960--referred to Guerra as the "'puppeteer'" and to Zambrano as the "'puppet.'" Id. at 510 (quoting Fajardo September 15, 2009 email to Donziger, Prieto, Yanza, and others re "PUPPETEER" stating, inter alia, "'The puppeteer is pulling the string

61

and the puppet is returning the package'"; "'it's pretty safe that there won't be anything to worry about'" (emphasis ours)).

The ghostwriting deal between Guerra and the LAPs' team was further confirmed by bank records and additional emails. See, e.g., Donziger, 974 F.Supp.2d at 509-10 (describing "Guerra's account statements and deposit slips confirm[ing] that in each of October, November, and December 2009, and February 2010, $1,000 was deposited into Guerra's [bank] account," two of those four deposits being made by a person identified by Donziger as "an employee of Selva Viva at the time each deposit was made"); id. at 510-11 & nn.964-966 (noting a Fajardo October 27, 2009 email to Donziger and Yanza stating that "'[t]he puppeteer won't move his puppet unless the audience pays him something,'" an October 29, 2009 withdrawal of $1,000 from a Selva Viva bank account, and a deposit of that amount on the same day into Guerra's bank account); id. at 511 (noting a November 26, 2009 withdrawal of $1,000 from a Selva Viva bank account, a November 27, 2009 deposit of $1,000 into Guerra's bank account, and a Yanza November 27, 2009 email to Donziger stating that "'the budget is higher in relation to the previous months, since we are paying the puppeteer'").

b.      Zambrano's Agreement With the LAPs

By September 2010, Zambrano and Guerra knew that the Chevron case would be reassigned to Zambrano. Guerra, who had maintained contact with the LAPs' team, sent Donziger a message that discussed another matter, but that "closed with the statement that he would 'support the matter of Pablo Fajardo so it will come out soon and well,'" Donziger, 974 F.Supp.2d at 514 (quoting Guerra September 5, 2010 email to Donziger (emphasis ours)).

> Guerra testified that the only business Guerra then had with Fajardo was the
> Lago Agrio [Chevron] case . . . . Thus, his message was an assurance to

62

Donziger that he would continue to assist the LAPs with respect to the case so that it would "come out soon and well."

Donziger, 974 F.Supp.2d at 514 (quoting Guerra trial testimony). "Donziger did not reply to Guerra directly, but Fajardo later told Guerra that Donziger had received the email and was looking into the matter." Donziger, 974 F.Supp.2d at 514.

In the meantime, at Zambrano's request, Guerra pursued the prospect of a deal with Chevron, viewed as the deepest pocket. He asked an intermediary to propose to Chevron's attorneys that Chevron write the final judgment in the case in exchange for payment to Zambrano and Guerra. The intermediary informed Guerra that the attorneys had declined. See id.

Zambrano . . . then suggested that Guerra approach the LAPs' representative with essentially the same proposition--"that they could obtain a verdict in their favor, in exchange for a payment of at least USD $500,000 to Mr. Zambrano; and for whatever amount [Guerra] could negotiate or agree to for [him]self." Guerra then took the offer to Fajardo, who allegedly was enthusiastic but said that he had to discuss it with Donziger. Days later, Guerra said, he received a call from Fajardo, who asked him to a meeting with himself, Donziger, and Yanza.

Id. (footnotes omitted) (quoting Guerra trial testimony (emphases ours)).

At the ensuing meeting, Guerra summarized the proposal and, in response to questions, Guerra assured Donziger that he could trust Zambrano to rule in the LAPs' favor if the payment were made. Although Donziger appeared interested in the deal, he ultimately replied that the LAPs did not then have that sum of money. See Donziger, 974 F.Supp.2d at 514. Some time later, however,

Zambrano informed Guerra that he had been in direct contact with Fajardo and that "the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect from the judgment, in exchange for allowing them to write the judgment in the Plaintiffs' favor."

Id. at 515 (quoting Guerra trial testimony). Zambrano promised to share some of that money with Guerra. See Donziger, 974 F.Supp.2d at 515; id. at 558 (noting "clear and convincing evidence that

63

Zambrano was corrupted by Donziger and the LAPs," as "Fajardo--with Donziger's approval--agreed to pay Zambrano $500,000 out of proceeds of the Judgment in exchange for Zambrano deciding the Lago Agrio case in the LAPs' favor and signing a decision provided by the LAPs").

c.        The LAPs-Written Judgment, Lightly Edited by Guerra

Guerra testified that about two weeks before the Judgment was issued in February 2011, he went to Zambrano's apartment where he met with Zambrano and Fajardo. "'Zambrano gave [Guerra] a draft of the judgment so that [Guerra] could revise it.'" Donziger, 974 F.Supp.2d at 515 (quoting Guerra trial testimony). Zambrano "told Guerra that the LAPs' attorneys had written the judgment and delivered it to him, and it was then Guerra's job to 'work on the document to fine-tune and polish it so it would have a more legal framework.'" Donziger, 974 F.Supp.2d at 515 (quoting Guerra trial testimony).

Guerra proceeded to work on the draft judgment in Zambrano's apartment for several hours over the course of two days.

> Guerra's edits were minor, involving mainly spelling and punctuation. When he was through, he returned the document to Zambrano on the laptop. The document was "not too different from the one that the Plaintiffs lawyers had given to Mr. Zambrano."

Donziger, 974 F.Supp.2d at 516 (footnotes omitted) (quoting Guerra trial testimony (emphasis ours)).

The district court credited this testimony by Guerra as to the events in 2010-2011 and found that "Guerra told the truth regarding the bribe and the essential fact" that the LAPs wrote the Judgment in their favor. Donziger, 974 F.Supp.2d at 526.

E.    The Ecuadorian Appellate Proceedings

    1.    Appeals to an Appellate Panel

        Both sides filed appeals from the $17.292 billion Lago Agrio Judgment, along with various motions, which were heard by an appellate panel consisting of three judges from the trial court ("Appeal Division" or "Division") selected by the provincial judicial counsel. Chevron, although it did not yet have Guerra's input (see Part I.D. above), argued, inter alia, that the Judgment had been fraudulently procured because the LAPs apparently had secretly assisted in the writing of the Judgment. Chevron had received some of the LAPs' internal files in the § 1782 proceedings in the United States, and it submitted an affidavit of an expert that identified overlaps between parts of the Judgment and the LAPs' internal Selva Viva database. Chevron also argued that the Judgment had likely been written by someone other than Zambrano, given that the record in the case was approximately 200,000 pages, and "only weeks before" the Judgment was filed Zambrano had stated that "he still had a quarter of the . . . record left to review." Donziger, 974 F.Supp.2d at 536 (internal quotation marks omitted).

        The LAPs, in their appeal, argued that the damages award should have been higher. They also argued that Chevron had planted the Selva Viva content in the Judgment, and they urged the court to deal with Chevron's fraud charges in order to avoid any adverse inferences if the court, on that issue, were to remain silent. See id. at 535-36.

        In an Opinion dated January 3, 2012, the Appeal Division affirmed the Judgment. The Division "acknowledged that the Judgment incorrectly had reported some of the data samples," but it "concluded that the errors were immaterial to the Judgment's damages award," and it "did not attempt to re-calculate the damages based on the correct figures," Donziger, 974 F.Supp.2d at 537;

65

rather, the panel "concluded simply that the judge had considered all of the evidence--not each piece individually--to arrive at the total damages award," id. at 537-38 (emphasis in original). (See Appeal Division Opinion at 12 ("the [trial] judge . . . has not assessed each sample and its results separately, as if they described isolated facts . . . .").) (See also Parts II.A.2. and II.D.1. below.)

The Appeal Division noted that there had been some errors in the Judgment's findings as to quantities of pollutants but stated that they did not "affect the opinion of the judgment." (Appeal Division Opinion at 11.) It concluded that, aside from the error in finding a high level of mercury, which the Appeal Division was disregarding, "the rest of the judgment of February 14th, 2011, in all its parts, is ratified, including the award of measures of moral reparation or their alternative." (Id. at 16.)

The Appeal Division made no modifications to any of the damages calculations that resulted in the $8.646 billion award, including the $5.4 billion component for remediation of soil at the "880 [waste] pits" referred to in the Judgment. The district court found, based on the expert testimony and the low-resolution aerial photographs in the Lago Agrio record, that the source for the number 880 must have been the Cabrera Report (see Part I.D.1 above). The Appeal Division neither made any findings with regard to this major component of the damages award nor stated that the Division did not rely on the Cabrera Report.

Nor did the Appeal Division address the "overlap between the Judgment and the LAPs' unfiled work product" or explain why information in the Judgment differed from the filed sampling data. Donziger, 974 F.Supp.2d at 537. The Appeal Division stated:

> Mention is also made of fraud and corruption of plaintiffs, counsel and representatives, a matter to which this Division should not refer at all, except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by the very defendant here, Chevron, under what is known as the RICO

66

act, and this Division has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice, if that were the case.

(Appeal Division Opinion at 10 (emphases added).) Thus, the Appeal Division did not deal with Chevron's argument that "the overlap in general and . . . the errors and other idiosyncracies common to the Judgment and the unfiled LAP documents" were not simply factual errors but were "evidence that the LAPs had written or secretly had a hand in writing the Judgment," which would have been improper under Ecuadorian law. Donziger, 974 F.Supp.2d at 538.

The LAPs asked the Appeal Division to clarify the extent to which it had addressed Chevron's claims of fraud. In response, the court issued an order on January 13, 2012 ("Appeal Division Clarification Order" or "Clarification Order") stating that "it was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction," id. at 538-39 (internal quotation marks omitted). The Clarification Order stated, inter alia:

This is a civil proceeding in which the Division does not find evidence of "fraud" by the plaintiffs or their representatives, such that, as has been said, it stays out of these accusations, preserving the parties' rights to present formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America.

(Appeal Division Clarification Order at 4 (emphasis added).)

2.     Appeal to the Ecuadorian National Court of Justice

Chevron then appealed to the Ecuadorian National Court of Justice (or "National Court"), arguing that the Judgment should be nullified for a variety of reasons, including, inter alia, the submission of reports fraudulently attributed to Calmbacher, the illegal activity regarding Cabrera, and the ghostwriting of the Judgment. See Donziger, 974 F.Supp.2d at 539. The National Court, "a court of cassation" which "reviews only the legal arguments and does not re-examine the facts," id.,

67

affirmed the decision of the Appeal Division with respect to all aspects of the Initial Judgment except the punitive damages award. Noting that "punitive damages are not contemplated under Ecuadorian law" (Opinion of Ecuadorian National Court of Justice at 222), the National Court reduced the Lago Agrio Judgment against Chevron to $8.646 billion (the Ecuadorian Judgment), see Donziger, 974 F.Supp.2d at 540.

As to Chevron's arguments that the Lago Agrio Judgment should be annulled, the National Court's opinion emphasized that "[t]he cassation appeal is an extraordinary appeal granted to the losing party so that the Cassation Court may annul not every unfair judgment, but only those in which their own specific unfairness has been proved to have been founded on a wrongful interpretation of the law." (Opinion of Ecuadorian National Court of Justice at 97.) It deemed the allegations that the LAPs had fraudulently submitted expert reports purportedly by Calmbacher, which Calmbacher had neither written nor approved, to be beyond the scope of cassation review, stating that Chevron had failed to identify "'which legal rule ha[d] been supposedly infringed.'" Donziger, 974 F.Supp.2d at 539 (quoting Opinion of Ecuadorian National Court of Justice at 97).

As to Chevron's contention that the LAPs had ghostwritten the Cabrera Report, the National Court "accepted the trial court's statement that it had not relied on the Cabrera Report" and concluded that the Appeal Division had properly weighed the remaining evidence in reaching its decision. Donziger, 974 F.Supp.2d at 539-40. The National Court itself, as a court of cassation, did not review the trial record.

The National Court also stated that the Appeal Division's Clarification Order was not inconsistent with the Division's original opinion disclaiming competence to rule on the conduct of counsel, or judicial experts or officials:

68

> In determining in a sufficient and clear manner that there was no procedural fraud in these proceedings, in the opinion of the Appeals Court, does not mean that the order issued on January 3, 2012 is inconsistent with the judgment rendered on January 13, 2012; it is clear that, <u>by preserving the rights and actions of the parties, the court acknowledges the lack o[f] jurisdiction to decide whether or not there has been procedural fraud</u>.

(Opinion of Ecuadorian National Court of Justice at 120 (emphasis added).)

F.    The LAPs' Strategies To Enforce the Judgment

In 2010, Donziger had hired the law firm of Patton Boggs to lead the LAPs' enforcement effort for the favorable judgment he was expecting. Patton Boggs had outlined a strategy, dubbed "Invictus," of getting "attachment[s] of Chevron's assets" and "attacking Chevron on multiple fronts--in the United States and abroad." Donziger, 974 F.Supp.2d at 475, 541 (internal quotation marks omitted). The Invictus strategy included "identify[ing] Chevron-related entities--such as subsidiaries and joint ventures--and target[ing] them with enforcement actions also." Id. at 476-77 (internal quotation marks omitted).

Once the Lago Agrio Judgment was entered and affirmed, the LAPs obtained orders in Ecuador "attach[ing] Chevron's intellectual property rights in Ecuador, funds going into or leaving Ecuador to Chevron's bank accounts abroad, and [the] $96 million arbitration award issued against the Republic of Ecuador." Id. at 542. They also brought enforcement actions in Argentina, Brazil, and Canada. The district court found that the LAPs intend to seek enforcement "in the United States when they conclude that it is tactically advantageous to do so." Id. at 541.

69

G.    The Final Judgment in the Present Action

The district court concluded that Donziger and the LAPs' team of attorneys, investors, experts, and consultants constituted a RICO enterprise, and that Donziger had conducted the affairs of that enterprise in a pattern of racketeering activity.  (See Part II.D. below.)  Having found that Donziger "and the Ecuadorian lawyers he led," in representing the LAPs, "corrupted the Lago Agrio case" by, inter alia,

■ "submitt[ing] fraudulent evidence,"

■ "coerc[ing] one judge" to use a single, "supposedly impartial, 'global expert' to make an overall damages assessment" for the judge,

■ "hand-pick[ing]" and illegally "pa[ying]" an expert who would "'totally play ball' with the LAPs" in making such a damages assessment for the judge,

■ coercing that judge to appoint Donziger's "hand-picked" expert as the court's "'global expert,'"

■ "pa[ying] a Colorado consulting firm secretly to write all or most of the global expert's report,"

■ "falsely present[ing] the report as the work of the court-appointed and supposedly impartial expert,"

■ fraudulently having the Colorado firm write supposed criticisms by the LAPs of the expert's report that that firm had written for the LAPs, to cause it to appear that the expert was impartial and his report neutral, rather than, as in fact it was, written by agents of the LAPs,

■ telling "half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing,"

■ having "the LAP team wr[i]te the Lago Agrio court's Judgment themselves,"

■ and "promis[ing] $500,000 to the [then-presiding] Ecuadorian judge" in exchange for his agreement "to rule in the[ LAPs'] favor and sign their judgment,"

Donziger, 974 F.Supp.2d at 384; see id. at 443-45, the district court concluded that "[i]f ever there were a case warranting equitable relief with respect to a judgment procured by fraud, this is it," id. at 384.

The court noted that "fraud in its procurement is an ancient basis for enjoining enforcement of or granting other equitable relief with respect to a judgment where other requisites of the exercise of equitable power are present," id. at 557. It concluded that as a result of the fraudulent, coercive, and corrupt acts orchestrated by Donziger, Chevron was entitled to equitable relief--under RICO against Donziger (see Part II.D. below), and under New York common law against Donziger, Camacho, and Piaguaje (see Part II.E. below)--to prevent Donziger and the LAP Representatives from profiting from their frauds and corruption, see Donziger, 974 F.Supp.2d at 639.

The district court rejected arguments by Donziger and the LAP Representatives that the effects of any fraud or corruption in the trial court had been eliminated by the appellate reviews of the Lago Agrio Judgment. The court stated, inter alia, that as the Ecuadorian appellate courts had declined to resolve Chevron's fraud and ghostwriting allegations, the appellate decisions did not break the causal chain between the Lago Agrio Judgment produced by Donziger's fraud, bribery, and other corrupt practices and the injury the Ecuadorian Judgment causes to Chevron. See id. at 606-08.

Defendants also contended "that the coercion of Judge Yánez was immaterial because," they argued, "the Cabrera Report played no role in the ultimate decision." Id. at 558. The court found their premise fallacious, having determined, inter alia, "that the Cabrera Report in fact was relied upon by the author or authors of the Judgment and that it played an important role in holding Chevron liable to the extent of more than $8 billion," most relevantly in the fact that the Cabrera Report was the source "for the count of 880 pits, which was an essential predicate to more than $5 billion of the damage award," id. at 559.

The district court also rejected arguments that, as a matter of comity, it could not award Chevron relief from the Lago Agrio Judgment. The court reasoned as follows:

> Comity and respect for other nations are important. But comity does not command blind acquiescence in injustice, least of all acquiescence within

71

the bounds of our own nation. Courts of equity long have granted relief against fraudulent judgments entered in other states and, though less frequently, other countries. Moreover, the United States has important interests here. The misconduct at issue was planned, supervised, financed and executed in important (but not all) respects by Americans in the United States in order to extract money from a U.S. victim.

That said, considerations of comity and the avoidance of any misunderstanding have shaped the relief sought here. Chevron no longer seeks, and this Court does not grant, an injunction barring enforcement of the Lago Agrio Judgment anywhere in the world. What this Court does do is to prevent Donziger and the two LAP Representatives, who are subject to this Court's personal jurisdiction, from profiting in any way from the egregious fraud that occurred here. That is quite a different matter. Indeed, the LAP Representatives' lawyer recently conceded before the Second Circuit that the defendants "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming that the judge was bribed. Defendants thus have acknowledged the propriety of equitable relief to prevent individuals subject to the Court's jurisdiction from benefitting from misdeeds for which they are responsible. And while the Court does enjoin enforcement of the Judgment by these defendants in the United States, that limited injunction raises no issues of comity or international relations. It is the prerogative of American courts to determine whether foreign judgments may be enforced in this country.

Donziger, 974 F.Supp.2d at 384-85 (footnote omitted) (quoting transcript in Naranjo v. Chevron Corp., No. 13-772 (2d Cir. Sept. 26, 2013) (oral argument of mandamus petition seeking vacatur of district court's refusals to allow defendants to withdraw defenses of collateral estoppel (emphases ours))).

The court noted that as a court of equity it has the power to "command persons properly before it to cease or perform acts," whether inside or "outside its territorial jurisdiction," Donziger, 974 F.Supp.2d at 556 (internal quotation marks omitted (emphasis ours)), including the power to "enjoin those parties from enforcing, or afford other equitable relief with respect to, a judgment of another state or another nation," id. at 556-57. Such an equitable in personam remedy "seek[s] to deprive" the person enjoined "of the benefit of the judgment by enjoining [its] enforcement

72

. . . . on the ground that the rights acquired cannot be retained in good conscience"; but "[t]he remedy in equity does not assail the court in which the judgment was rendered . . . ." Id. at 556 n.1268 (internal quotation marks omitted).

In order to ensure that Donziger and the LAP Representatives "never benefit[] in any material way from the Judgment in the Lago Agrio case," id. at 641, the district court determined that three types of relief for Chevron were appropriate: a constructive trust, disgorgement, and an injunction. Accordingly, the final judgment, defining Donziger and the Donziger Firm as "Donziger,"

> imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the [Ecuadorian] Judgment or the enforcement of the [Ecuadorian] Judgment anywhere in the world including, without limitation, all rights to any contingent fee under the Retainer Agreement and all stock in Amazonia. Donziger shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain.

Judgment as to Donziger Defendants and Defendants Camacho and Piaguaje ¶ 1 ("District Court Judgment"); see id. ¶ 7.2 (defining "Amazonia" to refer to "Amazonia Recovery Limited"); see also Donziger, 974 F.Supp.2d at 528 n.1110 ("Amazonia Recovery Limited" is a company created by Donziger and the LAPs in 2012 to distribute proceeds from the Lago Agrio Judgment). The District Court Judgment imposes a similar constructive trust against the LAP Representatives. See District Court Judgment ¶ 2.

The District Court Judgment also enjoins Donziger and the LAP Representatives from, inter alia, "[f]iling or prosecuting any action for recognition or enforcement of the [Ecuadorian] Judgment" or "seeking the seizure or attachment of assets based on the [Ecuadorian] Judgment . . . in any court in the United States," id. ¶ 4.1, and from "monetiz[ing]" the Lago Agrio Judgment by,

73

for example, "selling, assigning, [or] pledging . . . any interest" in it, id. ¶ 5. It also provides, however, that

> [n]otwithstanding anything to the contrary in this Judgment, nothing herein enjoins, restrains or otherwise prohibits Donziger, the LAP Representatives, or any of them, from (a) filing or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment . . . in courts outside the United States; or (b) litigating this action or any appeal of any order or judgment issued in this action.

Id. ¶ 6 (emphases added).

The district court pointed out that its final judgment would merely "prevent Donziger and the LAP Representatives from profiting from the [Ecuadorian] Judgment or seeking to enforce it in this country," Donziger, 974 F.Supp.2d at 639, i.e., the judgment "prevents the three defendants who appeared at trial--over whom [the district court] has personal jurisdiction--from profiting from their fraud," id. at 644 (emphases added). "The decision in the Lago Agrio case was obtained by corrupt means. The defendants here may not be allowed to benefit from that in any way. The order entered today will prevent them from doing so." Id.

## II.   DISCUSSION

On appeal, Donziger, his Firm, and/or the LAP Representatives contend principally that the district court's judgment should be vacated and the case dismissed for lack of federal jurisdiction on the ground that Chevron lacks Article III standing; that Chevron, in light of positions taken in earlier litigation, is estopped from challenging any Ecuadorian judgment; that the equitable relief granted by the district court was foreclosed by our decision in Naranjo and, in any event, is

74

unauthorized by RICO or common law; and that the district court's judgment violates principles of international comity. The LAP Representatives also argue that the district court lacked personal jurisdiction over any defendant other than Donziger and his Firm, and that any corrupt conduct by Donziger in Ecuador should not be attributed to the LAPs. For the reasons that follow, we are unpersuaded, and we affirm the judgment of the district court.

A.    Challenges to Federal Jurisdiction

Donziger contends that this action should be dismissed for lack of federal jurisdiction on the ground that Chevron lacks Article III standing, arguing principally that the decisions of the Ecuadorian appellate courts eliminated any causal connection between Chevron's injuries and the LAPs' team's misconduct in the Lago Agrio trial-level proceedings, and that Chevron failed in the present action to demonstrate any concrete injuries that could be redressed by the district court. For the reasons that follow, we conclude that, whether viewed as challenges to standing or as contentions of mootness, these challenges to federal jurisdiction are without merit.

1.    Article III Standing

"The concept of [Article III] standing" is part of "the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 37 (1976); see, e.g., Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014); Davis v. Federal Election Commission, 554 U.S. 724, 732 (2008); Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992); Warth v. Seldin, 422 U.S. 490, 498-99 (1975).

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact--an invasion of a legally

75

protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560-61 (internal quotation marks omitted). Any monetary loss suffered by the plaintiff satisfies the injury-in-fact element, see, e.g., Natural Resources Defense Council, Inc. v. United States Food & Drug Administration, 710 F.3d 71, 85 (2d Cir. 2013); and a liability, including a contingent liability, may be a cognizable legal injury, see, e.g., Clinton v. City of New York, 524 U.S. 417, 430-31 (1998); E.M. v. New York City Department of Education, 758 F.3d 442, 457 (2d Cir. 2014); Denney v. Deutsche Bank AG, 443 F.3d 253, 265-66 (2d Cir. 2006). And as indicated, the requisite "injury in fact" need not have been already "actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." Davis, 554 U.S. at 734. The requirement can be met by showing an actual injury or through an "allegation of future injury . . . if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List, 134 S. Ct. at 2341 (internal quotation marks omitted).

The traceability requirement for Article III standing means that "the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) (internal quotation marks omitted). The fact that the defendant's conduct may be only an "indirect[]" cause is "not necessarily fatal to standing," Simon, 426 U.S. at 44; see, e.g., Warth, 422 U.S. at 505. A defendant's conduct that injures a plaintiff but does so only after intervening conduct by another person, may suffice for Article III standing. See Rothstein v. UBS AG, 708 F.3d at 92. The traceability requirement focuses on whether the asserted injury could have

76

been a consequence of the actions of the defendant rather than being attributable to the "'independent'" acts of some other person not before the court. Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41-42).

The redressability requirement focuses on whether a plaintiff "personally would benefit in a tangible way from the court's intervention," Warth, 422 U.S. at 508, i.e., whether "the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision," Simon, 426 U.S. at 38; see, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 260-62 (1977); Warth, 422 U.S. at 498-99. A plaintiff "satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." Larson v. Valente, 456 U.S. 228, 244 n.15 (1982) (emphasis in original).

Although the case-or-controversy prerequisite to federal jurisdiction means that "'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed,'" Davis, 554 U.S. at 733 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997)), and, as discussed in Part II.A.2. below, a case becomes "moot," and beyond federal jurisdiction, if there ceases to be an actual controversy, see, e.g., Chafin v. Chafin, 133 S. Ct. 1017, 1023 (2013), "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed," Davis, 554 U.S. at 734 (emphasis added).

Chevron clearly met the requirements for Article III standing when it commenced the present action. Donziger's principal challenge to Chevron's "standing"--i.e., his argument that the decisions of the Ecuadorian appellate courts eliminated any causal connection between Chevron's injuries and defendants' misconduct in the Lago Agrio trial-level proceedings--is inapplicable because

77

when Chevron commenced the present action on February 1, 2011, none of the supposedly curative decisions had yet been rendered. The decisions of the Ecuadorian appellate courts were issued in 2012 and 2013.

Although the Lago Agrio Judgment itself was not entered until February 14, 2011, Chevron's February 1 complaint ("Complaint") adequately pleaded an imminent threat to its business and property by reason of the fraudulent and corrupt conduct of Donziger and other defendants. By the time Chevron commenced this action, it had, through the § 1782 proceedings (see Part I.B.11. above), obtained copies of numerous internal communications among Donziger and other members of the LAPs' team, including the consultants at Stratus (who had written--and objected to and responded to their own objections to--the Cabrera Report), as well as hundreds of hours of outtakes from the "Crude" documentary showing, inter alia, collaboration between Cabrera and the LAPs. Chevron's Complaint asserted RICO claims against Donziger, his Firm, Fajardo, Yanza, the main Stratus consultants, and others, and asserted common-law claims against all defendants, including claims of fraud and unjust enrichment. The Complaint included detailed allegations of most of the facts eventually found proven by the district court, discussed in Part I.B. above, as to, inter alia: the submission by the LAPs to the Lago Agrio trial court of fabricated inspection reports in the name of Calmbacher, who had neither written nor approved them; the coercion of one Ecuadorian judge to discontinue inspections of allegedly polluted sites and to appoint Cabrera as the court's global expert with respect to the overall damages assessment; the secret payments to Cabrera to have him claim impartiality and claim sole authorship of his report although it was written by the LAPs' consultants; and the repeated announcements of burgeoning estimates of damages the LAPs were irresponsibly predicting would be imposed on Chevron, starting at $6 billion without scientific foundation and

78

rising to $27 billion or even $113.5 billion. (See Complaint ¶¶ 3, 92-99, 100-112, 113-151, 158, 163-175, 299.)

Stating that on December 17, 2010, the Lago Agrio trial court had entered an order formally closing the evidence, thereby authorizing the court to enter judgment without further notice to the parties, and that the LAPs had filed their final alegato on January 17, 2011, the February 1 Complaint alleged that "a judgment that finds Chevron liable and awards damages appears to be imminent . . . ." (Id. ¶ 295.) The Complaint alleged that the defendants were "already . . . planning to seek immediate enforcement of the impending Ecuadorian judgment in U.S. and foreign courts, and to extort a payment from Chevron by using the Ecuadorian judgment to threaten seizure of Chevron's assets and those of its subsidiaries," quoting Patton Boggs's "'Invictus'" strategy statements (a) that "'[i]f and when an enforceable judgment is entered in Ecuador, Plaintiffs' Team expects to be engaged quickly, if not immediately, on multiple enforcement fronts--in the United States and abroad'" (id. ¶ 296), and (b) that "'[c]onsistent with their aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-judgment basis, largely as a means of attaining a favorable settlement at an early stage. Various laws and procedures within and outside the United States may permit attachment of Chevron's assets prior to successful recognition of the Ecuadorian judgment'" (id. ¶ 299).

The Complaint quoted Donziger as saying that "'[i]f we get a judgment out of the trial court, we're coming back immediately,--soon as we can,--to get that judgment enforced. We are not waiting for the appeals process.' . . . 'This could end up being one of the biggest forced asset seizures in history and it could have a significant disruptive impact on the company's operations.' . . . 'At the end of the day, it might be a situation where a U.S. court enforces the judgment and the marshals have

79

to go to Chevron and seize their assets.'" (Id. ¶ 297.) The Complaint also quoted Donziger's statement of his "intention . . . to 'take legal fees we can earn from this case and, do more cases like this in different places with, you know, the same team, if possible.'" (Id. ¶ 300.)

The Complaint alleged that

[t]he impending judgment of the Lago Agrio court, procured by the RICO Defendants' and their co-conspirators' fraud--in addition to related attachment and enforcement efforts and the specter of immediate liability, which according to the RICO Defendants and their co-conspirators, may be as high as $113.5 billion--threatens to disrupt Chevron's business operations, sully its reputation, and otherwise cause Chevron to suffer irreparable harm.

(Id. ¶ 299.) In addition to a request for treble damages and attorneys' fees on the RICO claims, the Complaint requested, with respect to most of the asserted causes of action,

a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them . . . from commencing, prosecuting, or advancing in any way--directly or indirectly--any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

(Id. ¶¶ 343, 366, 373, 383; see id. ¶¶ 351, 359, 377, 397.)

In sum, there can be no doubt that Chevron had standing to initiate the present action. Its initial Complaint alleged numerous corrupt and fraudulent acts on the part of Donziger and other defendants that were expressly designed to extract money from Chevron, either through the entry of a judgment against it by the Lago Agrio court or through a settlement. The Complaint plausibly alleged facts from which it could be inferred that a judgment imposing liability on Chevron would be traceable to the corrupt and fraudulent conduct of those defendants; it plausibly alleged facts from which it could be inferred that such a judgment was imminent. And plainly the injunctive relief

80

requested would have protected Chevron against the enforcement of such a judgment. All of the elements of standing were met at the outset of the case.

The district court properly denied appellants' motions to dismiss this action for lack of standing. It correctly viewed the issue raised--the purported cleansing of any taint from the Lago Agrio Judgment by the Appeal Division's affirmance in 2012--as one of mootness.

2.      Mootness: The Break-in-Causation Theory

The question of standing "bears close affinity" to the question of "mootness," which is "whether the occasion for judicial intervention persists." Warth, 422 U.S. at 499 n.10 (emphasis added). The principle that a federal court "lacks jurisdiction to consider the merits of a moot case is a branch of the constitutional command that the judicial power extends only to cases or controversies." Powell v. McCormack, 395 U.S. 486, 496 n.7 (1969). A case is moot when "the parties lack a legally cognizable interest in the outcome," City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (internal quotation marks omitted); "a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party,'" Chafin, 133 S. Ct. at 1023 (quoting Knox v. Service Employees International Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) (emphases ours)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Knox, 132 S. Ct. at 2287 (internal quotation marks omitted). "Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." Powell, 395 U.S. at 497.

Donziger's contention that there is no longer a live controversy as to the conduct of the LAPs' legal team, on the theory that the Ecuadorian appellate decisions eliminated the causal

81

connection between their corrupt conduct at the trial level and the $8.646 billion Ecuadorian Judgment against Chevron, is untenable. It is well established that

> [b]efore one may be deprived of a protected interest, whether in a criminal or civil setting, see Marshall v. Jerrico, Inc., 446 U.S. 238, 242, and n. 2 (1980), one is entitled as a matter of due process of law to an adjudicator who is not in a situation "'which would offer a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true.'"

Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 617-18 (1993) ("Concrete Pipe") (quoting Ward v. Village of Monroeville, 409 U.S. 57, 60 (1972) (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927) (emphasis ours))). A pecuniary interest in the outcome of a case plainly provides such a temptation. See, e.g., Ward, 409 U.S. at 60; Tumey, 273 U.S. at 523; cf. id. at 535 ("[n]o matter what the evidence [i]s against [a defendant, it] ha[s] the right to have an impartial judge"); United States v. Manton, 107 F.2d 834, 846 (2d Cir. 1939) ("Judicial action, whether just or unjust, right or wrong, is not for sale; . . . the judge must be perfectly and completely independent with nothing to influence or control him but God and his conscience." (internal quotation marks omitted)), cert. denied, 309 U.S. 664 (1940). "[D]ue process requires a 'neutral and detached judge in the first instance.'" Concrete Pipe, 508 U.S. at 617 (quoting Ward, 409 U.S. at 62). "Even appeal and a trial de novo [at the appellate level] will not cure a failure to provide a neutral and detached adjudicator." Concrete Pipe, 508 U.S. at 618; see Ward, 409 U.S. at 61.

The circumstances of the instant case present no reason to deviate from these principles. Notwithstanding Donziger's repeated characterization of the Appeal Division's affirmance of the Lago Agrio Judgment as a "substitute judgment," the fact remains that the Division did not alter the Lago Agrio Judgment at all. The only change in the Judgment entered by Judge Zambrano was

made by the Ecuadorian National Court, which vacated the punitive damages award; and the National Court made clear that its role as a cassation court was to concern itself only with the law, not with the record. The fact that the extant $8.646 billion award of compensatory damages against Chevron affirmed by the Appeal Division is traceable to the decision of then-Judge Zambrano, is plain from the opinion of the Appeal Division itself. In its 16-page opinion, less than one-third of which dealt with the merits of the LAPs' claims against Chevron, the Division, without stating any factual findings of its own, expressly approved Judge Zambrano's approach and conclusions. It stated, inter alia, that

> the judge in his judgment has not assessed each sample and its results separately, as if they described isolated facts, but instead it is the collection of information coming from various sources that undoubtedly has created in the trial judge the conviction of the existence of damage, allowing him at the same time to have a minimal margin of error in applying the interpretation method of sound discretion to assess scientific evidence. . . . In the present case, the trial court has complied with the provision [that evidence must be assessed as a whole], since, evaluating the evidence collectively, it refers to each item of evidence. Moreover, the method of interpretation--the interpersonal, psychic form or mechanism--is not subject to strict limits in any concrete, express legal rule that can be considered violated; it is indeed a mental form that leads to the assessment, where human elements such as experience, logical rules, and even some knowledge of ranks of human psychology play a role; this is how legal doctrine and its most distinguished exponents put it forth. . . . The rules of sound judgment are above all rules of proper human understanding. . . . The Division considers that the analysis of civil liability, clear in the lower judgment, is the appropriate one for the procedural situation under analysis, since this is a case of strict civil liability, because it is dealing with activities that, carried out as the defendant's business purpose, imply risk in and of themselves; or, as may be stated, merely engaging in the action entails great risk. The analysis of the relationship between damage and cause in the Ecuadorian Amazon is sound and derives from the examination of the items of evidence that exist in the record . . . . Then, the damages to the environment are legally proved and considering the causal relationship between the result of damage, and the action of the operations of the then Texpet, the Division does not find reasons to modify what was ordered in the lower court's judgment and states that it is appropriate to confirm the monetary amounts established as proportions of compensation and indemnization.

(Appeal Division Opinion at 12-13 (internal quotation marks omitted (emphases added)).) It

continued:

> As the lower court explains, and this ruling affirms, sound judgment as a form of intelligence in judicial activity allows for reasonable conclusions by putting forth the facts that serve as background; nothing is arbitrary pursuant to this process of mental certainty. The appealed judgment, since it is an opinion that was served in the first instance, and the subsequent amplification, proposes a detailed appraisal of all the body of evidence and finds the existence of environmental damages legally proved. The Division considers the lower court's appraisal in this part to be coherent and of good legal-logical judgment, because it stems from the body of evidence presented in the trial to which the trial court referred precisely. As regards standards for monetary appraisal, it can be seen, and affirmed, that the trial judge has not picked economic opinions or parameters that appear from the trial--and it would not have been strange at all for him to do so--, nor has he considered them as a means of proof for reaching a decision; the trial judge's judgment establishes amounts different from those established or stated by the parties in defense of their interests.

(Id. at 13 (emphases added).)

The Appeal Division concluded that as to Chevron's appeal, any errors were harmless;

it found merit

> only in the part that refers to the presence of mercury in the concession area, since there was an error in the assessment of the evidence with respect to this element in the lower court, and therefore its significance is left aside in this ruling. Considering that this error is not capable of influencing the final decision, the rest of the judgment of February 14th, 2011, in all its parts, is ratified . . . .

(Id. at 16 (emphases added).)

In sum, as stated by the Appeal Division in the above passages, "the [trial] judge in his judgment [did] not assess[] each sample and its results separately, as if they described isolated facts"; rather he made a "discretion[ary] . . . assess[ment of the] scientific evidence." His "method of interpretation" was "the interpersonal, psychic form or mechanism," which "is not subject to strict limits in any concrete, express legal rule." His "judgment establishe[d] amounts different from those

84

established or stated by the parties in defense of their interests." And, in his "monetary appraisal, . . . the trial judge [did] not pick[] economic opinions or parameters that appear from the trial." The record in the present case reveals a parade of corrupt actions by the LAPs' legal team, including coercion, fraud, and bribery, culminating in the promise to Judge Zambrano of $500,000 from a judgment in favor of the LAPs. The Appeal Division's Opinion provides no basis for an inference that the Lago Agrio Judgment was not the result of those corrupt acts, given its description of Judge Zambrano as having reached his decision without "assess[ing]" discrete "facts," without following "concrete, express legal rule[s]," and without "consider[ing]" the "economic opinions or parameters that appear from the trial." And given that the Appeal Division in its opinion (a) sets out no findings or damages assessments or calculations of its own, (b) approves Judge Zambrano's approach as "sound," "appropriate," and presenting "no[] . . . reasons to modify what was ordered in the lower court's judgment," and (c) "ratifie[s]" Judge Zambrano's award "in all its parts," we conclude that Chevron's $8.646 billion judgment debt, as approved by the Appeal Division, is clearly traceable to the LAPs' legal team's corrupt conduct.

Donziger's contention that Chevron has not met the requirement that it show injury is meritless. The threat of injury to Chevron, sufficiently imminent when this action was commenced, soon ripened into actual injury. Less than two weeks after Chevron initiated the present action, then-Judge Zambrano entered the $17.292 billion Lago Agrio Judgment, imposing on Chevron a judgment debt of $8.646 billion in compensatory damages plus $8.646 billion in punitive damages. The $8.646 billion debt for compensatory damages remains extant.

Donziger's additional arguments that Chevron's case became moot when this Court ruled in Naranjo that the Recognition Act does not authorize an affirmative attack on a foreign

85

judgment as to which there has yet been no attempted enforcement in New York (see Donziger brief on appeal at 84-93), or that the case became moot when Chevron withdrew its claim for money damages and pursued only equitable relief, which Donziger contends is not authorized by RICO (see id. at 116-19), are also untenable. An argument that claims mootness based on a challenge to "the legal availability of a certain kind of relief--confuses mootness with the merits." Chafin, 133 S. Ct. at 1024; cf. Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 151 n.1 (2010) ("The question whether [a plaintiff is] entitled to the relief that [it] seek[s] goes to the merits, not to standing.").

Nor is there merit in Donziger's contention that, in light of Chevron's withdrawal of its claim for money damages, its injury is not redressable. The injury to Chevron may not be fully compensable, but the equitable restrictions permissibly imposed by the district court (see Parts II.D., II.E., and II.H. below) provide some relief.

In sum, finding no merit in appellants' standing or mootness arguments, we reject the contention that the present action should have been dismissed for lack of federal jurisdiction.

B.    The Judicial Estoppel Contention

In 1999, after a group of Ecuadorian plaintiffs, who were substantially the same as the LAPs, had brought the Aguinda action against Texaco in the Southern District of New York, Texaco sought dismissal of the suit on the ground of forum non conveniens, arguing that the action belonged in Ecuador. In so moving, Texaco offered "'to satisfy any judgments in plaintiffs' favor, reserving its right to contest their validity only in the limited circumstances permitted by New York's Recognition of Foreign Country Money Judgments Act.'" Donziger, 974 F.Supp.2d at 631 n.1753 (quoting Texaco memorandum submitted to the Aguinda district court); see Republic of Ecuador, 638 F.3d at 389

86

(citing the same language). Donziger and the LAP Representatives contend that in light of that representation, principles of judicial estoppel bar Chevron from contending that the competence or integrity of the Ecuadorian judiciary is institutionally flawed or from challenging any Ecuadorian judgment against it. Given the record in this case, we do not reach any contentions as to the Ecuadorian judiciary in general. Focusing squarely on the conduct of the LAPs' legal team in the Lago Agrio Litigation itself, we cannot agree that judicial estoppel is applicable.

> [J]udicial estoppel[] "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 227, n. 8 (2000); see 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) (hereinafter Wright) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").

New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (emphasis added). Noting that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," the Supreme Court observed that

> several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled . . . . Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, . . . and thus poses little threat to judicial integrity. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. . . . [J]udicial estoppel forbids use of intentional self-contradiction . . . as a means of obtaining unfair advantage . . . .

New Hampshire, 532 U.S. at 750-51 (internal quotation marks omitted (emphases ours)). The

87

Supreme Court applied these factors to the case before it, see id. at 751-55, without establishing them as "inflexible prerequisites or [as] an exhaustive formula for determining the applicability of judicial estoppel," id. at 751.

Our Court "has consistently limited the application of judicial estoppel to situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced," applying it only in "situations where the risk of inconsistent results with its impact on judicial integrity is certain." Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 148 (2d Cir. 2005) ("Uzdavines") (internal quotation marks omitted) (citing cases). We do not apply judicial estoppel where "the statements at issue do not present an irreconcilable conflict." Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 119 (2d Cir. 2004).

We have expressed some question as to whether the standard of review for a ruling on judicial estoppel should be de novo or abuse of discretion. See, e.g., Intellivision v. Microsoft Corp., 484 F. App'x 616, 618 & n.1 (2d Cir. 2012) (noting that seven of our Sister Circuits review for abuse of discretion); Uzdavines, 418 F.3d at 143 (applying de novo review in denying a petition for review); see also New Hampshire, 532 U.S. at 750 (describing "judicial estoppel [a]s an equitable doctrine invoked by a court at its discretion" (internal quotation marks omitted)). In this case, however, the choice between the two standards is immaterial, for under either, the doctrine is inapplicable because Chevron's suit is not inconsistent with the prior Texaco representation.

The prior Texaco representation was at issue in Republic of Ecuador, 638 F.3d 384, in which the LAPs sought to stay a treaty-based arbitration commenced by Chevron. In the arbitration, Chevron alleged, inter alia, that the ROE "had improperly interfered in the Lago Agrio litigation" in breach of (a) its 1995 settlement agreement with Texaco that specified the remediation

work to be done in the Concession area, and (b) its 1998 release of Texaco from all potential claims by the ROE and PetroEcuador after ROE inspectors had confirmed Texaco's satisfactory completion of that work. Republic of Ecuador, 638 F.3d at 388, 390; see Donziger, 974 F.Supp.2d at 386-87. The LAPs argued that in light of Texaco's offer to satisfy Ecuadorian judgments, such an arbitration proceeding was barred by judicial estoppel. We rejected that contention because there was

> no conflict between Texaco's promises to the district court and Chevron's initiation of a contemporaneous challenge to Ecuador's conduct with respect to the Lago Agrio litigation. Texaco expressly conditioned its promises on a reservation of its rights under New York's Recognition of Foreign Country Money Judgments Act. See N.Y. C.P.L.R. 5304. Chevron has thus reserved its right to challenge any judgment issued in Lago Agrio on the grounds that the Ecuadorian judicial system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law," that the judgment itself "was obtained by fraud," or that "the proceeding in [Lago Agrio] was contrary to an agreement between the parties." Id. Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses. Nor did Texaco promise to wait until after a judgment was issued to challenge the fairness of the Lago Agrio litigation. Having reserved the rights conferred by N.Y. C.P.L.R. 5304, Chevron remains free to enforce them whenever and wherever it chooses, limited only by the scope of the statute and the availability of a forum prepared to address its claims.

Republic of Ecuador, 638 F.3d at 396-97 (footnote omitted) (emphases ours); see also id. at 397-98 ("Chevron can raise . . . due process claims in [the] arbitration without contravening Texaco's prior positions in the district court.").

Although in Republic of Ecuador we also referred to "New York's Recognition of Foreign Country Money Judgments Act . . . [a]s the sole reserved route for Chevron to challenge any final judgment resulting from the Lago Agrio litigation, provid[ing] only limited ways to attack a judgment based on a prior agreement," id. at 399, we went on to say that it was unnecessary in that case to resolve "entirely hypothetical conflicts," and that especially "[g]iven the extent and fluidity

89

of this dispute, we do not suggest that the possibilities discussed above are the only moves that the parties can or will make, nor do we express any views on how a court should respond to these potential arguments," id. at 399 & n.11.

As noted in Republic of Ecuador, the Texaco representation "reserved [Chevron's] right to challenge any judgment issued in Lago Agrio on the grounds . . . that the judgment itself was obtained by fraud." Id. at 397 (internal quotation marks omitted). And we noted that Texaco's promise itself did not "restrict the kind of forum or type of proceeding in which Chevron can raise those defenses," id. Thus, there is no inconsistency between the conditional representation by Texaco and the claims of Chevron in the present action that it has been injured by the entry of a judgment procured by means of the fraudulent and corrupt conduct of the LAPs.

Accordingly, we have no need here to reach any question as to the institutional adequacy of the Ecuadorian judicial system. There is no error in the district court's finding that neither the condition placed on Texaco's forum non conveniens agreement nor this Court's comments in any of our prior opinions obligated Chevron not to challenge a judgment which "the LAPs wrote," Donziger, 974 F.Supp.2d at 502, and which the sitting Ecuadorian judge "signed . . . as part of the quid pro quo for the promise of $500,000," id. at 534-35.

C.    Naranjo

Donziger and the LAP Representatives also contend that the district court's judgment against them was foreclosed by this Court's ruling in Naranjo, 667 F.3d 232. (See, e.g., Donziger brief on appeal at 68 ("[t]his Court has already held that '[t]here is no legal basis for the injunction that

90

Chevron seeks.' <u>Naranjo</u>, 667 F.3d at 242" (emphasis ours)); LAP Representatives brief on appeal at 84 ("the passage of the New York Recognition Act, as construed in <u>Naranjo</u>[,] . . . barr[ed] the issuance of prospective injunctive relief against the enforcement of a foreign money judgment").) These arguments misread <u>Naranjo</u>, which dealt with only one of Chevron's claims: the request for a global injunction under New York's Recognition Act. We expressly disclaimed consideration of Chevron's other claims.

The Recognition Act (<u>see also</u> Part II.E. below) governs the "[r]ecognition and enforcement" of foreign money judgments. <u>See</u> N.Y. C.P.L.R. § 5303. Subject to several exceptions, it provides that a foreign country judgment "is conclusive between the parties to the extent that it grants or denies recovery of a sum of money," <u>id</u>., and declares such judgments to be enforceable by several means, <u>see</u> <u>id</u>.

Chevron's Amended Complaint asserted, <u>inter alia</u>, RICO claims against Donziger, his Firm, Fajardo, and Yanza, and asserted common-law claims against all defendants, including claims of fraud and unjust enrichment. In Count 9 of the Amended Complaint, Chevron sought, under the Recognition Act, a declaratory judgment that the Lago Agrio Judgment was invalid and an injunction against any attempt by the ADF (which is controlled by Donziger and Yanza) or the LAPs to enforce that judgment anywhere in the world, "argu[ing] that the Ecuadorian judiciary [wa]s so captured by political interests as to be incapable of producing a judgment that the New York courts can enforce." <u>Naranjo</u>, 667 F.3d at 238. The district court granted Chevron's motion for a preliminary injunction on that basis, and it severed the Count 9 claim from Chevron's other claims in order to expedite trial as to the validity of the Ecuadorian judgment.

In Naranjo--the appeal from the preliminary injunction--we vacated the injunction on the ground that the Recognition Act, while allowing certain defenses against an attempt to enforce a foreign judgment, did not authorize a judgment debtor to attack a foreign judgment affirmatively:

> Whatever the merits of Chevron's complaints about the Ecuadorian courts, . . . the procedural device it has chosen to present those claims is simply unavailable: The Recognition Act nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment-debtor. The structure of the Act is clear. The sections on which Chevron relies provide exceptions from the circumstances in which a holder of a foreign judgment can obtain enforcement of that judgment in New York; they do not create an affirmative cause of action to declare foreign judgments void and enjoin their enforcement.

Id. at 240 (emphases added).

> Nothing in the language, history, or purposes of the Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them, or to preempt the courts of other countries from making their own decisions about the enforceability of such judgments.

Id. at 243 (emphasis added); see also id. at 242 ("There is thus no legal basis for the injunction that Chevron seeks, and, on these facts, there will be no such basis until judgment-creditors affirmatively seek to enforce their judgment in a court governed by New York or similar law." (emphasis added)).

Our Naranjo opinion also expressed concerns that if the Recognition Act were interpreted to authorize an injunction against enforcement of a foreign judgment anywhere in the world, it would implicate principles of international comity. See id. at 242-44. We concluded, however, that "New York undertook to act as a responsible participant in an international system of justice--not to set up its courts as a transnational arbiter to dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." Id. at 242. Thus, we stated that

> [w]e need not address here whether and how international comity

concerns would affect a hypothetical effort by a state to vest its courts with the authority to issue so radical an injunction. There is no such statutory authorization, for New York has authorized no such relief. To resolve the dispute before us, we need only address whether the statutory scheme announced by New York's Recognition Act allows the district court to declare the Ecuadorian judgment non-recognizable, or to enjoin plaintiffs from seeking to enforce that judgment. Because we find that it does not, the injunction collapses before we reach issues of international comity.

Id. at 244 (emphases added).

In light of our interpretation of the Recognition Act and of the fact that there had been no attempt to enforce the Lago Agrio Judgment in New York, there was "nothing further to be addressed on remand with respect to the severed claim." Naranjo, 667 F.3d at 239 n.11. We thus remanded Count 9 to the district court with instructions to dismiss Chevron's claim for declaratory and injunctive relief under the Recognition Act. See id. at 247.

Our conclusion that the declaratory judgment claim must be dismissed made it unnecessary for us to reach any of the "roughly a dozen [other] arguments" made by Donziger and the LAPs with respect to that claim. Id. at 239. Chevron's other claims were not before us, and we did not address them, stating, "[w]e decide only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon," id. at 238 n.8, and noting that there would "continu[e to be] separate proceedings between these parties on other causes of action before the same district court judge," id. at 239 n.11.

In sum, the Naranjo decision held simply that "the Recognition Act does not authorize a court to declare a foreign judgment null and void for all purposes in all countries, or to issue injunctions preventing parties to foreign litigation from acting abroad to present issues to foreign courts." Id. at 245 (emphases added). Other arguments were "either rendered moot by [that] disposition . . . or . . . pertain[ed] to litigation that [wa]s not properly before us." Id. at 246. We

93

"express[ed] no views on the merits of the parties' various charges and counter-charges regarding the Ecuadorian legal system and their adversaries' conduct of this litigation, which may be addressed as relevant in other litigation before the district court or elsewhere." Id. at 247 n.17.

Accordingly, Naranjo did not foreclose consideration of the validity of Chevron's remaining claims under RICO and New York common law or of the appropriateness of relief other than a declaratory judgment under the Recognition Act or a global injunction against enforcement of the Lago Agrio Judgment.

D.    The RICO-Based Rulings Against Donziger

Chevron asserted RICO claims against Donziger and others (not including the LAPs), alleging that, in orchestrating the frauds, extortions, and briberies leading to the entry of the $17.292 billion Lago Agrio Judgment, Donziger conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and conspired to do so, in violation of § 1962(d). Section 1964 of RICO (quoted more fully in subpart 2 of this Part II.D.) provides in part that the federal courts have "jurisdiction to prevent and restrain violations of section 1962 of this chapter by . . . imposing reasonable restrictions on the future activities . . . of any person," 18 U.S.C. § 1964(a) (emphases added), and that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee," id. § 1964(c). Although Chevron withdrew its request for damages, it sought equitable relief under RICO for its injuries resulting from Donziger's violations of §§ 1962(c) and (d). The district court, noting that either damages or equitable relief under RICO "are available only to those persons injured by reason of the defendant's predicate acts" and that the predicate acts must be "both the factual and the proximate

94

cause of the injury," Donziger, 974 F.Supp.2d at 601 (internal quotation marks omitted), found that Chevron had established all of the elements of its RICO claims.

The court found that there was a RICO "enterprise" consisting of "the LAP team and its affiliates," which included

> Donziger, . . . the U.S. and Ecuadorian lawyers, including Kohn[ and] Patton Boggs . . . , Yanza, the ADF, and Selva Viva, . . . the investors who gave money to finance the operation, usually in exchange for shares of any recovery, . . . the LAPs' public relations, media, and lobbying arms, [and] . . . the LAPs' technical people, including Stratus, Beltman, Maest, Russell, Calmbacher, . . . [and] Quarles.

Donziger, 974 F.Supp.2d at 576. Although not finding that each member of the enterprise committed acts of racketeering activity, the court found that these persons or entities were "associated in fact for the common purpose of pursuing the recovery of money from Chevron via the Lago Agrio litigation, whether by settlement or by enforceable judgment, coupled with the exertion of pressure on Chevron to pay." Id.

The district court found that Donziger had committed--and conspired with at least Fajardo and Yanza to commit--numerous indictable acts that fell within the RICO definition of racketeering activity in 18 U.S.C. § 1961(1), see, e.g., Donziger, 974 F.Supp.2d at 576-99, 601, including **extortion** in violation of 18 U.S.C. § 1951 (affecting interstate or foreign commerce "in any way or degree," by "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right" or "attempt[ing]" to do so); **wire fraud** in violation of 18 U.S.C. § 1343 (communicating or foreseeably causing communication "by means of wire . . . in interstate or foreign commerce," of "writings," etc., in furtherance of a "scheme or artifice to defraud, or [to] obtain[] money or property" by way of "false or fraudulent pretenses, representations, or promises"); **money laundering** in violation of 18 U.S.C.

§ 1956 (transmitting or transferring funds "from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity," defined to include "activity constituting an offense listed in section 1961(1) of [18 U.S.C.]"); **obstruction of justice** in violation of 18 U.S.C. § 1503 ("corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice" in "any court of the United States"); and **violations of the Travel Act**, 18 U.S.C. § 1952 (using "any facility in interstate or foreign commerce" in furtherance of, or with the intent to promote unlawful activity such as "bribery . . . in violation of the laws . . . of the United States," including the Foreign Corrupt Practices Act ("FCPA"), which makes it unlawful for a United States citizen or national to, inter alia, "offer, pay[], [or] promise to pay . . . any money, or . . . anything of value to . . . any foreign official for purposes of . . . influencing any act or decision of such foreign official," 15 U.S.C. § 78dd-2(a)). The district court found that

> [a]mong the predicate acts that Chevron has proved are (1) multiple extortionate acts including, among others, (a) the ghostwriting of the Judgment and the promise of $500,000 to Zambrano for signing it, and (b) the ghostwriting of the Cabrera Report upon which the author(s) of the Judgment relied for the pit count that underlies more than $5 billion of the damages award, as well as the false portrayal of Cabrera as a neutral, impartial and independent expert, and the payments and other inducements to Cabrera to ensure that he "played ball," (2) multiple acts of wire fraud in furtherance of fraudulent schemes with respect to all of the foregoing, (3) money laundering to promote racketeering acts, including with respect to the ghostwriting of the Cabrera Report by Stratus and payments to Cabrera, and (4) violations of the Travel Act to facilitate violations of the anti-bribery provision of the FCPA by payments to Cabrera.

Donziger, 974 F.Supp.2d at 601 (emphases added). In addition, referring to the findings described in Part I.B.11. above, the court found that

> Donziger and the LAPs' U.S. counsel submitted the deliberately misleading Fajardo Declaration first to the court in Denver and then to many other courts throughout the country, including this one. The LAPs' American lawyers-- including Donziger--were involved in drafting the declaration. They debated extensively the extent to which it would reveal the truth about the LAPs'

"contacts" with Cabrera. And they decided that Fajardo rather than Donziger should sign it for fear that Donziger, a U.S. resident and thus subject to compulsory process, would be deposed.FN1470 Finally, the declaration, as discussed earlier, was misleading at best.

> FN1470. PX 1316 (May 3, 2010 Email from [Patton Boggs partner] E. Westenberger to others) ("This is why we struggled with who would sign the declaration. If Steve [Donziger] signs, he will most certainly be deposed. Same for any other counsel in the US. We figured that with [Fajardo], they likely would not slow down the process by deposing him.").

> Donziger's conduct with respect to the Fajardo Declaration was obstruction of justice, plain and simple. The declaration was drafted while the Stratus Section 1782 proceeding was pending, as Donziger was acutely aware. Its purpose--in Donziger's words--was to "prevent Stratus' role relative to the Cabrera report from coming out." Donziger was involved in the communications as to what it would and would not say. He knew that it was false or misleading. His conduct was intended to "impede . . . the due administration of justice," and it fell squarely within the federal obstruction of justice statute.

Donziger, 974 F.Supp.2d at 594 & n.1470 (other footnotes omitted) (quoting Donziger deposition testimony and 18 U.S.C. § 1503 (emphases ours)).

The district court noted that "[n]umerous emails were sent in furtherance of these schemes." Donziger, 974 F.Supp.2d at 590 n.1443. It found that many of the wires at issue were interstate; and a number were sent to or from the United States--for example, the emails from Stratus's Beltman to Donziger, Fajardo, and others, with respect to Stratus's ghostwriting of the Cabrera Report, see id. at 590 & n.1443. The dozens of emails referred to in Part I of this opinion are but a small percentage of those in the trial record; with regard to the preparation of the Cabrera Report alone, "Donziger and Stratus personnel exchanged hundreds of emails," id. at 440 & n.439. And moneys funding the LAPs' team's corrupt activities were wired, for example, from Gibraltar to New York to Ecuador. See id. at 591-92. The court found that

97

the fact that certain of Donziger's wrongful efforts to force Chevron to pay took place in Ecuador is of no moment. While Donziger's activities in Ecuador were important, they in many respects were merely tools. Regardless of where the conduct creating the threat took place, the plan was hatched and run from the United States and its object was a multi-billion dollar payment from Chevron, a U.S. based company.

Id. at 588.

[T]he evidence at trial established that Donziger, a New York lawyer and resident, here formulated and conducted a scheme to victimize a U.S. company through a pattern of racketeering. That pattern included substantial conduct in the United States--e.g., the bulk of Donziger's overall supervision of the entire operation; much of Donziger's fund raising activity; the ghostwriting of the Cabrera Report, which occurred mainly in Boulder, Colorado, and was supervised by Donziger from New York; much of the pressure and lobbying campaign designed to injure Chevron's reputation and impact its bottom line and its stock price, a campaign micromanaged by Donziger that employed many U.S. public relations advisors and lobbyists; the making of Crude by a New York-based and recruited film maker; and the improper efforts to ward off discovery through U.S. courts of what really had taken place with Cabrera, Stratus, and the LAPs. Much of the funding came principally from Kohn in Philadelphia and Burford [Capital, a litigation finance firm], which operated at least partly in the United States. Absent the U.S. activity, there would have been no scheme. Even had there been one, it would have been doomed to failure, without that activity.

Donziger, 974 F.Supp.2d at 574.

The district court found that these acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) (requiring at least two acts of racketeering activity occurring within 10 years of each other). Donziger's acts of wire fraud, bribery, obstruction of justice, and money laundering were committed as part of an at-least "five-year effort to extort and defraud Chevron" into paying a huge sum of money; and it was likely that the "demonstrate[d] criminal activity . . . w[ould] continue into the future," especially "in view of the defendants' failure thus far to achieve their goal." Donziger, 974 F.Supp.2d at 599.

There is no challenge to the sufficiency of the evidence to support any of these findings.

98

Donziger makes other challenges to the district court's granting of relief to Chevron under RICO. In addition to arguing that the District Court Judgment should be set aside on international comity grounds (which we reject for the reasons set out in Part II.F. below), he contends that Chevron failed to establish a quantifiable, redressable injury, and that proximate causation was lacking by reason of the intervention of the Ecuadorian appellate decisions between the racketeering-activity-induced initial Lago Agrio Judgment and Chevron's $8.646 billion judgment debt; and he argues that RICO does not authorize the granting of equitable relief to private plaintiffs. We reject each contention.

### 1. RICO Injury and Causation

After Donziger promised Judge Zambrano $500,000 from the proceeds of a judgment in favor of the LAPs, Judge Zambrano entered the Lago Agrio Judgment, which had been written by the LAPs' team, against Chevron for $8.646 billion in damages (plus $8.646 billion in punitive damages, which was thereafter eliminated by the National Court because Ecuadorian law does not authorize the imposition of punitive damages). Thus, Chevron has an $8.646 billion judgment debt. The imposition of a wrongful debt constitutes an injury to one's business or property.

After the Ecuadorian Appeal Division affirmed that Judgment, attachments were placed on Chevron assets, including its intellectual property rights in Ecuador, which the district court found are worth between $15 and $30 million. Attachments were also placed on the funds in Chevron's Ecuadorian bank accounts, and on the approximately $96 million Chevron had been awarded in arbitration against the ROE. The LAPs also brought enforcement actions in Argentina, Brazil, and Canada. Donziger's contention that Chevron has suffered no injury from these

attachments, on the ground that the assets have not yet been transferred, is frivolous. The nature of an attachment is to prevent the asset's owner from using or disposing of his property as he wishes. That incursion into the owner's property rights constitutes injury. There is no serious question that Chevron has suffered injury in its business or property.

The district court also permissibly found that Chevron's legal fees--those already expended to uncover Donziger's wrongful conduct and those being spent and soon-to-be-spent to defend against enforcement proceedings--constituted further injury to Chevron. See Donziger, 974 F.Supp.2d at 553, 638. "[L]egal fees may constitute RICO damages when they are proximately caused by a RICO violation." Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir.), cert denied, 510 U.S. 945 (1993).

Donziger, under his retainer agreement with the LAPs, "is entitled to be paid (a) 6.3 percent of all amounts collected in respect of the Lago Agrio litigation, plus (b) any arrearages in his monthly retainer, plus (c) reimbursement for expenses." Donziger, 974 F.Supp.2d at 602 (footnotes omitted). Thus, if the $8.646 billion Ecuadorian Judgment debt is collected, Donziger is to be paid $544,698,000, plus arrearages and expenses. The district court found that

> [a]ll of the property that Donziger now has and which he hereafter may receive as a result of the Judgment are and will be the products of the Judgment obtained in consequence of his predicate acts of racketeering. To the extent he has been enriched by property taken from Chevron, Chevron has lost that property as a proximate consequence of those predicate acts. Moreover, to the extent the Judgment is enforced in the future, Donziger will be enriched further at Chevron's expense to the extent of 6.3 percent of the property thus obtained.

Id. (emphases added). The procurement of such moneys from a RICO plaintiff through acts of racketeering activity constitutes injury to the plaintiff's property.

100

Although Donziger also contends that any injury to Chevron from the Judgment cannot be redressed, the constructive trust that the District Court Judgment imposes on Donziger for the benefit of Chevron, requiring that he pay to Chevron all sums he has received or will receive that are traceable to the Lago Agrio Judgment, provides partial compensation. The fact that Chevron will not be compensated fully does not provide a basis for Donziger to retain proceeds from the Judgment that resulted from his corrupt conduct.

We find no greater merit in Donziger's contention that his racketeering activity was not the proximate cause of Chevron's injury on the theory that the Ecuadorian appellate decisions broke the causal chain. Although Donziger repeatedly refers to the decision of the Appeal Division as a "substitute judgment of the appellate court" (Donziger brief on appeal at 68; see also id. at 2, 4, 38, 72, 73, 99), "substitute" is a label unsupported by substance. The fact is that the Appeal Division, aside from acknowledging an error with respect to mercury levels (and finding it harmless), did not alter the Lago Agrio Judgment in any way.

Nor is there any finding in the Appeal Division's Opinion to show that the Division's own examination of the record led it--independently--to find Chevron liable for the sums awarded in the Lago Agrio Judgment. The Division noted that there were more than 220,000 pages of documents in the Lago Agrio Litigation record (see Appeal Division Opinion at 2); in reviewing Judge Zambrano's decision, the Division wrote a 16-page opinion--much of which was devoted to rejecting the arguments of Chevron that it was not subject to suit in Ecuador. Only some five pages of the opinion were devoted to the merits of the action, and only one of them refers to any specific part of the record (see id. at 11 (collecting 16 pages of the 220,000-page record)). Aside from acknowledging, on that page, some of the errors in the Judgment, which it found harmless, the Division stated no findings of its own.

101

Instead, most of that five-page section of the Appeal Division's opinion, much of which is quoted in Part II.A.2. above, extensively described the manner in which Judge Zambrano adjudicated the case (see Appeal Division Opinion at 10-13), and approved his approach and his decision as an exercise of "sound discretion" and an application of "coherent and . . . good legal-logical judgment" in reaching "reasonable conclusions" (id. at 12-13). Thus, "[t]he Division consider[ed]" that Judge Zambrano's "analysis . . . . [wa]s the appropriate one" (id. at 12); the Division "d[id] not find reasons to modify what was ordered in the lower court's judgment" (id. at 12-13); the Division found it "appropriate to confirm the monetary amounts established as proportions of compensation and indemnization" (id. at 13); and except for acknowledging (and finding harmless) Judge Zambrano's error with respect to mercury levels, the Division "ratified" Judge Zambrano's decision "in all its parts" (id. at 16).

The district court concluded that the decision of the Appeal Division was "not truly the 'independent action[] of [a] third . . . part[y],'" Donziger, 974 F.Supp.2d at 601 (quoting Hemi Group, LLC v. City of New York, 559 U.S. 1, 15 (2010)), and that it therefore did not break the chain of causation between the racketeering activity of the LAPs' team and Chevron's existing $8.646 billion judgment debt. We see no error in that conclusion, given the contents and focus of the Appeal Division's own opinion.

2.    The Availability of Equitable Relief Under RICO

Donziger contends that the District Court Judgment against him should be overturned on the ground that RICO does not authorize the granting of equitable relief to a private plaintiff. We disagree.

Neither the Supreme Court nor this Court has decided the question of whether RICO authorizes a court to award equitable relief to a private plaintiff. See, e.g., RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2111 n.13 (2016); Scheidler v. National Organization for Women, Inc., 537 U.S. 393, 411 (2003) ("NOW II"); Trane Co. v. O'Connor Securities, 718 F.2d 26, 28-29 (2d Cir. 1983) (expressing doubt as to the availability of such relief to RICO private plaintiffs). Of the two federal Courts of Appeals that have decided the issue, the Seventh Circuit has found such relief authorized, see National Organization for Women, Inc. v. Scheidler, 267 F.3d 687, 695 (7th Cir. 2001) ("NOW I"), reversed on other grounds, 537 U.S. 393 (2003), and the Ninth Circuit has found it unauthorized, see Religious Technology Center v. Wollersheim, 796 F.2d 1076, 1088-89 (9th Cir. 1986), cert. denied, 479 U.S. 1103 (1987). Other Circuits that have addressed the issue obiter have expressed divergent views. See, e.g., NOW I, 267 F.3d at 695 (collecting cases). We conclude that a federal court is authorized to grant equitable relief to a private plaintiff who has proven injury to its business or property by reason of a defendant's violation of § 1962, largely for the reasons stated by the Seventh Circuit opinion in NOW I.

The three relevant subsections of RICO § 1964 provide as follows:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; [or] imposing reasonable restrictions on the future activities . . . of any person, . . . making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions . . . as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate

United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964 (emphases added).

We read subsection (a) of § 1964 as expansively authorizing federal courts to exercise their traditional equity powers:

"When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As . . . long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature.' Clark v. Smith, 38 U.S. (13 Pet.) 195, 203, 10 L.Ed. 123."

United States v. Sasso, 215 F.3d 283, 289 (2d Cir. 2000) (quoting Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291-92 (1960)). Accordingly, "unless a statute expressly, 'or by a necessary and inescapable inference, restricts the court's jurisdiction in equity,' we will infer that 'all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.'" United States v. Sasso, 215 F.3d at 289 (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946)); cf. De Beers Consolidated Mines, Ltd. v. United States, 325 U.S. 212, 218-19 (1945) (reasoning that Sherman Act's grant of jurisdiction "to prevent and restrain violations of th[at] act" carried with it "power . . . traditionally exercised by courts of equity" (internal quotation marks omitted)).

As we read § 1964, subsection (a) gives the federal courts jurisdiction to hear RICO claims and sets out general remedies, including injunctive relief; subsection (b) makes it clear that the court, on the application of the Attorney General, has authority to grant temporary injunctive relief even before there is a final adjudication; and subsection (c) provides a private right of action for any person injured in his business or property by reason of a violation of § 1962. We agree with the

Seventh Circuit's view that subsection (a) is not simply a jurisdictional section but rather is a section that "grant[s] district courts authority to hear RICO claims and then . . . spell[s] out a non-exclusive list of the remedies district courts are empowered to provide in such cases." NOW I, 267 F.3d at 697. Subsection (a) itself neither states that any category of persons may not obtain relief that is within the powers granted to the federal courts nor specifies the persons in whose favor the courts are authorized to exercise the powers there granted. In our view, this means that Congress did not intend to limit the court's subsection (a) authority by reference to the identity or nature of the plaintiff.

The limitations as to who may obtain certain other types of relief are, as we interpret § 1964, spelled out in subsections (b) and (c). Thus, because subsection (b) states that "[t]he Attorney General" may seek restraining orders "[p]ending [a] final" adjudication, we view such interim relief as available only to the United States, not to a private person.

In contrast, we interpret § 1964(c) as not authorizing awards of treble damages or attorneys' fees to the United States. Subsection (c) allows awards of that type of relief to a "person," a term defined as "any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3). And while the United States is capable of owning property, the term "person" in RICO is used in § 1964 to apply both to potential plaintiffs (subsection (c)) and to potential defendants (subsection (a)). As there is no indication that that word was meant to have differing meanings in the same section, and as there is no indication that Congress intended RICO to waive the United States's sovereign immunity--as would be required for the United States to be a defendant--we have concluded that the United States does not come within the RICO definition of "person." See United States v. Bonanno Organized Crime Family of La Cosa Nostra, 879 F.2d 20, 21-27 (2d Cir. 1989) (affirming dismissal of the government's action brought under § 1964(c)). Thus,

105

subsection (c) excludes the federal government from those to whom a court may award treble damages and attorneys' fees.

While subsections (b) and (c) limit the categories of plaintiffs to which the relief they respectively specify may be granted, we do not interpret those subsections as limiting the authorized relief to the types they mention, i.e., as excluding relief that the federal courts are authorized to grant under subsection (a). To read the subsections after subsection (a) as limiting the nature of the relief that may be granted to the persons identified in those subsequent subsections would mean that although the Attorney General can be granted an injunction "[p]ending" the final adjudication of the case, she could not get any other relief such as a permanent injunction. The most sensible reading of subsection (b), in our view, is that the interim relief identified in that subsection is available only to the United States, which is relief in addition to that which it may be granted under subsection (a). By parity of reasoning, we read subsection (c) as meaning that only a "person" may sue for money damages, but that that right is in addition to the relief that the court has power to grant under subsection (a). As the Seventh Circuit stated, the sentence in subsection (b) that

> "[t]he Attorney General may institute proceedings under this section" is . . . the equivalent of the first clause in § 1964(c), which says "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court[ ]. . . ." Neither one addresses what remedy the plaintiff may seek.[] Given that the government's authority to seek injunctions comes from the combination of the grant of a right of action to the Attorney General in § 1964(b) and the grant of district court authority to enter injunctions in § 1964(a), we see no reason not to conclude, by parity of reasoning, that private parties can also seek injunctions under the combination of grants in §§ 1964(a) and (c).

NOW I, 267 F.3d at 697 (quoting 18 U.S.C. §§ 1964(b) and (c)).

As the NOW I decision noted, the interpretation of § 1964 as authorizing the grant of equitable relief to private plaintiffs is consistent with Congress's intent "to 'encourag[e] civil litigation

106

to supplement Government efforts to deter and penalize the . . . prohibited practices. The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity.'" NOW I, 267 F.3d at 698 (quoting Rotella v. Wood, 528 U.S. 549, 557 (2000)); cf. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 492 n.10 (1985) ("Indeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident.").

In sum, under the reading of the statute that we find most logical, subsection (a) of § 1964

> grants the district courts jurisdiction to hear RICO claims and also sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek. Section 1964(b) makes it clear that the statute is to be publicly enforced by the Attorney General and it specifies additional remedies, all in the nature of interim relief, that the government may seek. Section 1964(c) similarly adds to the scope of § 1964(a), but this time for private plaintiffs.

NOW I, 267 F.3d at 696 (emphases added).

Given this interpretation, we reject Donziger's contention that equitable relief is not available to Chevron under RICO.

Nor can we agree that such relief is unavailable because the amount that the Ecuadorian Judgment will actually cost Chevron is unsure. Statements that a RICO private plaintiff cannot recover without showing an injury that is "quantifiable," see McLaughlin v. American Tobacco Co., 522 F.3d 215, 227 (2d Cir. 2008), are relevant in cases in which the plaintiff seeks treble damages, for in order for the court to "treble" an amount, the factfinder must first know the amount; but such statements generally focus on whether the cause of action has accrued. See, e.g., Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988) (finding § 1964(c) damages claim unripe

because "it is impossible to determine the amount of damages that would be necessary to make plaintiff whole" "until it suffers the injury" (emphasis added)), cert denied, 490 U.S. 1007 (1989). Similarly, the occurrence of the injury is the focus of statements that the private plaintiff in a RICO action must show injury that is "clear and definite." E.g., First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994), cert denied, 513 U.S. 1079 (1995). But Chevron's injury is in part its liability on an $8.646 billion judgment obtained through a pattern of racketeering activity; that injury, affecting its net worth, is clear and definite. The inability to predict whether that entire amount will be collected from Chevron does not affect the amount of the liability imposed. And the difficulty in calculating the amount of money damages that would be needed to redress the entire loss is a common basis for the granting of equitable relief. See, e.g., Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004).

In sum, we reject Donziger's contention that RICO does not authorize the granting of equitable relief to a private plaintiff that has proven injury to its business or property by reason of a defendant's violation of § 1962.

E.       The Availability of Equitable Relief Under New York Common Law

Chevron did not assert RICO claims against the LAPs, and the district court based its grant of equitable relief against the LAP Representatives--for procurement of the Judgment by means of fraud--on principles of common law. The court also based the relief it granted against Donziger on that common-law theory as well as on RICO. Donziger and the LAP Representatives contend that the district court lacked authority to grant such relief under common law, arguing that New York's adoption of the Recognition Act supplanted the common-law cause of action for relief from a

108

judgment procured by fraud, and that even if the common-law cause of action survives, Chevron should not have been granted equitable relief because adequate relief at law was available. We are unpersuaded.

While there is a strong interest in the finality of judgments, such that assertions of fraud that are intrinsic to the claim that led to entry of a judgment may be entertained only by direct appeal or by motion to vacate made to the court that rendered the judgment, see, e.g., N.Y. C.P.L.R. § 5015, D. Siegel, Practice Commentaries; Crouse v. McVickar, 207 N.Y. 213, 100 N.E. 697 (1912); Vinokur v. Penny Lane Owners Corp., 269 A.D.2d 226, 703 N.Y.S.2d 35 (1st Dep't 2000), New York common law has long recognized that equitable relief may be granted to a person victimized by the procurement of a judgment through fraud that is extrinsic to the gravamen of the cause of action, see, e.g., Ward v. Town of Southfield, 102 N.Y. 287, 292-93, 6 N.E. 660, 661 (1886) ("Ward"); Gray v. Richmond Bicycle Co., 167 N.Y. 348, 355, 60 N.E. 663, 665 (1901) ("Gray").

> Courts of equity have general jurisdiction to grant relief against fraud, and to set aside all deeds, contracts and other instruments obtained by fraudulent practices; and the jurisdiction of the court to grant such relief extends not only to voluntary contracts inter partes, but also to judgments and decrees of courts.

Ward, 102 N.Y. at 292, 6 N.E. at 661 (emphases added); see, e.g., McDonald v. McDonald, 228 A.D. 341, 343, 239 N.Y.S. 533, 535 (1st Dep't 1930) ("A court will annul or restrain the enforcement of a judgment obtained by fraud either between the parties, or upon the court.").

Such equitable in personam relief may be granted by a court that has jurisdiction of the parties, even though the fraudulent judgment was entered in a different jurisdiction:

> Although the courts of one country have no authority to stay proceedings in the courts of another, they have undoubted authority to control all persons and things within their own territorial limits. When . . . both parties to a suit in a foreign country are residents within the territorial limits of another country, the courts of equity in the latter country may act in personam upon those parties and direct them by injunction to proceed no further in such suit.

Davis v. Cornue, 151 N.Y. 172, 179-80, 45 N.E. 449, 451 (1896) ("Davis") (internal quotation marks omitted (emphases ours)); see, e.g., id. at 179, 45 N.E. at 451 ("a court of one state may, where it has jurisdiction of the parties, determine the question whether a judgment between them, rendered in another state, was obtained by fraud, and, if so, may enjoin the enforcement of it"); Gray, 167 N.Y. at 355, 60 N.E. at 665 ("even a foreign judgment may be successfully assailed for fraud in its procurement" (internal quotation marks omitted)); McDonald, 228 A.D. at 344, 239 N.Y.S. at 536 ("The rule is that a judgment rendered in our own, or a sister State, or in a foreign country, may be attacked collaterally for want of jurisdiction, or for fraud on the court, or between the parties to the action."); Trebilcox v. McAlpine, 17 N.Y.S. 221, 223 (3d Dep't 1891) ("Trebilcox") ("when the plaintiff in a judgment fraudulently obtained in one state comes into another to enforce the same, the courts of the latter state may redress the fraud according to the system of practice prevailing there," e.g., "by an injunction action").

> In such a case these courts act upon an acknowledged principle of public law in regard to jurisdiction. They do not pretend to direct or control the foreign court, but without regard to the situation of the subject-matter of the dispute, they consider the equities between the parties and decree in personam according to those equities and enforce obedience to their decrees by process in personam. . . . This is the acknowledged rule in England and in this country . . . .

Davis, 151 N.Y. at 180, 45 N.E. at 451 (internal quotation marks omitted (emphasis ours)).

We do not see that enactment of the Recognition Act overruled this line of cases. "New York ha[d] traditionally been a generous forum in which to enforce judgments for money damages rendered by foreign courts," and its adoption of the Recognition Act "was designed," in part, "to codify and clarify existing case law on the subject." CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V., 100 N.Y.2d 215, 221, 762 N.Y.S.2d 5, 9 (2003). In requesting enactment of the bill that would become the Recognition Act by incorporating the "Uniform Foreign Money-Judgments Recognition

110

Act," New York's Judicial Conference stated that the goal was to gain better reciprocity for New York's judgments:

> The basic purpose of this proposal is to procure for New York judgments in foreign countries much better reciprocal treatment at the hands of foreign courts than they now receive. The lack of recognition often accorded to New York judgments in foreign countries stems in large part from the fact that many foreign countries of civil law background do not accept decisional law as proof that New York treats foreign judgments liberally, but they rather require statutory proof of this fact. It is the opinion of experts in the field of international litigation that this codifying legislation would answer the requirements of the courts in many foreign countries and would therefore result in obtaining better treatment for New York citizens engaged in litigation abroad. . . .
>
> The Uniform Act codifies, rather than reforms, existing United States decisional law respecting the recognition of foreign country judgments at a level below that presently accorded to them by New York courts.

New York Judicial Conference Memorandum in Support, Bill Jacket, L 1970, ch. 981, at 2 (emphases in original).

Nothing in the legislative history of the Recognition Act stated that its enactment was intended to abrogate the above line of common-law cases recognizing the authority of courts of equity to grant in personam relief from a judgment procured by fraud. And indeed, since the enactment of the Recognition Act in 1970, that authority has continued to be exercised. See, e.g., Tamimi v. Tamimi, 38 A.D.2d 197, 328 N.Y.S.2d 477 (2d Dep't 1972) (reversing the posttrial dismissal of an action collaterally attacking a Thai divorce judgment allegedly procured by fraud). The Tamimi court noted that

> [i]t is a rule well settled, that every judgment may be impeached for fraud, and this applies as well to judgments of our own State, as to those of other States or foreign judgments . . . .
>
>                          . . . .

In Marine Ins. Co. of Alexandria v. Hodgson (7 Cranch [11 U.S.] 332, 336) Chief Justice MARSHALL said: "that any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a Court of law; or of which he might have availed himself at law, but was prevented by fraud or accident unmixed with any fault or negligence in himself or his agents, will justify an application to a Court of Chancery."

Id. at 200, 328 N.Y.S.2d at 480 (other internal quotation marks omitted (emphasis ours)). In the course of its opinion, the Tamimi court also cited such cases as Davis, Trebilcox, and Gray. We cannot conclude that New York common law ceased, in 1970, to allow New York courts to grant equitable in personam relief to a person victimized by a judgment procured by fraud.

Nor are we persuaded that the district court erred in concluding that equitable relief was appropriate because there was no adequate remedy at law. Although Donziger argued in the district court that any injury from satisfaction of a monetary judgment could be remedied by an award of money damages, the district court noted that

[t]he LAP Representatives are indigenous people living in the Ecuadorian rainforest. Both they and Donziger repeatedly have cited their lack of resources as reasons to delay this action. Donziger's claim, in particular, is strikingly at odds with innumerable representations to this Court concerning his claimed lack of resources. In such circumstances, the theoretical availability of an action [by Chevron] for damages is and always was entirely immaterial. As Justice Scalia has written, while economic injury usually "is not considered irreparable, . . . that is because money can usually be recovered from the person to whom it is paid. If the expenditures cannot be recouped, the resulting loss may be irreparable." That is this case.

Donziger, 974 F.Supp.2d at 638 (footnotes omitted) (quoting Philip Morris USA Inc. v. Scott, 131 S. Ct. 1, 4 (2010) (other internal quotation marks omitted (emphases ours))).

The district court noted that "the Judgment has been enforceable in Ecuador, and elsewhere, at least since the intermediate appellate court ruled," and "[a]ssets already have been seized in Ecuador." Donziger, 974 F.Supp.2d at 637. The court noted that even if Chevron could pursue its

112

claims of LAPs' team corruption in Ecuador's Constitutional Court (a route never suggested by the opinions of the Ecuadorian Appeal Division or National Court, which referred only to the actions in the United States (see Part II.F. below)), "[g]iven the size of the Judgment and the comparative impecuniousness of the defendants, there is no assurance that Chevron could recoup property applied to the Judgment between now and any decision by the Constitutional Court even if it prevailed." Donziger, 974 F.Supp.2d at 637. The district court also noted that Donziger and the LAPs had, in addition, "taken extensive steps to ensure that any funds recovered are held offshore and beyond the reach either of U.S. or Ecuadorian courts." Id.

Nor does Chevron's right to defend against enforcement actions provide a basis for finding that it has an adequate remedy at law, given that the Donziger and Invictus strategy is to inundate Chevron with such actions, forcing it to incur sizeable legal fees. Even if Chevron prevailed in every such action, its legal expenses would likely not be recoverable from the impecunious LAPs or Donziger. See id. at 638.

We conclude that the district court had authority under New York common law to grant equitable relief against Donziger and the LAP Representatives over whom the court had personal jurisdiction (see Part II.G. below).

F.      Considerations of International Comity

Donziger, the LAP Representatives, and several of the amici curiae contend that the District Court Judgment should be overturned on the ground that it violates principles of international comity. Indeed, Donziger argues that this is required by our opinion in Naranjo. For several reasons, we are not persuaded.

113

First, the injunction at issue in Naranjo ("Naranjo injunction") purported to enjoin Donziger and all of the LAPs, directly or indirectly, from taking any actions to enforce the Lago Agrio Judgment. In contrast, the injunction in the District Court Judgment is directed at only three persons-- Donziger (including his Firm) and the two LAP Representatives over whom the district court has personal jurisdiction.

Second, the geographic scope of the Naranjo injunction and scope of the injunction granted in the District Court Judgment are different. The Naranjo injunction was essentially global, prohibiting actions toward enforcement of the Judgment anywhere outside of Ecuador, see, e.g., Naranjo, 667 F.3d at 238 n.10. The geographic scope of the present District Court Judgment anti-enforcement injunction against the LAP Representatives is limited to the United States: Donziger and the LAP Representatives are enjoined from taking actions toward enforcement in courts of the United States; but "nothing []in [the District Court Judgment] enjoins, restrains or otherwise prohibits Donziger, the LAP Representatives, or any of them, from . . . filing or prosecuting any action for recognition or enforcement of the Judgment . . . in courts outside the United States . . . ." District Court Judgment ¶ 6 (emphases added).

Thus, the present injunction, unlike the Naranjo injunction, is not global; and no part of it purports to limit in any way the conduct of any of the LAPs--the actual judgment creditors--other than the two LAP Representatives. It does not invalidate the Lago Agrio Judgment; and it does not prohibit any of the judgment creditors--including the LAP Representatives--from taking action to enforce the Judgment outside of the United States.

To the extent that Donziger and/or the LAP Representatives will receive or have received property from enforcement of the Lago Agrio Judgment, the District Court Judgment

114

imposes on them a constructive trust for the benefit of Chevron. It does so in order to "prevent[] the three defendants who appeared at trial--over whom [the district court] has personal jurisdiction--from profiting from their fraud." Donziger, 974 F.Supp.2d at 644. But that is an aspect of this matter on which the Ecuadorian courts have essentially deferred to the courts of the United States:

The appeal from the global preliminary injunction was heard in Naranjo in September 2011, and the panel promptly issued an order that vacated the injunction in its entirety and halted all proceedings on Chevron's declaratory judgment claim, stating that an opinion would follow. Thereafter, even before our Naranjo opinion was issued on January 26, 2012, the Appeal Division in Ecuador twice stated that it was beyond the Division's domain to entertain Chevron's fraud allegations. The Appeal Division in its initial Opinion on January 3, 2012, stated that the Chevron claim of "fraud and corruption" by the LAPs and their legal team was

> a matter to which this Division should not refer at all, except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by the very defendant here, Chevron, under what is known as the RICO act, and this Division has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice . . . .

(Appeal Division Opinion at 10 (emphases added).) And in its January 13, 2012 Clarification Order, the Division similarly stated that

> it stays out of these accusations, preserving the parties' rights . . . to continue the course of the actions that have been filed in the United States of America.

(Appeal Division Clarification Order at 4 (emphasis added).)

When the Naranjo opinion was issued, it expressed concerns as to whether the declaratory and global injunctive relief Chevron had requested would cause "friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court," 667 F.3d at 245 (internal quotation marks omitted). And perhaps it would have. But no such friction or

115

encroachment should be seen in the limited, non-global equitable relief granted by the district court in its final judgment adjudicating Chevron's claims of fraud and corruption. When the Ecuadorian National Court issued its decision some 22 months after the Naranjo opinion--and after Chevron's claim for a declaratory judgment invalidating the Lago Agrio Judgment had been dismissed--the National Court endorsed the Ecuadorian Appeal Division's decisions that "preserv[ed]" Chevron's right to seek relief in the United States courts:

> it is clear that, <u>by preserving the rights and actions of the parties, the court acknowledges the lack o[f] jurisdiction to decide whether or not there has been procedural fraud</u>.

(Opinion of Ecuadorian National Court of Justice at 120 (emphasis added).)

In these circumstances, in which the district court has, on the claims of corruption, granted equitable <u>in personam</u> relief that does not invalidate the Ecuadorian judgment, and in which the Ecuadorian courts have expressly disclaimed jurisdiction to address the corruption claims and stated that the matter is preserved for adjudication in the United States courts, international comity is not an obstacle to the present District Court Judgment.

G.    Contentions of the LAP Representatives

The LAP Representatives have advanced arguments paralleling those made by Donziger, contending that the Ecuadorian appellate decisions cleansed the pro-LAPs judgment of any taint from wrongdoing by Donziger (see, e.g., LAP Representatives brief on appeal at 23, 25, 34, 49, 51-52, 65), that international comity demanded that those decisions be so treated (see, e.g., id. at 63-65), and that injunctive relief against them was foreclosed by this Court's decision in Naranjo (see, e.g., id. at 83-85). We reject those arguments for the reasons set out in Parts II.C.-II.F. above. In addition, the LAP Representatives seek reversal of the district court's judgment against them on the

grounds that the court lacked personal jurisdiction over them and that they were not responsible for wrongdoing by Donziger. They also argue that the district court judgment should be vacated because of the absence of parties the LAP Representatives term "indispensable" (LAP Representatives' brief on appeal at 78-83), to wit, (1) the other LAPs (who are named as defendants but who have defaulted), (2) indigenous Ecuadorian non-LAPs such as the Waorani (who were not parties to the Lago Agrio Litigation and whose motion to intervene in the present action the LAP Representatives opposed), and (3) the Republic of Ecuador (against which no relief in the present action was either sought or granted). None of these contentions is persuasive. Only the arguments as to lack of personal jurisdiction and lack of responsibility for the acts of Donziger warrant discussion.

### 1. Personal Jurisdiction

The district court rejected the LAP Representatives' personal jurisdiction defenses on two grounds. First, following noncompliance by the LAP Representatives with discovery orders to produce documents related to their contention that personal jurisdiction was lacking, the court, pursuant to Fed. R. Civ. P. 37(b)(2)(A), sanctioned them by striking the personal jurisdiction defenses. See Chevron Corp. v. Donziger, 296 F.R.D. 168, 220-21 (S.D.N.Y. 2013). Second, catering to the possibility that that sanction could be overturned on appeal, the court stated that it would nonetheless receive evidence at trial on the personal jurisdiction issue and make findings on that issue, see id. at 221; following the trial, the court ruled that it would have jurisdiction over the LAP Representatives under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), see Donziger, 974 F.Supp.2d at 617-28. The LAP Representatives contest both decisions. Finding no abuse of discretion in the district court's imposition of the sanction, we affirm the striking of the personal jurisdiction defenses, without the need to address the court's posttrial ruling.

117

In the district court, Camacho and Piaguaje had moved to dismiss the action against them for lack of personal jurisdiction, arguing that their retention of New York attorneys and their participation in litigations against Chevron in New York were insufficient to provide jurisdiction over them under the New York long-arm statutes. The district court determined that the motion involved arguments and facts that went beyond the allegations in Chevron's complaint and that discovery was needed in order to assess the defenses. The court denied the motion to dismiss, without prejudice to renewal following the completion of discovery. See generally Chevron Corp. v. Donziger, 296 F.R.D. at 199-200.

In June 2012, Chevron served a request on the LAP Representatives for the production of documents in the possession of their Ecuadorian lawyers and other associates, including documents relating to the LAP Representatives' personal jurisdiction defenses. The LAP Representatives objected, "lodg[ing] boilerplate objections" such as privilege and work product, but without providing the descriptions required by Fed. R. Civ. P. 26(b)(5)(A); they also "purported to invoke Ecuadorian law, on an 'and/or' basis, [but] they failed to identify any particular Ecuadorian law or decisions said to preclude disclosure." Chevron Corp. v. Donziger, 296 F.R.D. at 187 nn.77, 79. The LAP Representatives did not object to the demand for "responsive documents in the physical possession of their Ecuadorian attorneys and allies on the ground that they lacked control over or practical ability to procure the documents from them." Id. at 187.

In August 2012, Chevron moved to compel production of the responsive documents. In response, the LAP Representatives made a specific argument, "for the first time," that Ecuadorian law prohibited their attorneys from releasing the documents, id.; they argued, on a group-privilege theory, that where an attorney represents a group of clients, he cannot provide to any individual client his or her own documents (or any documents belonging to the group) without the express permission

118

of every member of the group. The LAP Representatives submitted a declaration from an Ecuadorian lawyer supporting their position; Chevron submitted a declaration from an Ecuadorian lawyer who opined that their argument was erroneous. The LAP Representatives did not produce any responsive documents in the possession, custody, or control of their Ecuadorian agents or attorneys. See id. at 187-88.

Chevron's motion to compel remained pending until February 2013. In late January 2013, the LAP Representatives informed the district court that an Ecuadorian court had granted one of the LAPs who defaulted in the present case, Octavio Ismael Córdova Huanca ("Córdova"), an injunction against the LAPs' attorneys' production of documents. This was the first information the district court received that such an injunction action had been brought. Evidence subsequently submitted to the district court revealed that the Ecuadorian injunction action had been commenced in October 2012 at the request--made to Fajardo--of United States lawyers representing the LAP Representatives. In that action, Córdova was the plaintiff, Fajardo was a defendant, and Fajardo argued in support of Córdova's request for an injunction. See generally Chevron Corp. v. Donziger, 296 F.R.D. at 187-88.

By order dated February 11, 2013, the district court granted Chevron's motion to compel the production of documents held by the LAP Representatives' Ecuadorian attorneys and agents. With respect to all responsive documents as to which there was no claim of work product or privilege, the court ordered production by March 6, 2013. The order also instructed defendants to inform the court by February 20 whether or not they would comply with the order. "The defendants responded that they would not." Id. at 188.

119

Chevron thereafter moved pursuant to Fed. R. Civ. P. 37 for sanctions, including contempt and default judgments, see, e.g., Fed. R. Civ. P. 37(b)(2)(A)(vi) (a "just order[] . . . . may include . . . rendering a default judgment against the disobedient party"). Following briefing and an evidentiary hearing, the district court "decline[d] to impose the harshest of these sanctions, notwithstanding defendants' obdurate and quite possibly contemptuous refusal to comply with their discovery obligations." Chevron Corp. v. Donziger, 296 F.R.D. at 220. It concluded that the less severe sanction of striking the LAP Representatives' personal jurisdiction defenses was appropriate, as it was commensurate with their noncompliance and would restore Chevron to the position it would presumably have enjoyed had the discovery orders been obeyed and the relevant documents been produced. See id. at 220-21. The court's ruling, issued on October 10, 2013, stated that the personal jurisdiction defenses asserted by the LAP Representatives would be stricken unless they produced the required documents by October 24, 2013. They did not do so; their personal jurisdiction defenses were thus stricken.

Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure allows the court in which an action is pending to impose on a party who has failed to obey a discovery order a "just" sanction, which may include

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; [or]

> (iii) striking pleadings in whole or in part . . . .

Fed. R. Civ. P. 37(b)(2)(A)(i)-(iii). "Severe sanctions" may be "justified . . . when the failure to

120

comply with a court order is due to willfulness or bad faith, or is otherwise culpable." Daval Steel Products v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991) (affirming the district court's granting of the plaintiff's claim and precluding a defendant from presenting evidence in opposition to it, in light of that defendant's "willful violation of the court's discovery order and prior obstruction of discovery").

In fashioning an appropriate Rule 37 sanction, the court may permissibly "presume from a party's willful failure to answer a discovery request relating to a particular issue that the facts of that issue are established against the noncompliant party." Southern New England Telephone Co. v. Global NAPs Inc., 624 F.3d 123, 147 (2d Cir. 2010). A defendant who has failed to obey a district court's order to produce information relating to his defense of lack of personal jurisdiction may properly be sanctioned by the striking of his personal jurisdiction defense. See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 705 (1982).

A district court's decision to impose a sanction, and the court's selection among permissible sanctions, are reviewed for abuse of discretion. See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642 (1976). Such an abuse may consist of an error of law, a clearly erroneous finding of fact, or a decision that cannot be located within the range of permissible decisions. See, e.g., SEC v. Razmilovic, 738 F.3d 14, 25 (2d Cir. 2013), cert. denied, 134 S. Ct. 1564 (2014).

The district court made detailed findings as to why the imposition of sanctions on the LAP Representatives in this case was appropriate, see Chevron Corp. v. Donziger, 296 F.R.D. at 207-20, including the following:

121

- "[T]he LAP Representatives' U.S. counsel--while continuously telling this Court that they had asked Fajardo for the LAPs' documents--at the same time secretly suggested to him that he initiate a lawsuit in Ecuador in an effort to foreclose that very possibility." Id. at 215.

- In that secret lawsuit, Fajardo stated to the Ecuadorian court, "'"we have discussed this matter and decided to turn over the information Chevron is demanding,"'" id. at 216 (quoting Córdova decision (quoting Fajardo representation) (first emphasis ours, second emphasis in Donziger)), while contemporaneously in the present case, the LAP Representatives' United States lawyer represented to the district court, "'I have asked [Ecuadorian counsel] in person for the documents, and the [Ecuadorian] lawyer has said, I can't give them to you,'" Chevron Corp. v. Donziger, 296 F.R.D. at 214 (quoting Oct. 18, 2012 hearing transcript (emphasis ours)).

- Although "[t]he LAP Representatives opposed Chevron's motion on the ground that [an] alleged Ecuadorian 'group secrecy' law prevented Fajardo from turning over the LAPs' documents without the express permission of all his clients," Chevron Corp. v. Donziger, 296 F.R.D. at 214, in fact "Fajardo h[eld] a broad power of attorney on behalf of all of the LAPs. . . . He thus was in a position to facilitate all of the U.S. discovery on behalf of all of them, not to mention himself, had he wished to do so. He likewise was in a position to have resisted the Córdova suit, both individually and on behalf of the other LAPs, had he so desired," id. at 215 n.284 (emphases added).

- Although the LAP Representatives claimed they had no control over the documents, the Fajardo Retainer Agreement stated that "The Plaintiffs' files shall be and remain the property of the Plaintiffs"; nonetheless, the LAP Representatives did not "threaten to sue or fire Fajardo for his refusal to provide them with the documents so they could comply with th[e District] Court's order." Id. at 217-18 & n.297 (internal quotation marks omitted).

- The LAP Representatives "did not inform Chevron or the Court about the [Córdova] lawsuit until they were told Fajardo had received his desired result and the injunction had been granted. . . . Even assuming that Ecuadorian law did not require notice to or joinder of Chevron on an indispensable party or other basis, the LAPs' concealment of the action, especially given the ongoing litigation in this Court concerning the production of the Ecuadorian documents, was done in bad faith." Id. at 215-16 (emphases added).

- The LAP Representatives' claim that they had no control over the documents and were enjoined from producing them was finally belied as a practical matter by the fact that shortly before the start of trial, their list of planned trial exhibits included previously unproduced documents from Ecuador that "clearly were responsive to Chevron's document requests," and "likely would fall within the definition of materials the

122

production of which was barred by" the Córdova order. Id. at 218-19 (emphasis added).

In challenging the order striking their personal jurisdiction defenses, Camacho and Piaguaje argue principally (1) that they were improperly "punished . . . for their Ecuadorian lawyers' failure to respond to Chevron's discovery demands" (LAP Representatives' brief on appeal at 73); (2) that they "were not in a position to direct . . . Ecuadorian counsel[] to comply with discovery demands of which they were ignorant, and the significance of which they could not understand" (id. at 76-77); and (3) that the information requested "was already fully discoverable from Mr. Donziger" (id. at 77).

These arguments are meritless. Addressing them in reverse order, we note that the supposed availability of documents from Donziger is squarely contradicted by the fact that Donziger himself also refused to comply with Chevron's discovery demands, see Chevron Corp. v. Donziger, 296 F.R.D. at 188-89. The second argument--ignorance and lack of understanding--is untenable in light of the fact that Camacho and Piaguaje were represented in the present litigation by counsel; any lack of knowledge of the discovery demands served on their United States lawyers and any failure to understand the significance of those demands is the responsibility of the LAP Representatives and the attorneys they chose to represent them. And the argument that the LAP Representatives's failure to respond was a choice by the Ecuadorian lawyers, rather than the responsibility of the LAP Representatives themselves, is belied by the district court's findings that, inter alia, the LAP Representatives' own agents, their United States lawyers, while representing to the district court that they had asked the Ecuadorian attorneys to provide the documents, instead had in fact asked the Ecuadorian attorneys to get an injunction forbidding production. The LAP Representatives "did not attempt meaningfully to comply with Chevron's document requests or the Court's order compelling

123

production," but "[i]nstead . . . sought a court order preventing the production," which "in and of itself is evidence of bad faith. 'Evidence that parties or targets have actively sought a prohibition against disclosure . . . may be regarded as evidence of bad faith and justification for sanctions in accordance with Subsection 2(b) [of § 442].'" Id. at 217 & n.292 (quoting Restatement (Third) of Foreign Relations Law § 442 comment h (1987)); see id. § 442(2)(b) (court may impose sanctions for deliberate concealment).

The LAP Representatives have not argued, or presented any basis for inferring, that any of the district court's factual findings is clearly erroneous. As we see no error of law, nor any other basis for concluding that the striking of the personal jurisdiction defenses was an abuse of discretion, we affirm that sanction substantially for the reasons stated in the district court's decision, see 296 F.R.D. at 207-21.

2.      Responsibility of the LAPs for the Misconduct of Their Attorneys

The LAP Representatives contend that any misdeeds by Donziger did not provide a basis for the district court to grant relief against them, arguing that they were unaware of any misconduct, "had absolutely no control over the[ir] so-called 'agents,'" and are simply "unsophisticated client-principals following the lawyers' lead" (LAP Representatives brief on appeal at 50, 71-73; reply brief on appeal at 9). We disagree.

As an initial matter, there is no authority suggesting that a party ignorant of its attorney's fraudulent actions may enforce a fraudulently procured judgment. To hold otherwise would run afoul of the Supreme Court's warning that fraud "is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated

124

consistently with the good order of society." Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944). Even innocent clients may not benefit from the fraud of their attorney.

As a general matter, a client-principal is "bound by the acts of his lawyer-agent." Link v. Wabash RR. Co., 370 U.S. 626, 634 (1962); see, e.g., Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 396-97 (1993); United States v. Boyle, 469 U.S. 241, 251-52 (1985). This rule rests upon "well-settled principles of agency law," Maples v. Thomas, 132 S. Ct. 912, 922 (2012) (internal quotation marks omitted). It is well established that "[a] principal is subject to liability to a third party harmed by an agent's conduct when the agent's conduct is" either "within the scope of the agent's actual authority or ratified by the principal." Restatement (Third) of Agency § 7.04 (2006) (emphasis added). A principal ratifies his or her agent's act either by "manifesting assent that the act shall affect the person's legal relations" or through "conduct that justifies a reasonable assumption that the person so consents." Id. § 4.01(2).

The district court found the LAP Representatives liable on the basis that they (along with the other LAPs) retained Donziger as their attorney and gave Fajardo power of attorney. See Donziger, 974 F.Supp.2d at 477-78, 566 n.1304. This finding is amply supported by the record, as the LAPs in November 2010 granted Fajardo a new power of attorney that expressly ratified all of his prior acts, direct or indirect, in pursuit of their litigation interests. With the LAPs being defined as the "Principals," the document states, in part, as follows:

> The Principals point out that this is an expansion of the scope of the power of attorney that has been granted to the same professional previously, for which reason the Principals ratify and approve each and every one of the actions undertaken by Attorney Pablo Fajardo Mendoza in [the Lago Agrio Litigation] as well as in any other legal actions in other courts of justice, whether national or foreign; all financial or administrative acts and acts which have been carried out directly or through other persons he legally authorizes for the defense of our interests.

(PX 390 (Fajardo Special Power of Attorney), at 4-5 (emphases added).)

125

Given the collaborative actions of Donziger and Fajardo described in Part I above to secure the Lago Agrio Judgment for the LAP Representatives and the other LAPs, there was no error in the district court's ruling that the LAP Representatives are responsible for injury to Chevron perpetrated by Donziger in his capacity as their attorney.

H.     Appropriateness of the Equitable Relief Granted

Having concluded that the district court had authority to grant equitable relief to Chevron against Donziger and the LAP Representatives, i.e., the defendants over whom it had personal jurisdiction, and that the normal preconditions for such relief were present, we review the relief fashioned only for abuse of discretion. The inability of the court to grant Chevron complete relief is not a basis for a complaint about its granting of partial relief. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944). "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow." Lemon v. Kurtzman, 411 U.S. 192, 200 (1973).

Chevron asked the district court not only for specific relief, but also, "As to All Causes of Action[,] . . . such other legal and equitable relief as the Court may deem Chevron is entitled to receive." (Amended Complaint, Prayer for Relief ¶ 11.) The relief tailored by the district court, while prohibiting Donziger and the LAP Representatives from seeking enforcement of the Ecuadorian judgment in the United States, does not invalidate the Ecuadorian judgment and does not prohibit any of the LAPs from seeking enforcement of that judgment anywhere outside of the United States. What it does is prohibit Donziger and the LAP Representatives from profiting from the corrupt conduct that

126

led to the entry of the Judgment against Chevron, by imposing on them a constructive trust for the benefit of Chevron. "[A]ssets acquired by fraud are subject to a constructive trust for the benefit of the defrauded party." SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88 (2d Cir. 2002). As the district court noted,

> "[a] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee . . . ."

Donziger, 974 F.Supp.2d at 639 (quoting Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919)).

Given all of the above considerations, including the Ecuadorian courts' statements deferring to the United States courts for adjudication of Chevron's allegations of corruption by the LAPs' legal team (see Part II.F. above), and the district court's unchallenged findings of fact as to the fraud, coercion, and bribery engaged in by the LAPs' team (see Parts I.B.-I.G. above), we see no abuse of discretion in the equitable in personam relief granted by the district court.

## CONCLUSION

We have considered all of the arguments of Donziger and the LAP Representatives on this appeal and have found in them no basis for dismissal or reversal. The judgment of the district court is affirmed.